Colleen Duffy-Smith (CA Bar No. 161163)
MORGAN DUFFY-SMITH & TIDALGO LLP
1960 The Alameda, Suite 220
San Jose, CA 95126
(408) 244-4570
cduffysmith@mdstlaw.com

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(San Francisco Division)

| | |
|---|---|
| **Colleen Eastman,** **Christi Cruz,** **Carmen Mendez,** | Case No. _____ |
| | **COMPLAINT** |
| **Plaintiffs Individually** **and as Members of** **a Class** | **CLASS ACTION** |
| | **Sherman Act § 2** 15 U.S.C. § 2 |
| **v.** | **Unfair Competition Law** Cal. Bus. & Prof. Code §§ 1720 *et seq.* |
| **Quest Diagnostics Incorporated,** | **Unfair Practices Act** Cal. Bus. & Prof. Code §§ 17043, 17044 |
| **Defendant** | **Cartwright Act** Cal. Bus. & Prof. Code § 16700 *et seq.* |
| | **JURY TRIAL DEMANDED** |

COMPLAINT

1

**Table of Contents**

2

**NATURE OF THE ACTION**...................................................................................1

3

A.    Major Types of Health Plans .....................................................................2

4

B.    How the Markets for Routine Diagnostic Testing Work .........................3

5

C.    Quest's Scheme to Monopolize the Relevant Market For Plan/Out-Patient Billing ..........4

6

**PARTIES** ..............................................................................................................8

7

**JURISDICTION AND VENUE** ...........................................................................9

8

**CLASS ACTION (Quest Plan/Out-Patient Billing Class)** ..............................10

9

A.    Federal Rule of Civil Procedure 23(a) Prerequisites ............................10

10

B.    Federal Rule of Civil Procedure 23(b)(3) Prerequisites .......................12

11

C.    Federal Rule of Civil Procedure 23(b)(2) Prerequisites .......................12

12

**RELEVANT MARKETS** .....................................................................................12

13

A.    Product Markets ........................................................................................12

14

    1.    Market for Plan/Out-Patient Billing.................................................12

15

    2.    Market for Physician Billing ............................................................14

16

B.    Relevant Geographic Markets: Northern California...............................14

17

C.    The Separate Markets for Plan/Out-Patient Billing and Physician Billing.......................15

18

D.    Quest's Market Power in the Market for Plan/Out-Patient Billing.......................15

19

    1.    Direct Evidence..................................................................................15

20

    2.    Circumstantial Evidence ...................................................................16

21

E.    Quest's Market Power in the Physician Billing Market .......................18

22

**EXCLUSIONARY CONDUCT** ...........................................................................18

23

A.    Exclusionary Physician Kickbacks ..........................................................18

24

B.    Exclusionary Agreements with Large "Aligned" California Health Insurers ..................20

25

    1.    Aetna..................................................................................................21

26

27

28

COMPLAINT

i

(a)   Quest Has Persuaded Aetna to Exclude Competing Laboratories From the Aetna Network ............................................................22

(b)   "Cracking the Whip" Over Physicians to Drive Business to Quest..........23

(c)   Exclusionary Bonus Pools ..........................................................24

(d)   Aetna's Refusal to Pay Quest's Competitors..............................24

2.   Blue Shield of California ..............................................................24

(a)   Quest's Exclusion of Two Substantial Routine Testing Competitors .......25

(b)   California Blue Shield's Refusal to Pay Quest's Competitors .................25

(c)   Contract Stacking..........................................................26

3.   Alignment of the Economic Interests of Quest and Key Insurers ........................26

C.   Acquisition of Competitors........................................................27

**INJURY TO COMPETITION** ........................................................28

**COUNT I (Monopolization - Section Two of the Sherman Act)** ............................................31

**COUNT II (Violation of California Unfair Competition Law)** ............................................31

**COUNT III (Violation of California Unfair Practices Act)** ..........................................33

**COUNT IV (Violation of the California Cartwright Act)**..........................................33

**PRAYER FOR RELIEF**........................................................34

**JURY DEMAND**........................................................35

COMPLAINT

Plaintiffs individually and as proposed class representatives will show the Court as follows.

## NATURE OF ACTION

1.      This is a class action under the Sherman Act and related state laws on behalf of health plans and out-patients to recover monopoly overcharges that they have paid directly to Quest Diagnostics Incorporated for routine diagnostic testing.

2.      Routine diagnostic testing influences a large majority of medical decisions. Quality testing helps to prevent and control disease, which in turn reduces the overall cost of medical care. Because of how important routine diagnostic testing is to the health of patients, it is imperative to preserve vigorous competition among providers on price and quality.

3.      There are two relevant product markets.  One is the market for the sale of routine diagnostic testing that is billed directly to health plans or out-patients ("relevant market for plan/out-patient billing").  The plan or the out-patient typically pays the provider of the testing, such as Quest, on a test-by-test basis. Often the direct payments to Quest for a particular test are paid jointly by the plan as well as by out-patient funding of co-payments, co-insurance, or deductibles.  Quest has charged monopoly prices in this market to Plaintiffs and other members of the Class since at least 2011. The other relevant market is the market for the sale of routine diagnostic testing that the laboratories bill directly to medical providers ("relevant market for physician billing").

4.      The relevant geographic market for each relevant product market is Northern California. Quest has a market share in the relevant market for plan/out-patient billing of at least 70% by revenue. Barriers to entering the market are high, as evidenced by the fact that Quest has

COMPLAINT

1

been able to price above competitive levels with very little challenge from other competitors, despite providing inferior service.

### A.   Major Types of Health Plans

5.      The vast majority of Americans, and the vast majority of California residents, receive either public health insurance through the federal or state government, or private insurance through plans offered by their employers.

6.      Common types of health plans offered by public and private insurers include health maintenance organization plans ("HMOs"), preferred provider organization plans ("PPOs"), point-of-service plans ("POS plans"), and traditional fee-for-service or indemnity plans.

7.      Patients enrolled in HMO plans have less flexibility when choosing medical providers than patients in most of other types of plans. A patient in an HMO plan is covered only for services offered by a designated "network" of medical providers. Patients in HMO plans generally have no coverage if they choose to go "out of network" for services.

8.      A patient in an HMO plan must choose a primary care physician from within the network for all basic healthcare services. If a patient in an HMO plan needs to see a specialist, the patient must receive a referral from his or her primary care physician. Patients in HMO plans generally do not have to file claims in order to receive coverage. Instead, the medical provider submits claims directly to the insurer.

9.      In contrast to patients in HMO plans, patients in PPO plans may choose medical providers from within the PPO network or from outside the network. A patient in a PPO plan does not need to designate a primary care physician and does not need to receive a referral in order to see a specialist. A key feature of PPOs is that the patient must bear more of the financial

COMPLAINT

2

burden if he or she chooses to go "out of network." For example, a patient that receives services from a network provider might be responsible for only 10% of the total cost of services, whereas a patient that goes out of network might be responsible for 40% of the total cost of services. A patient in a PPO plan may not have to a file a claim if he or she receives services from a provider in the PPO network. If the patient receives services from outside the network, he or she often has to pay for services directly and then seek reimbursement from the plan.

10.     Point-of-service, or POS, plans essentially are a hybrid between HMOs and PPOs. As with an HMO plan, a patient in a POS plan must go through a primary care physician in order to receive in-network services. As with a PPO plan, a patient in a POS plan has the option of going out of network for services, but must pay more for doing so.

11.     Traditional fee-for-service plans, also known as indemnity plans, offer the most choice for patients. A patient in such a plan is free to choose whichever doctor he or she wishes, and may switch doctors at any time. The patient often must pay for services directly and then seek reimbursement from the plan.

**B.     How the Markets for Routine Diagnostic Testing Work**

12.     Diagnostic laboratories that provide out-patient testing, such as Quest, depend heavily on the referral of business from medical providers, such as individual physicians, clinics, independent physician groups, and group purchasing organizations.

13.     Diagnostic laboratories such as Quest bill for the routine diagnostic testing ordered by medical providers in one of two ways - either directly to health plans or out-patients ("plan/out-patient billing") or directly to the medical provider ("physician billing").

14.     Physician billing is the norm for out-patients who are covered by HMO plans.

COMPLAINT

15.     Four aspects of the markets for routine diagnostic testing are critical to understanding Quest's overall monopoly scheme. First, the physician billing relevant market is dominated by sales under so-called capitated contracts between Quest and the medical providers. Under these contracts, Quest does not bill the medical providers on a per-test basis. Instead, the medical provider pays Quest a set fee per patient per month for all testing.

16.     Medical providers enter into capitated contracts with Quest in large part to defray the risks associated with capitated contracts that the medical providers themselves have entered into with large health insurers offering HMO plans. Capitated agreements, both between medical providers and insurers, and between medical providers and Quest, are common in California, in large part because of the pervasiveness of HMOs in California.

17.     Second, the medical providers that enter into exclusive, capitated contracts with Quest and that serve patients covered by HMO plans also serve non-HMO patients purchasing in the relevant market for plan/out-patient billing.

18.     Third, for administrative reasons, medical providers overwhelmingly prefer to direct all of their testing to a single diagnostic testing company. As a result, a diagnostic testing company that has a monopoly in the relevant market for physician billing very easily can leverage that position to acquire a monopoly in the relevant market for plan/out-patient billing.

19.     Fourth, the relevant markets for plan/out-patient billing and physician billing are separate. Under the various health plans, testing conducted under one type of billing arrangement is not a ready substitute for testing under the other type of billing.

**C.     Quest's Scheme to Monopolize the Relevant Market for Plan/Out-Patient Billing**

20.     Quest has acquired, and continues to exploit, its monopoly position in the relevant market for plan/out-patient billing through at least three exclusionary practices: (1) it has paid

COMPLAINT

4

kickbacks to medical providers (in the form of dramatically below-cost billings) in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/out-patient billing to Quest exclusively regardless of Quest's pricing or its testing quality; (2) it has colluded with two major private health insurers to suppress its competition in the relevant market for plan/out-patient billing; and (3) it has acquired its competitors for plan/out-patient billing in order to eliminate their competition. As a result of these exclusionary practices, since at least 2011, Quest has been able to charge above-competitive prices to members of the Class (as defined below) while providing inferior quality service.

21. The first step in Quest's scheme has been to leverage its dominance in the relevant market for physician billing to suppress and exclude competition in the separate relevant market for plan/out-patient billing. Quest has accomplished this goal by discounting its pricing on testing that is billed to medical providers (often under capitated contracts) to as much as 50% or more below cost in exchange for commitments by the medical providers to refer to Quest exclusively all additional testing done under plan/out-patient billing arrangements. In large part because of this dramatically below-cost pricing, Quest now has substantially more than 70% of sales in the relevant market for physician billing in Northern California.

22. These large, below-cost discounts effectively function as kickbacks to the medical providers. In exchange for the kickbacks, and also because of the providers' preference for "one-stop shopping," they refer all of their routine diagnostic testing in the relevant market for plan/out-patient billing to Quest, regardless of whether Quest can provide the out-patients or health plans with the lowest cost or highest quality testing. Quest refers to this referral business for plan/out-patient billing as "pull-through" sales.

COMPLAINT

23.     The kickback arrangement works well for both the medical providers and Quest. Just as if they received cash payments, the medical providers are able to increase their profits by substantially lowering their costs. Quest, on the other hand, is able to build its market share and charge monopoly prices on the pull-through, plan/out-patient billing business.

24.     The second step in Quest's scheme has been to suppress competition in the relevant plan/out-patient billing market by aligning itself with two private health insurers.

25.     Blue Shield of California and Aetna, Inc. are the third and fourth largest private health insurers in Northern California. Quest has paid large sums to these health insurers directly to induce them to exclude competitors of Quest from their networks, which has made it impossible or very difficult for these other laboratories to compete with Quest. As just one example, Quest induced Aetna to kick 400 of Quest's competitors out of the Aetna network nationwide, at least two of which were located in Northern California. Similarly, in 2008, Quest gave California Blue Shield a 10% discount on test pricing in exchange for its agreement to kick two of Quest's competitors out of the California Blue Shield network in Northern California. Such practices are exclusionary and unlawful if they are implemented to obtain or maintain market power and foreclose competition as part of a larger scheme to monopolize.

26.     Stephen Rusckowski, Quest's Chief Executive Officer, has admitted that Quest is cooperating with large health insurers *"aligned with it"* to coerce physicians to direct plan/out-patient business to Quest.

27.     The health insurers also cooperate with Quest, as Mr. Rusckowski puts it, to "crack the whip" over physicians to coerce them not to refer plan/out-patient business to the competitors of Quest. Physicians face retaliation if they refuse to cooperate, including threats to terminate their plan contracts. Most medical providers are not in a position to resist these threats

COMPLAINT

because they depend heavily on their membership in large plan networks such as those of Aetna and California Blue Shield.

28.    The third step in Quest's scheme has been to acquire competitors aggressively. In 2003, Quest, which at the time was the second largest provider of testing in Northern California, acquired its largest competitor, Unilab Corporation. If the United States Federal Trade Commission had not intervened, the acquisition would have given Quest at least a 70% share of all routine diagnostic testing, and market power, in Northern California. In response to Quest's acquisition of Unilab, the FTC compelled Quest to make substantial divestitures to prevent it from using its capitated business to suppress competition. This was done both to preserve competition in the immediate term and to prevent Quest from abusing a dominant position in the physician billing market in the future.

29.    The mandatory divestitures failed to preserve competition. Even with the divestitures, the acquisition of Unilab allowed Quest to increase its market share from 17% to 53%, making it by far the largest competitor in the market. Quest recently acquired the outreach laboratories of Dignity Healthcare, another smaller competitor that it had marginalized through its exclusionary conduct. This acquisition increased Quest's market share even further.

30.    As a result of its long-term and persistent exclusionary use of kickbacks, exclusionary contracting with large aligned insurers, and acquisitions to advance its overall and integrated monopoly scheme, Quest has obtained and maintained market power and substantially foreclosed competition in the relevant market for plan/out-patient billing.

31.    Since at least 2011, Quest has abused this market power by charging above-competitive prices on the sales of tests billed directly to plans and out-patients. Importantly, there are several imperfections in this relevant market that prevent the competitors of Quest from

COMPLAINT

forcing prices back to competitive levels and restoring choice and quality for out-patients. *See* ¶¶ 120-128 *infra.*

32.     Quest has been able to obtain and maintain its market power in this relevant market even though its testing quality often has been substandard. For example, in April 2009, Quest pled guilty to a criminal felony for incorrect parathyroid test results and paid a criminal fine of $40 million and civil fines of $262 million to the federal government. For many patients these faulty test results led to unnecessary and life-changing surgeries to remove their parathyroid glands. Further, in January 2009, regulatory agencies forced Quest to issue the largest recall in industry history because of inaccurate Vitamin D test results.

## PARTIES

33.     Plaintiff Colleen Eastman resides in Hollister, California. Her daughter, Madison Eastman, for whom Colleen Eastman is an Attorney-in-Fact, also resides in Hollister, California. Over the last four years, Colleen Eastman has paid several thousand dollars directly to Quest under plan/out-patient billing plans for out-patient routine diagnostic testing services for herself and her daughter, who faces a life-threatening illness. Those payments were made as a result of co-payment and deductible obligations.  Health plans in which Colleen and Madison Eastman have been enrolled also have made payments to Quest directly on their behalf

34.     Plaintiff Christi Cruz resides in San Jose, California. She has paid Quest directly for out-patient routine diagnostic testing to fulfill her co-payment and deductible obligations under plan/out-patient billing plans. These plans also have made payments to Quest on her behalf.

35.     Plaintiff Carmen Mendez resides in Milpitas, California. Over the last four years, she has paid Quest directly for out-patient routine diagnostic testing to fulfill her co-payment and

COMPLAINT

8

deductible obligations under plan/out-patient billing plans. These plans also have made payments to Quest on her behalf.

36.     Defendant Quest Diagnostics Incorporated is the largest routine testing laboratory in the United States. It is organized under the laws of Delaware and headquartered in Madison, New Jersey. Quest includes affiliated entities Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Nichols Institute, Quest Diagnostics Incorporated (Nevada), Unilab Corporation, and Specialty Laboratories; Inc.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) under Sections 2 of the Sherman Act (15 U.S.C. §§ 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

38.     This Court also has supplemental jurisdiction over the claims alleged under California Unfair Competition Law, California Unfair Practices Act, and California Cartwright Act, as well as original subject matter jurisdiction over these claims under 28 U.S.C. § 1332(d)-(2) because the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and members of the class alleged herein are citizens of California, whereas Quest is a diverse citizen. *See* 28 U.S.C. § 1332(c)(1).

39.     Venue is proper because Quest resides within this judicial district as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

COMPLAINT

**CLASS ACTION**

**Quest Plan/Out-Patient Billing Class**

A.      **Federal Rule of Civil Procedure 23(a) Prerequisites**

40.      Plaintiffs ("Class Representatives") are representatives of a Class of out-patients or health plans residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011 (the "Class") under plan/out-patient billing arrangements. "Plan/out-patient billing" refers to routine diagnostic testing for which a private health insurance plan, the State of California, or an out-patient (through the payment of a plan deductible, co-insurance or co-payment or a testing fee as an uninsured) has paid a fee directly to Quest. Routine diagnostic testing provides chemical analysis of bodily fluids, typically in the areas of hematology, blood chemistry, urine chemistry, endocrinology, and microbiology. Routine diagnostic testing does not include what is known as specialized diagnostic testing which is tailored to assess certain specific conditions, such as cancer or allergy. Specialized testing is performed less frequently and requires more sophisticated and specialized knowledge or equipment than routine diagnostic testing. "Health plan" includes without limitation private insurance plans, health care plans, the State of California to the extent it pays for Quest testing on behalf of its residents in Northern California, or other third-party payors that defray all or part of the cost of Quest testing for others. The Class does not include:

(a)      Blue Shield of California and its affiliates, and any officers, directors or employees of Blue Shield of California or its affiliates;

(b)      Aetna, Inc. and its affiliates, and any officers, directors or employees of Aetna or its affiliates;

(c)      Quest and its affiliates, and any offiers, directors or employees of Quest or its affiliates; or

COMPLAINT

(d)     the presiding Judge in this action and personnel associated with her or his Chambers.

41.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is in the millions, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of Quest's anticompetitive conduct that are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Quest has engaged in prohibited anticompetitive conduct, including monopolization and unfair competition; and (2) whether the exclusionary conduct of Quest, taken as a whole, has caused at least some overcharge injury to members of the Class. In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

42.     The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive action.

43.     The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class that would make class certification

COMPLAINT

11

1   inappropriate.   Counsel   for   the   Class   will   vigorously   assert   the   claims   of   the   Class

2   Representatives and the other members of the Class.

3        **B.**     **Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

4        44.     In addition, the prosecution of the claims of the Class as a class action pursuant to

5   Rule 23(b)(3) is appropriate because:

6

7        (a)     Questions of law or fact common to the members of the Class predominate

8   over any questions affecting only its individual members; and

9        (b)     A   class   action   is   superior   to   other   methods   for   the   fair   and   efficient

10   resolution of the controversy.

11        **C.**     **Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

12        45.     The   prosecution   of   the   claims   of   the   Class   as   a   class   action   pursuant   to   Rule

13   23(b)(2) is appropriate because Quest acted, or refused to act, on grounds generally applicable to

14   the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief,

15   for the Class as a whole.

16

17                       **RELEVANT MARKETS**

18        **A.**     **Product Markets**

19        **1.**     **Market for Plan/Out-Patient Billing**

20        46.     This   antitrust   relevant   product   market   is   the   market   for   sales   of   out-patient,

21   routine   diagnostic   testing   that   is   billed   directly   to   health   plans   or   out-patients.   This   testing

22   includes   thousands   of   individual   procedures   that   relate,   for   example,   to   hematology,   blood

23   chemistry, urine chemistry, endocrinology, and microbiology. Commonly ordered tests include

24   red and white blood cell counts, blood chemistry panels, urinalyses, microbiology cultures, HIV

25   screening tests, and pregnancy tests.

26

27

28   COMPLAINT

47.     Quest competes in the relevant product market. The market also includes the testing services of the competitors of Quest to which medical providers reasonably can turn to find substitutes for tests for which Quest bills patients and health plans directly.

48.     "Medical providers" include individual physicians and any group medical practice, individual practice association, physician service organization, management service organization, medical foundation, or physical/hospital organization that provides, or through which physicians contract to provide, physician services either to out-patients under pre-paid health plans, or to out-patients not covered by such health plans.

49.     Many physicians require a laboratory that offers, among other things, an extensive specimen collection and distribution system that includes conveniently located patient service centers and courier networks across the group's entire geographic coverage area; a comprehensive menu of clinical diagnostic tests, including rapid testing (also known as "stat testing") capabilities; and advanced electronic data reporting and electronic medical record interfacing capabilities. These requirements limit the substitutes for Quest's testing services in the relevant product market.

50.     In general, three types of providers may perform routine diagnostic testing: independent laboratories like Quest, out-patient laboratories that are affiliated with hospitals, and laboratories in physicians' offices. Physicians can perform a limited number of relatively simple routine tests in their own offices, but this testing is not a substitute for testing that is performed in a laboratory that is certified for complex testing.

51.     In limited circumstances, hospital laboratories that supply out-patient services to physician groups can compete with Quest and other independent laboratories. For example, some hospital laboratories have established outreach programs to obtain additional business in the

COMPLAINT

13

communities surrounding the hospitals. These outreach services are included among the competitors of Quest for sales in the relevant market for plan/out-patient billing. Hospital laboratories that do not provide outreach services do not compete for the business of physician groups outside the hospital because they are tasked only with providing in-patient testing services and are captive to their hospitals. Therefore, their services are not included in the relevant product market.

### 2. Market for Physician Billing

52. Quest also competes in the relevant product market for physician billing. Physician billing refers to routine diagnostic testing for which laboratories like Quest bill medical providers (rather than out-patients or health plans). As noted above, capitated contracts – both between medical providers and health plans, and between medical providers and diagnostic laboratories – are pervasive in this product market. The vast majority of out-patients who receive services in this market are covered by HMO plans.

53. This product market includes the testing services of the competitors of Quest to which medical providers can reasonably turn to find substitutes for tests performed by Quest.

### B. Relevant Geographic Markets: Northern California

54. The relevant geographic market for both relevant product markets is Northern California, which includes the counties north of, but not including, San Luis Obispo, Kern, and San Bernardino counties. It is regional in nature because physicians prefer to have routine testing specimens collected at laboratories that are convenient and accessible to physicians or patients. Physicians also require prompt reporting of routine test results, generally within twenty-four hours. In addition, the physicians require even more rapid reporting of results for stat testing, generally within a few hours.

COMPLAINT

55.     Medical providers in California have several service areas that vary from a single town to multiple counties; however, none has a service area that covers both Southern and Northern California.

### C.     The Separate Markets for Plan/Out-Patient Billing and Physician Billing

56.     The two relevant product markets are separate because out-patients and their medical providers are not able to substitute readily, on a test-by-test basis, testing that is subject to physician billing for testing that is not subject to physician billing. Substitution is not possible because the manner in which Quest bills for its services is dictated largely by the out-patient's health plan (*i.e.*, by whether the patient is enrolled in an HMO plan.)

### D.     Quest's Market Power in the Market for Plan/Out-Patient Billing

57.     There is both direct and circumstantial evidence of Quest's market power in the relevant market for plan/out-patient billing in Northern California.

#### 1.     Direct Evidence

58.     The direct evidence of Quest's market power is its persistent ability to charge above-competitive prices and make monopoly margins for so-called "pull-through" testing and other testing billed directly to health plans or out-patients. Quest also has the capacity to exclude competition as alleged herein. *See also* ¶¶ 120-128 *infra* (market imperfections preventing the disciplining of Quest's monopoly pricing).

59.     In addition, Quest has been able to maintain its high market share even though its testing quality and responsiveness is known to be inferior to that of its competitors. Physicians often complain about poor routine testing services by Quest, but the exclusionary conduct of Quest very often leaves physicians with no other options. Because physicians have few other options, Quest is free to prioritize volume over quality of testing.

COMPLAINT

## 2.    Circumstantial Evidence

60.    Quest's market share and the competitive barriers to entry and expansion in the relevant market for plan/out-patient billing are also strong circumstantial evidence of Quest's market power.

61.    Quest does not report separately its revenues or its market shares for the relevant markets for plan/out-patient and physician billing in Northern California. Its percentage share of both markets in Northern California, however, is at least 70% by revenue, and there is no reason to believe that its share of the market for plan/out-patient billing is less than 70%. Indeed, Quest would need a substantial share of the plan/out-patient billing market and monopoly premiums in that market (including such premiums on pull-through business) to offset the profits that it forgoes when it prices below cost, usually through capitated contracts, in the relevant market for physician billing.

62.    In addition, (a) the high penetration of managed care in Northern California, (b) the pervasiveness of exclusive capitated contracts between Quest and medical providers, (c) the inducements that Quest offers medical providers to refer plan/out-patient pull-through business to Quest, and (d) the preference of physicians for "one-stop shopping" when ordering testing services, strongly suggest that Quest's share of the market for plan/out-patient billing in Northern California is at least as great as its 70% share of the combined sales and, upon information and belief, may be greater.

63.    For several reasons, barriers to entry and expansion make competitive entry and expansion difficult and costly in the relevant market for plan/out-patient billing.

64.    First, attempting to penetrate the market is extremely expensive. Fixed costs are high. Expansion into Northern California is risky even for laboratories that are in adjacent areas

COMPLAINT

16

already and have a low-cost, high-volume routine testing infrastructure. They have far fewer convenient patient service centers and stat testing facilities to meet the needs of any given Northern California physician group, and therefore are faced with the added cost of building out their infrastructure when competing for sales to physician groups. The risks associated with such a build-out are substantial, as it can take a significant amount of time for a new patient service center to become profitable.

65.     Second, Quest benefits from economies of scale. It has significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests through its existing infrastructure. It is also able to reduce its unit costs by negotiating volume discounts on supplies. Quest processes far more routine tests in-house than smaller laboratories do. As a result, it is able to minimize the costly outsourcing of low-volume tests.

66.     Third, entrants are also disadvantaged by Quest's capitated contracts and dominance over pull-through, plan/out-patient business. Further, Quest's anticompetitive cooperation with large health insurers prevents its competitors from obtaining the in-network status they need to compete effectively. These practices also disadvantage its out-of-network competition.

67.     Fourth, medical providers strongly prefer one-stop shopping. Thus, Quest's dominance of the physician billing market effectively serves as a barrier to competition in the plan/out-patient billing market.

68.     Fifth, state regulatory requirements may block de novo entry (or expansion) by out-of-state laboratories.

COMPLAINT

### E.     Quest's Market Power in the Physician Billing Market

69.     The evidence of Quest's market power in the relevant market for physician billing is much the same as the evidence of Quest's market power in the relevant market for plan/out-patient billing. Quest has at least a 70% market share in the physician billing market. The vast majority of the laboratory work in this market is governed by exclusive contracts between Quest and medical providers. This share is protected by the same high barriers to competitive entry and expansion as the plan/out-patient billing market. *Supra* ¶¶ 63-68. In addition, if the competitors of Quest try to match Quest's below-cost pricing, they risk violating federal and state laws that prohibit kickbacks to physician groups. *Infra* ¶ 77. As with testing that is subject to plan/out-patient billing, Quest has been able to maintain its market power in the physician billing market even though its testing quality and responsiveness are often inferior to its competitors.

## EXCLUSIONARY CONDUCT

70.     Quest has engaged willfully in at least three types of anticompetitive practices. All of these practices are integral to its scheme to monopolize the relevant market for plan/out-patient testing.

### A.     Exclusionary Physician Kickbacks

71.     Quest has moved aggressively to perfect and maintain its market power in the relevant market for physician billing through kickbacks to medical providers. Quest has leveraged the power it has acquired in this market to monopolize the relevant market for plan/out-patient billing.

72.     The kickbacks essentially amount to deep, well-below-cost discounts for laboratory work that Quest bills to medical providers (rather than to health plans or out-patients). The kickbacks typically are implemented through capitated contracts between the medical

COMPLAINT

providers and Quest. Under those contracts, the medical providers pay capitated testing rates that are often 50% or more below the costs Quest knows it will bear on a per-test or group-of-tests ("accession") basis to service the medical providers.

73.    On occasion, Quest also augments these kickbacks by providing services to physician groups free of charge.

74.    As the State of California has documented (after years of discovery into Quest's records), Quest carefully calculates the lucrative revenues it earns by use of such below-cost kickbacks. *See* Sixth Amended Complaint ¶¶ 84-88, *California ex. re. Hunter Laboratories, Inc. LLC v. Quest Diagnostics Inc.*, Civ. 34-2009-00048046 (Super. Ct. Sacramento, filed March 11, 2010).

75.    The purpose of the kickbacks is to induce medical providers to send all their pull-through, plan/out-patient billing business to Quest. These kickbacks functionally are no different than if Quest were to give cash to medical providers in exchange for their agreement to steer such business to Quest.

76.    This kickback practice is anticompetitive and excludes quite substantial competition in the relevant market for plan/out-patient billing. First, competitors are unable to match the large, below-cost kickbacks by virtue of their substantially higher costs. Quest has a large competitive cost advantage due to economies of scale.

77.    Further, and just as importantly, the federal Anti-Kickback Law, 42 U.S.C. § 1320a-7b(b), and the anti-kickback provisions of California Bus. & Prof. Code § 650, expressly prohibit the giving of value to medical providers (in the form of cash, free service, or below-cost service) in exchange for the referral of business. Thus, competitors would have to risk violating

COMPLAINT

19

the law to even attempt to match Quest's anticompetitive kickback practice. Such exposure is an insurmountable barrier to competition.

78.     The kickback scheme is beneficial for both Quest and the medical providers.

79.     Just as cash payments, the large kickbacks Quest pays to medical providers who service HMO plans (most often under capitated contracts) allow them to increase their profits by substantially lowering their costs. Quest, in turn, gets the benefit of above-competitive pricing on the pull-through business in the relevant market for plan/out-patient billing to the detriment of members of the Class.

80.     Health plans and out-patients that pay monopoly pricing for Quest pull-through testing in the relevant market for plan/out-patient billing cannot direct their business away from Quest to lower-cost or higher-quality competing laboratories because they do not control how the business is directed. Instead, medical providers, whom Quest has influenced with large kickbacks, direct the business to Quest.

81.     In addition, several other market imperfections prevent competitors from disciplining Quest's monopoly pricing. *Infra* ¶¶ 120-128.

**B.      Exclusionary Agreements with Large "Aligned" California Health Insurers**

82.     Health insurers are crucial partners for Quest and its competitors because they control which laboratories can gain preferred access to their physician networks and patients on an in-network basis. Patients typically pay less in the form of deductibles and co-payments for testing done by in-network laboratories than they do for testing done by laboratories that are out-of-network.

83.     In order to have a fair opportunity to compete, the competitors of Quest must be on a level playing field. If competitors cannot obtain the same preferred, in-network status as

COMPLAINT

Quest but instead are forced out of network, their services become substantially more expensive than Quest's and are largely non-competitive.

84. Quest recognizes this and has worked aggressively to secure the participation of large health insurers in its exclusionary practices. Stephen Rusckowski, Quest's Chief Executive Officer, has admitted that, as the largest diagnostic testing company, it is cooperating with large health insurers *"aligned with it"* to coerce physicians to use Quest testing. In 2012 he told Quest's shareholders that "there should be more consolidation in [testing] volumes around fewer suppliers of laboratory testing services *and that plays nicely into what we are all about* …." Quest has "an opportunity with some of our *health plan partners to help them narrow the network. We're working together with the health plans* to get more volume...." (Emphasis supplied) (http://seekingalpha.com/article/929761-quest-diagnostics-management-discusses-q3-2012-results-earnings-call-ttranscript?page=4&p=qanda&l=last).

85. To narrow competition in networks in Northern California, Quest has enlisted at least California Blue Shield and Aetna, the third and fourth largest health plans in California, in its exclusionary schemes. These plans service nearly two million enrollees in Northern California. Given the importance of these plans for testing distribution, this "alignment" with Quest forecloses substantial competition as part of the larger scheme to monopolize.

### 1. Aetna

86. To secure near-exclusive access to Aetna's insurance network in California and elsewhere, and to gain protection from competition, Quest has provided cash and other large financial incentives to Aetna.

COMPLAINT

(a)   **Quest Has Persuaded Aetna to Exclude Competing Laboratories from the Aetna Network**

87.   Quest uses Aetna's cooperation to force competitors of Quest out of the Aetna network so that their services become substantially more expensive than Quest's.

88.   Since 2000, Quest has had a "preferred national provider" contract with Aetna and has not hesitated to exert exclusionary leverage based on this close relationship. A senior sales executive at a competitor of Quest learned from two Aetna employees in Philadelphia that Quest approached Aetna in October of 2011 and pushed for a nationwide contract (covering in part Northern California) that would have been entirely exclusive to Quest. The proposed arrangement would have required Aetna to force laboratories that competed with Quest out of the Aetna network. The executive believes that Quest offered steep price discounts in exchange for this exclusivity. Although Aetna refused to terminate all competing laboratories, it did agree to terminate 400 laboratories across the United States, including laboratories in Northern California such as Hunter Laboratories, Inc. and Western Health Sciences Medical Laboratory.

89.   On information and belief, Quest also has bargained for right-of-first-refusal contracts with Aetna applicable to Northern California and other regions under which Quest controls and/or impairs competitive entry into the network. These contracts require the Aetna regional plans to contact Quest before entering into a new contract with a competitor.

90.   A consultant that assists independent regional laboratories believes there may be a "grand bargain" between Aetna and Quest to exclude all of Quest's competitors from the Aetna network. On multiple occasions when he has presented a client laboratory to Aetna for contracting, he has been told that Aetna would need to vet the lab with Quest. This suggests that there are provisions in the Quest-Aetna contract that demand this exclusionary cooperation.

COMPLAINT

22

91.     A senior sales executive of a New York laboratory further believes that the contract between Quest and Aetna will document the discounting that lured Aetna to terminate the contracts described above.

### (b)     "Cracking the Whip" Over Physicians to Drive Business to Quest

92.     Quest cooperates with Aetna not only to force Quest's competitors out of network but also to protect Quest from its out-of-network competition. Quest pays hundreds of millions of dollars to Aetna to "crack the whip" (as Quest's CEO put it) over its network physician groups to coerce them not to use out-of-network laboratories.

93.     As Quest's CEO put it, aligned health insurers and Quest are "incented" to "crack[] the whip with physicians" and "... we've already taken some actions to ... put some of these physicians [on notice] that we believe there is a [Quest sales] opportunity... And we believe [the aligned health insurers] will be acting more aggressively going forward because it serves [Quest's] interests well and their interest to do this. We believe there is an opportunity *for us* going forward, *there's an opportunity with the health plans ... [W]e'll work on this real time [to] make it a reality."* (Emphasis supplied.) (http://seekingalpha.com/article/929761-quest-diagnostics-management-discusses-q3-2012-results-earnings-call-transcript?page=4&p=1anda&1=last).

94.     Physicians that refuse to fall into line face retaliation. Such retaliation includes threatening telephone calls and letters to patients and physicians. Physicians also are threatened with the termination of their contracts with Aetna.

95.     "Cracking the whip" threatens the livelihoods of physicians, many of whom depend heavily on remaining in the Aetna network. More importantly, it creates a dangerous

COMPLAINT

conflict between the physicians' judgments as to what is best for their patients and their economic interests.

96.     Aetna has gone so far as to harass physicians and patients not to use out-of-network Quest competitors *even where Aetna patient contracts allow such use.* In other words, Aetna is so motivated by the large financial incentives offered by Quest to suppress competition that it is willing to violate hundreds of its own patient contracts.

### (c)     Exclusionary Bonus Pools

97.     Aetna and Quest have created physician bonus pools to further attack Quest's out-of-network competition. These are pools of funds that Aetna distributes among physicians. Aetna adds money to the pools, but withholds it from physician groups until expenses incurred by Aetna for out-of-network testing by Quest's competitors (or "leakage") are deducted. Surpluses in the bonus pools are then shared with physicians.

98.     These bonus pools of course encourage physicians to refer all work that is billed to plans or out-patients to Quest.

### (d)     Aetna's Refusal to Pay Quest's Competitors

99.     Aetna also assists Quest by refusing to pay its competitors directly.  Rather, Aetna often sends payments for out-of-network testing to the patients and does not tell Quest's competitors if and when this has been done. As a consequence, Quest's competitors often find it difficult to collect payments even for business they are able to maintain. Further, their administrative and bad debt costs soar, thus placing them at further competitive disadvantage.

### 2.     Blue Shield of California

100.     Quest has pursued a similar course of conduct with California Blue Shield.

COMPLAINT

### (a)      Quest's Exclusion of Two Substantial Routine Testing Competitors

101.    In 2008, Quest obtained California Blue Shield's assistance in suppressing competition from two substantial competitors. It provided Blue Shield a 10% discount on test pricing in exchange for the Blue Shield's exclusion of Westcliff Medical Laboratories and Hunter Laboratories, Inc. from its network. This exclusion caused their fee-for-service testing to be significantly less competitive because patients had to pay higher out-of-network co-payments and deductibles.

102.    Shortly after it was terminated from the Blue Shield network, Westcliff went into bankruptcy. Quest's sales representatives immediately approached physicians using Hunter in Northern California to tell them how much more money their patients would pay if they used Hunter out of network and warned that Quest would soon drive Hunter into bankruptcy, "just like Quest did to Westcliff." In addition, Quest recommended that physicians serviced by Hunter avoid service disruptions from the imminent Hunter bankruptcy by sending their patients to Quest instead.

103.    This has proven to be a very effective marketing technique. In 2013, facing bankruptcy, Hunter exited the relevant market and sold most of its business.

### (b)      California Blue Shield's Refusal to Pay Quest's Competitors

104.    Like Aetna, California Blue Shield assists Quest by refusing to pay its competitors directly. Rather, Blue Shield often sends payments for out-of-network testing to the patients and does not tell the competitors if and when this has been done. As a consequence, Quest's competitors often find it difficult to collect payment even for business they are able to maintain. Further, their administrative and bad debt costs soar, thus placing them at further competitive disadvantage.

COMPLAINT

### (c)    Contract Stacking

105.    Quest also employs contract stacking or blocking with California Blue Shield to further exclude in-network competition. California Blue Shield in Northern California operates a closed panel of testing competitors; that is, it only accepts a limited number of laboratories into its network. By achieving multiple contracts with California Blue Shield's testing panel, Quest and its affiliates are able to block some or all of its competitors from gaining in-network status. And, by dominating the Blue Shield panel, Quest markedly increases its chances to become the "one-stop shop" for physicians across all health plans in the relevant market for plan/out-patient billing.

### 3.    Alignment of the Economic Interests of Quest and Key Insurers

106.    Exclusionary conduct by Quest with large health insurers is plausible and actionable as part of a larger scheme to monopolize, even if the economic interests of Quest and the insurers are different. It is sufficient that they are "aligned," to use the terminology of Quest's CEO.

107.    Here, Quest obtains above-competitive pricing in the plan/out-patient billing market and monopoly profits by excluding competition with the help of Aetna and California Blue Shield. It is also protected from competition that is often superior in quality.

108.    For their part, the health insurers cut their short-term costs immediately due to Quest's large financial inducements, and they are able to protect themselves from Quest's above-competitive pricing by passing the pricing injury on to enrollees through increased deductibles, co-payments, co-insurance, and actuarial processes that set pre-paid plan premiums.

COMPLAINT

109.   Quest is well aware that its cash payments and financial incentives often result in significant increases in the compensation for plan procurement personnel (including bonuses which reward cost cutting).

110.   Finally, and importantly, the out-patients and health insurers are handicapped by several imperfections in the relevant market. Those imperfections make any effort by them to discipline Quest's monopoly pricing by taking business away from it – as opposed to cooperating in its exclusionary practices – ineffective. *Infra* ¶¶ 120-128.

### C.   Acquisition of Competitors

111.   In 2003, Quest acquired Unilab. The acquisition combined the two leading testing laboratories in Northern California, and, but for the action of the FTC, would have given Quest a combined market share of more than 70% by revenue in the combined plan/out-patient and physician billing markets.

112.   In response to the proposed acquisition, the FTC compelled Quest to divest 46 patient and stat centers. The FTC forced the divestitures because it recognized (a) the high penetration in Northern California of capitated, managed care; (b) the resulting pervasiveness of capitated contracts for diagnostic testing secured by the largest, low-cost laboratory (then Unilab, and soon to be Quest), and (c) the potential that the combined firm could create a substantial barrier to competition using its capitated pricing to dominate all routine testing.[1]

113.   Even so, the transaction increased Quest's share of the combined markets from approximately 17% by revenue to 53%.

---

[1] FTC Analysis of Agreement Contain Consent Orders (Quest Diagnostics Inc. and Unilab Corp.), Docket No. C-4074 at 2-4 (2003) ("*FTC Analysis of Quest Consent Decree*").

COMPLAINT

114.    In 2013, Quest increased its share of the combined markets by approximately another three percentage points by combining with the out-patient testing laboratories of Dignity Health**,** a hospital system which had determined that it could not compete with Quest's exclusionary physician kickbacks.

## INJURY TO COMPETITION

115.    As a result of its long-term and persistent pattern of kickbacks, exclusionary contracting with aligned health insurers, and acquisitions to advance its overall scheme to monopolize, Quest has injured, and continues to injure, competition in the relevant market for plan/out-patient billing. The injury to competition is manifest in at least three ways: above-competitive prices, inferior quality of testing, and reduction in choice among providers of routine diagnostic testing.

116.    There is ample evidence that Quest has controlled prices in the relevant market in Northern California since at least 2011.

117.    Quest is a rational monopolist. It often substantially discounts its prices in the physician billing market to well below cost to get pull-through business in the relevant plan/out-patient billing market; therefore, it must add a monopoly premium for pull-through testing to compensate for its below-cost prices. The fact that it has been able to charge such premiums for over a decade is strong evidence of its control over pricing in the relevant market for plan/out-patient billing.

118.    Quest has charged above-competitive prices despite offering inferior quality of service. As noted above, in 2009, Quest paid criminal fines of $40 million and civil fines of $262 million related to faulty parathyroid test results. That same year, Quest was forced to undergo the

COMPLAINT

largest recall in the history of the industry because of inaccurate Vitamin D results.  In 2012, Quest paid $241 to the State of California to settle claims relate to fraudulent billing.

119.    Despite above-competitive prices and inferior quality, Quest has succeeded in reducing choice for purchasers in the relevant market for plan/out-patient testing. Quest has eliminated some competitors, such as Unilab and Dignity Healthcare, by acquiring them. It has negotiated with major health insurers effectively to exclude multiple other competitors. The net result is that Quest has at least a 70% market share, and there are no actual or potential competitors in this relevant market with the ability to restore choice as to price and quality.

120.    Several factors prevent the competitors of Quest and health insurers or out-patients from restoring competition among laboratories on price and quality in the relevant market for plan/out-patient billing.

121.    First, patients and health insurers that pay monopoly prices to Quest for pull-through testing cannot effectively shift their business to competitors of Quest because they do not decide where the testing goes. The medical providers who have been influenced by Quest kickbacks decide which laboratory does the testing. As a result, Quest's kickback strategy is highly profitable and highly durable. The durability of Quest's scheme over a decade underscores its market power and the inability of the market to correct for this lack of competition.

122.    Second, the competitors of Quest, both individually and in combination, lack sufficient capacity (in terms of convenient patient testing centers, stat laboratories, full-service processing facilities and other infrastructure) to take enough business away from Quest in the plan/out-patient billing market to make its monopoly pricing unprofitable, and force it to lower its prices to competitive levels. Quest's largest competitor in the relevant market has only

COMPLAINT

approximately a 16% market share by revenue, whereas Quest has a market share of at least 70%. The remaining competitors of Quest are much smaller still, with market shares of approximately five percent or less.

123    Third, Quest has involved in its exclusionary practices at least two of the State's largest health insurers, which serve nearly two million enrollees in Northern California, thereby helping to neutralize any pricing threat that these large plans could cause by sending their testing business to Quest's competitors. Indeed, as Quest's CEO has pointed out, they are "aligned" with Quest.

124.    Fourth, Quest has a dominant position not only in the plan/out-patient billing market, but also in the physician billing market. For administrative and other reasons, physicians prefer to send all of their testing to one provider. Effectively then, Quest's domination of the physician billing market makes it difficult for competitors to challenge Quest in the plan/out-patient billing market.

125.    Fifth, health insurers in the relevant market do not fully focus on routine testing fees, which typically account for only about three percent of their costs for patient care. The main priority of these health insurers when they are looking to contain costs is physician and other costs, which comprise 97% of their cost exposure.

126.    Sixth, patients and health insurers do not have complete and accurate information as to the extent of Quest's monopoly practices and their effects on pricing and freedom of choice. For example, they may not be fully aware of Quest's physician kickbacks (often under capitated contracts to which they are not privy) and the resulting monopoly pricing of the pull-through business.

COMPLAINT

127.    Seventh, if the competitors of Quest wish to try and match Quest's below-cost pricing to garner pull-through business, competitors face the substantial disincentive of risking violations of federal and state laws that prohibit kickbacks to physician groups. *Supra ¶ 77.*

128.    Finally, not only are the capacities of competitive testing alternatives limited, competitors' unit costs tend to be substantially higher than those of Quest in part because Quest's anticompetitive practices have not allowed them to realize anything like the large economies of scale that Quest enjoys. This makes price competition with Quest difficult.

## COUNT I

### Monopolization
### (Section 2 of the Sherman Act)

129.    All foregoing paragraphs are incorporated herein by reference.

130.    Quest has monopolized the relevant market for plan/out-patient billing as alleged.

131.    By virtue of its demonstrated ability to control pricing or exclude competition, its dominant market share, and the high barriers to competitive entry and expansion, Quest has market power in the relevant market. Since 2003, its market share of the plan/out-patient billing market in Northern California has increased by revenue from approximately 17% to at least 70%.

132.    As an integral part of its scheme to obtain and maintain market power, Quest has willfully engaged in the exclusionary practices as described herein.

133.    As a consequence of its conduct, Quest has caused substantial price injury and actual damages to members of the Class, as well as denied them competitive choice.

134.    Quest's conduct is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT II

### (Violation of California Unfair Competition Law)

135.    All foregoing paragraphs are incorporated herein by reference

COMPLAINT

31

136.    Quest has engaged in unfair competition within the meaning of California Business and Professions Code § 17200 *et seq.* because its conduct is unfair and illegal as described herein.

137.    Quest's conduct has caused substantial injury to competition and to the members of the Class.

138.    Quest's wrongful business acts constitute a continuing course of conduct of unfair competition since Quest's business acts and practices, as alleged herein, have caused price and quality injury to competition and to members of the Class and the California public. Quest's business practices are also unlawful.

139.    The injury to competition and to Plaintiffs and the Class was a proximate and foreseeable result of Quest's wrongful conduct as alleged above. Plaintiffs and the Class are entitled to relief including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained from the Class by Quest as a result of such unfair and unlawful business acts or practices.

140.    Plaintiffs and the Class are informed and believe, and based thereon allege, that Quest's unfair acts as set forth above are a serious and continuing threat to Plaintiffs and the Class. If Quest is allowed to continue its wrongful acts, Plaintiffs and the Class will suffer further immediate and irreparable injury, loss, and damage. Plaintiffs and the Class are further informed and believe, and based thereon allege, that, in the absence of a temporary restraining order and preliminary and permanent injunctions as prayed for below, Quest will continue to engage in unfair business practices. Unless restrained by this court, Quest will continue to charge improper testing prices in the plan/out-patient billing market, as alleged above, in violation of Section 17200 of the California Business and Professions Code, and Plaintiffs and the Class will have no

COMPLAINT

adequate remedy at law because individual suits for rescission and restitution will not be economically justified because of the relatively small amounts that would be due to each customer.

141    Representatives of the Class are acting for the interests of themselves, the Class, and the general public.

## COUNT III

### (Violation of California Unfair Practices Act)

142.    All foregoing paragraphs are incorporated herein by reference.

143.    Quest has sold testing services below cost or as a loss leader as leverage to foreclose competition in the relevant market for plan/out-patient billing, and, as a consequence, has raised its prices in the relevant market above competitive levels and has suppressed competitive choice under Cal. Bus. & Prof. Code §§ 17043, 17044.

144.    Quest's conduct has the purpose of injuring members of the Class and suppressing competition in the plan/out-patient billing market.

145.    As a proximate result of Quest's conduct, members of the Class have paid above-competitive prices for routine diagnostic testing and have been denied competitive choice.

146.    Quest's conduct has in fact proximately caused damages to members of the Class in an amount to be proved at trial.

## COUNT IV

### (Violation of the California Cartwright Act)

147.    All foregoing paragraphs are incorporated herein by reference.

COMPLAINT

148.    Quest has monopolized the relevant market for plan/out-patient billing in Northern California as alleged or has gained a competitive advantage in this market by leveraging its market power in the relevant market for physician billing.

149.    By virtue of Quest's demonstrated ability to control prices or exclude competition, its dominant market share, and the high barriers to competitive entry and expansion in Northern California, Quest has market power in the relevant market plan/out-patient billing.

150.    To obtain and maintain its market power in this market, Quest has willfully engaged in various exclusionary acts as described herein.

151.    As a consequence of its conduct, Quest has caused substantial price injury and actual damages for members of the Class, as well as denied them competitive choice.

152.    Quest's conduct is unlawful under the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as members of the Class pray that:

A.    This Court declare that Defendant's conduct violates of the Sherman Act, 15 U.S.C. § 2; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*; the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17043, 17044; and the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.;

B.    This Court permanently enjoin Quest and its agents and employees from continuing the unlawful actions described herein;

C.    Plaintiffs recover treble actual damages and full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which the Class has paid to Quest as a result of such business acts or practices;

COMPLAINT

34

D.      Plaintiffs recover their reasonable attorneys' fees and costs as allowed by law;

E.      Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.      Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs request a trial by jury in this matter.

COMPLAINT

Dated: January 29, 2015

GRAIS & ELLSWORTH LLP
J. Ross Wallin
(*pro hac vice application to be submitted*)
Silvia Ostrower
(*pro hac vice application to be submitted*)
1211 Avenue of Americas
New York, NY 10036
Telephone: (212) 755-0100
Telecopy: (212) 755-0052
Emails:
rwallin@graisellsworth.com
sostrower@graisellsworth.com

Respectfully submitted,

BY: /s/ R. Stephen Berry

R. Stephen Berry (D.C. Bar No. 234815)
(*pro hac vice application pending*)
BERRY LAW PLLC
1717 Pennsylvania Avenue, N.W.
Suite 450
Washington, D.C. 20006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
sberry@berrylawpllc.com

Colleen Duffy-Smith
MORGAN DUFFY-SMITH &
  TIDALGO LLP
Colleen Duffy-Smith (CA Bar No. 161163)
1960 The Alameda, Suite 220
San Jose, CA 95126
Telephone: (408) 244-4570
cduffysmith@mdstlaw.com

*Attorneys for Plaintiffs*

COMPLAINT

36