1   Richard D. Raskin
    rraskin@sidley.com
2   (*pro hac vice application pending*)
    Allison W. Reimann
3   areimann@sidley.com
    (*pro hac vice application pending*)
4   SIDLEY AUSTIN LLP
    One South Dearborn Street
5   Chicago, Illinois  60603
    Telephone:  (312) 853-7000
6   Facsimile:  (312) 853-7036

7   Ryan M. Sandrock (SBN 251781)
    rsandrock@sidley.com
8   SIDLEY AUSTIN LLP
    555 California Street, Suite 2000
9   San Francisco, California  94104
    Telephone:  (415) 772-1200
10  Facsimile:  (415) 772-7400

11
    Attorneys for Defendant
12  QUEST DIAGNOSTICS INCORPORATED

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17  COLLEEN EASTMAN,  CHRISTI CRUZ,     )   Case No.:  3:15-cv-00415-WHO
18  AND CARMEN MENDEZ                    )
                                         )   **QUEST DIAGNOSTICS**
                                         )   **INCORPORATED'S NOTICE OF MOTION**
19              Plaintiffs,              )   **AND MOTION TO DISMISS PLAINTIFFS'**
                                         )   **COMPLAINT AND [PROPOSED] ORDER**
20  v.                                   )
                                         )   **ORAL ARGUMENT REQUESTED**
21  QUEST DIAGNOSTICS INCORPORATED,      )
                                         )   Hearing Date:  May 13, 2015
22              Defendant.               )   Time:          2:00 p.m.
                                         )   Courtroom:     2, 17th Floor
23                                       )   Judge:         Hon. William H. Orrick

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT ........................ 1

BACKGROUND ......................................................................................................... 2

STATEMENT OF THE ISSUES ................................................................................. 6

LEGAL STANDARD .................................................................................................. 7

ARGUMENT ............................................................................................................... 7

I.     PLAINTIFFS LACK ARTICLE III AND STATUTORY STANDING ............................ 7

     A.    Plaintiffs Do Not Allege Injury-In-Fact ........................................................ 8

     B.    Plaintiffs Lack Standing to Bring Claims Based On Alleged Injuries to Health Plans ........................................................................................... 10

II.    PLAINTIFFS' MONOPOLIZATION CLAIMS ARE DEFICIENT ............................ 11

     A.    Plaintiffs Do Not Plausibly Allege Harm to Competition or Antitrust Injury ............ 12

          1.    Plaintiffs Fail to Plead that QDI's Alleged Discounts to Aetna and BSC or QDI's Acquisitions Unreasonably Restricted Competition ................................................................................. 12

          2.    Plaintiffs' Conclusory Allegations of Higher Prices and a Reduction in Quality and Consumer Choice Do Not Plausibly Allege Harm to Competition or Antitrust Injury ....................... 15

     B.    Plaintiffs Have Not Plausibly Alleged Monopoly Power in a Relevant Market ......... 16

          1.    Plaintiffs' Relevant Product Market Is Implausible ......................... 17

          2.    Plaintiffs Do Not Plausibly Allege Monopoly Power in a Relevant Market Identified in the Complaint ................................. 18

III.   PLAINTIFFS DO NOT PLEAD AN UNFAIR PRACTICE ACT CLAIM .................... 20

     A.    Plaintiffs As Consumers Cannot Recover Damages Under the UPA ......................... 21

     B.    Plaintiffs Do Not Plead The UPA's Purpose Requirement ......................... 22

     C.    Plaintiffs Do Not Plead A Below-Cost Sale ....................................... 23

IV.   PLAINTIFFS DO NOT PLEAD AN UNFAIR COMPETITION LAW CLAIM ............ 23

CONCLUSION ......................................................................................................... 24

i

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC Int'l Traders, Inc. v. Matsushita Electric Corp.,*
14 Cal. 4th 1247 (1997) ...........................................................................................21

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.,*
141 F.3d 947 (9th Cir. 1998) ...............................................................................14, 15

*Advo Inc. v. Philadelphia Newspapers,*
51 F.3d 1191 (3d Cir. 1995)........................................................................................15

*Ameritox Ltd. v. Millennium Labs., Inc.,*
No. 8:11-cv-775-T-24-TMB, 2013 U.S. Dist. LEXIS 4005 (M.D. Fla. Jan. 10, 2013) .........23

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................................7, 15

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,*
459 U.S. 519 (1983)...................................................................................................8

*Bay Guardian Co. v. New Times Media,*
187 Cal. App. 4th 438 (Ct. App. 2010).................................................................21, 22

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
65 F.3d 1406 (7th Cir. 1995) .....................................................................................17

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)...........................................................................................12, 17

*Brownfield v. Bayer Corp.,*
No. 2:09-cv-00444 JAM-GGH, 2009 U.S. Dist. LEXIS 63057 (E.D. Cal. July 6, 2009).........7

*Cascade Health Solutions v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) .....................................................................................12

*Cel-Tech Comm., Inc. v. L.A. Cellular Tel. Co.,*
20 Cal. 4th 163 (1999).....................................................................................20, 22, 23

*Cetacean Cmty. v. Bush,*
386 F.3d 1169 (9th Cir. 2004) .....................................................................................7

*Cost Mgmt. Servs., v. Washington Nat. Gas Co.,*
99 F.3d 937 (9th Cir. 1996) .........................................................................................8

*Day v. AT&T Corp.,*
63 Cal. App. 4th 325 (Ct. App. 1998).........................................................................23

ii

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ................................................................................................11, 19

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of the City and Cnty. of San Francisco*,
    114 Cal. App. 4th 309 (Ct. App. 2003) ..........................................................20, 21

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ................................................................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000) ................................................................................................8

*FTC v. Lab. Corp. of Am.*,
    No. SACV 10-1873, 2011 U.S. Dist. LEXIS 20354 (C.D. Cal. Feb. 22, 2011) ......17

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................10

*Gerlinger v. Amazon.com, Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ................................................................................7

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ................................................................................................9, 10

*Image Tech. Serv. v. Eastman Kodak*,
    125 F.3d 1195 (9th Cir. 1997) ................................................................................19

*In re ATM Fee Antitrust Litig.*,
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ..................................................................18

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................................23

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    No. 1:13-cv-00740, 2013 WL 6682981 (E.D. Va. 2013) ........................................15

*Leonberger v. Wells Fargo*,
    No. 13-0114 PJH, 2013 U.S. Dist. LEXIS 89836 (N.D. Cal. June 25, 2013) ........21

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................................10

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) ................................................................................9

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1985) ................................................................................11

*McGrath v. Home Depot USA, Inc.*,
    298 F.R.D. 601 (S.D. Cal. 2014) ............................................................................8

*Newcal Indus., Inc. v. Ikon Office Sol'n*,
    513 F.3d 1038 (9th Cir. 2008) ...............................................................16, 17, 18

*Park Ave. Radiology Assocs. v. Methodist Health Sys., Inc.*,
    No. 98-5668, 1999 U.S. App. LEXIS 29986 (6th Cir. Nov. 10, 1999) .....................12

*Raines v. Byrd*,
    521 U.S. 811 (1997)..............................................................................................8, 10

*Rebel Oil Co., v. Atl. Ritchfield Co.*,
    51 F.3d 1421 (9th Cir. 1985) .................................................................11, 18, 19

*Siechert & Synn v. Apple Inc.*,
    No. H036402, 2015 WL 513645 (Cal. Ct. App. Feb. 6, 2015)..............................21

*Somerville v. Stryker Orthopaedics*,
    No. C 08-02443 JSW, 2009 WL 113369 (N.D. Cal. Jan. 16, 2009).........................9

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).................................................................................................11

*Spindler v. Johnson & Johnson Corp.*,
    No. C 10-01414 JSW, 2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) ..................8, 9

*Stewart v. Gogo, Inc.*,
    No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ....................18

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004).................................................................................12, 14

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...............................................................................22

*Uneedus v. Cal. Shoppers, Inc.*,
    86 Cal. App. 3d 932 (Ct. App. 1978)......................................................................21

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)................................................................................................14

*Virgin Atl. Airways v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2000)....................................................................................15

*W. Mining Council v. Watt*,
    643 F.2d 618 (9th Cir. 1981) ....................................................................................7

*Zoellner v. St. Luke's Regional Med. Center, Ltd.*,
    937 F. Supp. 2d 1261 (D. Idaho 2013) ..................................................................16

iv

ACTIVE 206095729v.10

STATUTES

Sherman Act, Section 2........................................................................................................12, 13, 14

15 U.S.C. § 15..............................................................................................................................8

Cal. Bus. & Prof. Code § 17043 .........................................................................................6, 20, 22

Cal. Bus. & Prof. Code § 17044 .............................................................................................6, 20

Cal. Bus. & Prof. Code § 17200 .............................................................................................6, 23

Cal. Bus. & Prof. Code § 17082 ................................................................................................21

v

ACTIVE 206095729v.10

1

## NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT

2      TO THE COURT, ALL PARTIES AND COUNSEL OF RECORD:  PLEASE TAKE

3 NOTICE THAT on May 13, 2015 at 2 p.m. or as soon thereafter as this matter may be heard before

4 the Honorable William H. Orrick, United States District Court Judge, Defendant Quest Diagnostics

5 Incorporated ("QDI") will and hereby does move this Court for an order dismissing the Complaint

6 for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction

7 pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure.

8      QDI seeks an order dismissing all causes of action brought against it in this matter.

9

## MEMORANDUM OF POINTS AND AUTHORITIES

10      This suit recycles antitrust claims that this Court dismissed three separate times in

11 *Rheumatology Diagnostics Laboratory, Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO ("*RDL*").  *See*

12 Comparison of *Eastman* and *RDL* Complaints (attached hereto as Exhibit 1).  The principal

13 difference between the two cases is that Plaintiffs here allege that they are *consumers* of QDI's

14 clinical laboratory testing services, whereas *RDL* was filed by *competitors* of QDI.  But the

15 substantive antitrust theories at issue here are virtually identical to those presented – and thrice

16 rejected – in *RDL.*  Further, Plaintiffs' status as consumers dooms their claims under the California

17 Unfair Practices Act ("UPA") and Unfair Competition Law ("UCL") – the only claims that survived

18 dismissal on the pleadings in *RDL.*[1]

19      The Complaint should be dismissed in its entirety for the following reasons:

20      *First*, Plaintiffs lack Article III and statutory standing.  Although they claim that they made

21 payments to QDI as a result of co-payment and deductible obligations under their health insurance

22 plans, they do not allege that QDI's conduct had any impact on the *amount* of those payments.  Nor

23 is it self-evident that QDI's alleged above-market pricing on fee-for-service business would flow

24

25

26

27

---

[1] Citations to Judge Tigar's June 25, 2013 Order (*RDL* Dkt. 85) (attached hereto as Exhibit 2) are abbreviated "6/25/13 Order."  Citations to Your Honor's October 18, 2013 Order (*RDL* Dkt. 113) (attached hereto as Exhibit 3) and February 6, 2014 Order (*RDL* Dkt. 146) (attached hereto as Exhibit 4) are abbreviated "10/18/13 Order" and "2/6/14 Order," respectively.

28

1

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1    through to Plaintiffs' co-payments and deductibles.  Plaintiffs' allegations therefore do not establish

2    any injury-in-fact.

3        *Second*, Plaintiffs' monopolization claims contain the same deficiencies as those in *RDL*.  At

4    bottom, Plaintiffs object to *competition* itself – specifically, the competitive process by which health

5    care providers offer discounts in return for inclusion in health plans' networks.  Plaintiffs offer no

6    facts necessary for this Court to evaluate how competition was unreasonably restricted by the

7    agreements they challenge.  Nor do they allege any other viable theory of harm to competition;

8    rather, Plaintiffs recite the same stale allegations of reduction in consumer choice that this Court

9    found deficient in *RDL*.  Plaintiffs also fail to allege a plausible relevant market or monopoly power

10   in that market.

11       *Third*, Plaintiffs' California state law claims are fatally flawed.  As consumers, these

12   Plaintiffs are not parties the UPA is intended to protect, and they have no plausible claim that they

13   have been damaged by conduct the UPA prohibits.  Moreover, despite detailed guidance from this

14   Court in *RDL*, Plaintiffs do not plead the basic elements of a UPA claim, including a below-cost sale

15   and the purpose to injure competitors or destroy competition.  As for their follow-on UCL claim, that

16   claim fails for the same reasons as their monopolization and UPA claims.

## BACKGROUND

### A.    Parties

19       QDI provides out-patient laboratory services for patients that are referred to QDI by medical

20   providers.  ¶ 12.[2]  Plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez are three such

21   patients.  They contend that, to fulfill co-payment and deductible obligations under their health

22   insurance plans, they made payments to QDI for out-patient routine diagnostic testing services.  ¶¶

23   33-35.  Plaintiffs, however, do not identify the name of their health plans, the type of coverage they

---

[2] Unless otherwise noted, citations to paragraph numbers refer to paragraphs in the Complaint.  (Dkt. 1.)

ACTIVE 206095729v.10

1    have (e.g., HMO, PPO, or indemnity), the amount they paid to QDI, or whether that amount was

2    affected in any way by the conduct challenged in the Complaint.[3]

3        **B.    Product And Geographic Markets**

4        Plaintiffs assert that there are two relevant product markets at issue in this case, based on two

5    different types of purchasers: health plans/patients and physicians.

6        First, they assert that there is a product market for "plan/out-patient billing," described as

7    "the market for sales of out-patient, routine diagnostic testing that is billed directly to health plans or

8    out-patients." ¶ 46.  This market "also includes the testing services of the competitors of [QDI] to

9    which medical providers reasonably can turn to find substitutes for tests for which [QDI] bills

10   patients and health plans directly." ¶ 47.  Such competitors include other commercial laboratories,

11   out-patient laboratories affiliated with hospitals, and laboratories in physicians' offices.  ¶¶ 50-51.

12       Second, Plaintiffs assert that there is a product market for "physician billing," described as

13   "routine diagnostic testing for which laboratories . . . bill medical providers (rather than out-patients

14   or health plans.)" ¶ 52.  They further allege that "[t]his product market includes the testing services

15   of the competitors of [QDI] to which medical providers can reasonably turn to find substitutes for

16   tests performed by [QDI]." ¶ 53.

17       Plaintiffs assert that the relevant geographic market is "Northern California, which includes

18   the counties north of, but not including, San Luis Obispo, Kern, and San Bernardino counties." ¶ 54.

19       They also claim that QDI's market share "is at least 70% by revenue" in the *combined*

20   plan/out-patient and physician billing markets, ¶ 61 (emphasis added), the same market share alleged

21   for the "Northern California out-patient clinical laboratory market" in the original *RDL* Complaint.

22   *See* RDL Compl. ¶ 74; *see also* Exh. 1 at 11 (citing 73% market share alleged in RDL SAC ¶ 123).

23

24

25

26   [3] Plaintiff Eastman alleges that she has paid "several thousand dollars" to QDI for testing for herself
     and her daughter.  ¶ 33.  She does not, however, provide any detail regarding her payments or allege
27   that that she paid more money as a result of QDI's conduct.

28

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

### C.   Alleged Exclusionary Conduct

Plaintiffs allege that QDI has acquired and maintained its monopoly in the plan/out-patient billing market through three exclusionary practices.  Each alleged practice will be familiar to the Court based on its review of similar allegations in *RDL*.

#### 1.   *Agreements with Insurers to Narrow Networks*

Plaintiffs allege that QDI has "colluded" with Aetna and Blue Shield of California ("BSC") – the two insurer defendants dismissed from the *RDL* action – "to suppress its competition in the relevant market for 'plan/outpatient billing.'"  ¶¶ 20, 25.[4]  These allegations are nearly identical to the "network narrowing" allegations underlying the *RDL* complaints.

Plaintiffs allege that QDI has had a "preferred national provider" contract with Aetna since 2000, and that QDI "pushed for a nationwide contract . . . that would have been entirely exclusive to [QDI .]" ¶ 88.  Plaintiffs claim that Aetna refused to give QDI exclusivity, but agreed to terminate 400 laboratories throughout the country, including two laboratories in Northern California (Hunter Laboratories and Western Health Sciences Medical Laboratory).  *Id.*  They further allege that QDI "bargained for right-of-first refusal contracts with Aetna," which require Aetna to contact QDI before entering into a new contract with one of QDI's competitors.  ¶ 89.  They also claim that Aetna and QDI have created "bonus pools" of funds that are distributed to physician groups after deducting expenses incurred by Aetna for out-of-network testing by QDI's competitors.  ¶ 97.  And they claim that QDI pays Aetna to "coerce" network physicians not to use out-of-network labs.  ¶¶ 92-96.

In the case of BSC, Plaintiffs allege that, in 2008, QDI provided a 10% discount on laboratory tests in exchange for BSC's agreement to exclude two laboratories (Westcliff Medical Laboratories and Hunter Laboratories) from its network.  ¶ 101.[5]  They allege that after Westcliff was terminated, it went into bankruptcy, and that QDI warned physicians that Hunter, too, would

---

[4] Plaintiffs do not bring claims based on alleged agreements between QDI and dismissed *RDL* Defendant Blue Cross and Blue Shield Association ("BCBSA").

[5] Plaintiffs also allege that through "contract stacking or blocking" with BSC, QDI is able "to block some or all of its competitors from gaining in-network status."  ¶ 105.  Plaintiffs provide no detail regarding this practice, and it is not clear to what they are referring.

4

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

soon be driven into bankruptcy.  ¶ 102.  Plaintiffs claim that Hunter exited the relevant market and

sold most of its business in 2013.  ¶ 103.

These allegations regarding agreements with Aetna and BSC all are materially the same as

allegations made in *RDL*.  *See, e.g.*, RDL SAC ¶¶ 83, 87, 90, 92, 93, 95, 96 (Aetna); *id.* ¶¶ 99, 101,

109 (BSC); Exh. 1 at 1-6.[6]  As in *RDL*, Plaintiffs do *not* allege – nor could they – that QDI is the

exclusive in-network provider for Aetna or BSC in Northern California.

### 2.       *Acquisition of Competitors*

Plaintiffs also allege that QDI has "acquired its competitors for plan/out-patient billing in

order to eliminate their competition."  ¶ 20.  Plaintiffs, however, mention only two acquisitions:  the

acquisition of Unilab Corporation in 2003 (which they note was cleared by the Federal Trade

Commission ("FTC")) and of Dignity Healthcare's outpatient laboratory business  in 2013.  ¶¶ 28-

29, 111-114.  These allegations also are similar to allegations made in *RDL*.  *See, e.g.*, RDL SAC ¶

121; Exh. 1 at 7.

### 3.       *Below-Cost Capitated Agreements/Pull-Through*

Plaintiffs further allege that QDI has offered customers in the physician billing market

below-cost capitated contracts in return for "commitments" by providers to refer to QDI all testing

in the plan/outpatient billing market.  ¶¶ 20-21, 72.  Plaintiffs call such referrals "pull-through," ¶ 22,

and claim that the below-cost contracts are "kickbacks," ¶¶ 20-22.  These allegations are less

detailed variants of otherwise identical allegations made in *RDL*.  *See, e.g.*, RDL SAC ¶¶ 61-67;

Exh. 1 at 7-8.

### D.       <u>Alleged Anti-Competitive Effects</u>

Plaintiffs assert that the alleged exclusionary conduct has harmed competition in three ways.

*First*, they claim that QDI charges "above-competitive" prices in the plan/out-patient billing

market.  They assert that because QDI "often substantially discounts its prices in the physician

---

[6] Plaintiffs also allege that Aetna and BSC "assist" QDI by sending payments for out-of-network labs to patients, rather than to the labs themselves.  ¶¶ 99, 104.  The *RDL* plaintiffs made a similar allegation that Blue Plans sent payments for out-of-network labs to patients.  *See, e.g.*, RDL SAC ¶ 35; Exh. 1 at 6-7.  Plaintiffs do not allege that this practice is the result of any agreement with QDI.

5

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1   billing market to well below cost to get pull-through business in the relevant plan/out-patient billing

2   market," QDI "must" add a "monopoly premium" for pull-through testing to compensate.  ¶ 117.

3   The *RDL* plaintiffs made similar allegations.  *See, e.g.*, RDL SAC ¶ 3; Exh. 1 at 8-9.

4         *Second*, Plaintiffs claim that QDI offers "inferior quality," citing fines QDI allegedly paid for

5   faulty parathyroid test results, a recall due to inaccurate Vitamin D results, and a settlement relating

6   to "fraudulent billing."  ¶ 118.  The *RDL* plaintiffs made identical allegations.  *See, e.g.*, RDL SAC ¶

7   116-17; Exh. 1 at 9-10.

8         *Third*, Plaintiffs claim that QDI has "succeeded in reducing choice for purchasers in the

9   relevant market for plan/outpatient testing" by eliminating competitors.  ¶ 119.  These allegations

10  also parrot allegations made in *RDL*.  *See, e.g.*, RDL SAC ¶ 55; Exh. 1 at 11.

11        Plaintiffs assert that there are a variety of barriers to competition in the relevant markets,

12  which are nearly identical to the barriers to entry alleged in *RDL*.  These include, among other

13  things, physicians' alleged preference to send all of the laboratory business to a single lab, which

14  Plaintiffs refer to as "one-stop shopping."  ¶¶ 62-68; *see also* RDL SAC ¶¶ 115, 119; Exh. 1 at 13.

15                          **STATEMENT OF THE ISSUES**

16        1.      Whether all of Plaintiffs' claims should be dismissed because Plaintiffs have not

17  alleged injury-in-fact and thus lack standing.

18        2.      Whether Plaintiffs' Sherman Act and Cartwright Act claims should be dismissed

19  because the Complaint does not allege (a) harm to competition or antitrust injury; (b) a plausible

20  relevant market; or (c) monopoly power in that market.

21        3.      Whether Plaintiffs' UPA claim, Cal. Bus. & Prof. Code §§ 17043-17044, should be

22  dismissed because Plaintiffs, as consumers, cannot recover damages, and because the Complaint

23  fails to allege below-cost pricing or that QDI acted with the purpose of injuring a competitor or

24  destroying competition.

25        4.      Whether Plaintiffs' UCL claim, Cal. Bus. & Prof. Code § 17200 *et seq.*, should be

26  dismissed because Plaintiffs fail to allege predicate violations of other laws and plead no basis for

27  restitution.

28

ACTIVE 206095729v.10

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "There must be 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement," *id.*, and the Court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations," *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

Due to the substantial cost of discovery in antitrust cases, courts must "['']insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Twombly*, 550 U.S. at 558. Further, a complaint that fails to plead facts sufficient to establish Article III standing does not state a "plausible" claim for relief under *Iqbal* and *Twombly*, and also should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). *See, e.g.*, *Brownfield v. Bayer Corp.*, No. 2:09-cv-00444 JAM-GGH, 2009 U.S. Dist. LEXIS 63057, at *12 (E.D. Cal. July 6, 2009) (finding that plaintiff had not pleaded facts sufficient to show injury-in-fact and therefore complaint was deficient under *Iqbal* and *Twombly*); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ( "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' . . . [and] should be dismissed under Rule 12(b)(1).").

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III AND STATUTORY STANDING

Article III standing is a "jurisdictional prerequisite" to any claim brought in federal court. *See, e.g.*, *Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1254-55 (9th Cir. 2008). To establish constitutional standing, a plaintiff must allege facts sufficient to establish an injury-in-fact, a causal connection between the injury and the conduct complained of, and redressability. *See, e.g.*, *id.* (rejecting antitrust claims for lack of Article III standing where plaintiff "did not show that he ever purchased an item for a higher price than he would have paid had there been no marketing

7

ACTIVE 206095729v.10

1    agreement and thus has suffered no injury-in-fact"); *McGrath v. Home Depot USA, Inc.*, 298 F.R.D.

2    601, 610 (S.D. Cal. 2014) (dismissing complaint for lack of Article III standing due to failure to

3    allege injury-in-fact).  To meet Article III's injury-in-fact requirement, the plaintiff's alleged injury

4    must be "concrete and particularized" as well as "actual or imminent, not conjectural or

5    hypothetical."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).  In

6    other words, "a plaintiff's complaint must establish that he has a 'personal stake' in the alleged

7    dispute, and that the alleged injury suffered is particularized as to him."  *Raines v. Byrd*, 521 U.S.

8    811, 819 (1997).

9            Injury-in-fact also is required for statutory standing to bring a monopolization claim.  *See* 15

10   U.S.C. § 15 ("Any person *who shall be injured* in his business or property *by reason of* anything

11   forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ."

12   (emphasis added)).  An antitrust complaint must "allege sufficient facts from which the court can

13   discern the elements of an injury resulting from an act forbidden by the antitrust laws.'"  *Cost Mgmt.*

14   *Servs., v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996).  Only individuals who possess

15   antitrust standing by virtue of having suffered such injury may sue to redress an antitrust violation.

16   *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 529-35

17   (1983).[7]

18       **A.    Plaintiffs Do Not Allege Injury-In-Fact**

19           Plaintiffs' vague allegations that they paid "co-payments" and "deductibles" to QDI are not

20   sufficient to establish that Plaintiffs were injured by QDI's alleged exclusionary conduct.  *See* ¶¶ 33-

21   35.  Accordingly, the Complaint should be dismissed in its entirety for lack of standing.

22           Plaintiffs do not allege that they paid more money than they otherwise would have as a result

23   of QDI's conduct.  For example, they do not plead that their co-payment obligations, which often are

24   fixed amounts set by the health plans themselves, vary depending on the amount that QDI charges

25   for laboratory tests.  For example, if Plaintiffs must make the same $20 co-payment whether QDI

26   _____

27   [7] Failure to allege injury-in-fact also is fatal to claims under the UCL.  *See, e.g.*, *Spindler v. Johnson & Johnson Corp.*, No. C 10-01414 JSW, 2011 WL 12557884, at *4 n.2 (N.D. Cal. Aug. 1, 2011).

28

                                                        8

ACTIVE 206095729v.10

charges $80 or $200 or some other amount, Plaintiffs are not injured.  *See Loren v. Blue Cross &*

*Blue Shield of Mich.*, 505 F.3d 598, 608-09 (6th Cir. 2007) (affirming dismissal of ERISA claim for

failure to plead injury resulting from allegedly inflated hospital charges, explaining that "individual

injury would only be possible if Plaintiffs paid percentage contributions instead of the usual flat-rate

co-payment or deductible").  Nor do Plaintiffs plead that their co-payments would have been lower if

their laboratory work had been referred to a competitor of QDI.  They also do not plead that, due to

QDI's "monopoly" prices, they paid more than they otherwise would have toward their deductibles;

again, if Plaintiffs would have reached their deductibles regardless of anything QDI did, then they

were not injured.[8]

On similar facts, courts have dismissed antitrust complaints for lack of Article III and

statutory standing.  For example, in *Somerville v. Stryker Orthopaedics*, No. C 08-02443 JSW, 2009

WL 113369 (N.D. Cal. Jan. 16, 2009), the plaintiff asserted Cartwright Act and UCL claims based

on allegations of a conspiracy between a hip replacement manufacturer and hospitals and physicians

in which the manufacturer paid "kickbacks" to physicians who agreed to use its products

exclusively.  *Id.* at *1.  She alleged that this conspiracy caused her to pay out-of-pocket expenses for

hip replacement surgery, and her complaint specified the dollar amount she paid for her hip

replacement surgeries.  *Id.* at *4.  Nevertheless, the court dismissed the claims based in part on the

plaintiff's failure to allege whether any portion of the out-of-pocket expenses were attributable to

increased costs for hip replacement products due to the misconduct alleged.  *Id.*

Similarly, in *Spindler v. Johnson & Johnson Corp.*, No. C 10-01414 JSW, 2011 WL

12557884 (N.D. Cal. Aug. 1, 2011), the court dismissed Sherman Act and UCL claims premised on

various supply and distribution agreements that allegedly forced residents of the defendant nursing

---

[8] Plaintiffs also do not plead that, as a result of QDI's conduct, their health plans raised their insurance premiums.  In fact, their own allegations show that such increases are implausible, given that "health insurers in the relevant market do not fully focus on routine testing fees, which typically account for *only about three percent* of their costs for patient care."  ¶ 125 (emphasis added).  But even if Plaintiffs made such an allegation, they would be barred from bringing their Sherman Act claim under the doctrine set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which bars claims based on overcharges that are passed on to indirect victims of an antitrust violation.

ACTIVE 206095729v.10

1    home operator to use drugs manufactured by the defendant drug company.  Although the plaintiffs

2    there alleged that they paid specific amounts for nursing home care, including payments for

3    prescription drugs, the court concluded that the plaintiffs lacked standing, explaining:

> Plaintiffs do not allege that J & J's medications that Plaintiffs took cost more than
> other equivalent medications when they purchased such medications or that the cost
> of J & J's medications that Plaintiffs took rose as a result of Defendants' alleged
> anti-competitive conduct. More significantly, Plaintiffs fail to allege that any such
> additional costs were paid by Plaintiffs, such as by paying increased co-payments.
> Nor do Plaintiffs allege, as they must, that their out-of-pocket costs for their long
> term health care increased due to Defendants' alleged conduct.

8    *Id.* at *4.  Here, Plaintiffs fail to plead any facts that plausibly suggest that their out-of-pocket

9    expenses (if any) increased due the alleged conduct.

10         Because Plaintiffs' vague allegations of payments to QDI do not plausibly establish Article

11   III or statutory standing, the Complaint should be dismissed in its entirety.

### B.   Plaintiffs Lack Standing to Bring Claims Based On Alleged Injuries to Health Plans

14         The Plaintiff consumers allege that, in addition to payments they made to QDI, their health

15   plans also made payments to QDI on their behalf.  ¶¶ 33-35.  Plaintiffs thus purport to bring claims

16   on behalf of a class that includes both consumers and health plans.  *E.g.*, ¶ 40.  However, Plaintiffs

17   allege no basis whatsoever to conclude that *they* have been injured as a result of payments made by

18   their health plans.  Further, to the extent that they claim that their health plans passed on any injury

19   to the consumers, *see* ¶ 108, those claims run squarely into *Illinois Brick*.  *See supra* n.8.

20   Accordingly, Plaintiffs lack the "personal stake in the alleged dispute" necessary to establish

21   standing to bring claims on behalf of the health plans.  *Raines*, 521 U.S. at 819.[9]  The Court thus

---

[9] It makes no difference that Plaintiffs bring this case as a class action:  "a class representative must
be part of the class and '*possess the same interest and suffer the same injury*' as the class members."
*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (emphasis added); *see also Lewis v. Casey*,
518 U.S. 343, 357 (1996) ("[E]ven named plaintiffs who represent a class must allege and show that
they personally have been injured, *not that injury has been suffered by other, unidentified members
of the class to which they belong and which they purport to represent*." (emphasis added)).  Plaintiffs
merely plead that health plans made payments to QDI; they allege no facts that plausibly suggest that
the health plans "possess the same interest and suffer the same injury" as consumers who pay QDI
only as a result of co-pays and deductibles.

1    should reject the Plaintiff consumers' attempt to inflate the putative class's damages by

2    piggybacking injuries allegedly sustained by health plans to their own claims.

3    **II.   PLAINTIFFS' MONOPOLIZATION CLAIMS ARE DEFICIENT**

4           Plaintiffs' principal claims are for monopolization under the Sherman and Cartwright Acts.

5    As this Court explained in *RDL*, "To establish liability for a monopolization claim, a plaintiff must

6    demonstrate '(1) the possession of monopoly power in the relevant market and (2) the willful

7    acquisition or maintenance of that power as distinguished from growth or development as a

8    consequence of a superior product, business acumen, or historic accident.'"  10/18/13 Order (Exh. 3)

9    at 23 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992)).  "The test

10   of willful maintenance or acquisition of monopoly power is whether the acts complained of

11   unreasonably restrict competition."  *Id.* (quoting *Drinkwine v. Fed. Publ'ns, Inc.*, 780 F.2d 735, 739

12   (9th Cir. 1985)).  In addition, "[a] private plaintiff must also demonstrate antitrust injury by 'proving

13   that his loss flows from an anticompetitive aspect or effect of the defendant's behavior.'"  *Id.*

14   (quoting *Rebel Oil Co., v. Atl. Ritchfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1985)).  In other words,

15   Plaintiffs must set forth facts, which, if proved, establish "injury to the market or to competition in

16   general, not merely injury to individuals or individual firms."  *McGlinchy v. Shell Chem. Co.*, 845

17   F.2d  802, 811 (9th Cir. 1985); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458-59

18   (1993) ("[The Sherman Act] directs itself not against conduct which is competitive, even severely

19   so, but against conduct which unfairly tends to destroy competition itself.").

20          Plaintiffs here, as in *RDL,*  have not plausibly alleged any of these elements.  Accordingly,

21   their monopolization claims under the Sherman Act and Cartwright Act should be dismissed.[10]

22

23

24

25

26   _____

27   [10] "Because California's Cartwright Act mirrors the federal Sherman Act, the Court analyzes them
     jointly according to federal law."  10/18/13 Order (Exh. 3 ) at 13 n.4.

28

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

A.     **Plaintiffs Do Not Plausibly Allege Harm to Competition or Antitrust Injury**

1.     ***Plaintiffs Fail to Plead that QDI's Alleged Discounts to Aetna and BSC or QDI's Acquisitions Unreasonably Restricted Competition***

Plaintiffs devote substantial portions of their Complaint to the same allegations concerning QDI's alleged agreements with Aetna and BSC and QDI's acquisitions of competitors that this Court deemed insufficient to state an antitrust claim in *RDL*.  Plaintiffs' monopolization claims should be dismissed for the same reasons as before.

As an initial matter, it is not an antitrust violation for a party to discount its prices in order to obtain in-network status so that it is preferred over its out-of-network competitors – that is not a competition offense, it is *competition*.  The antitrust laws approve discounts as pro-competitive. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008) ("[B]ecause of the benefits that flow to consumers from discounted prices, price cutting is a practice the antitrust laws aim to promote.").  Nor it is an antitrust violation to condition discounts on the exclusion of competitors, as the Complaint alleges QDI has done here.  The antitrust laws also approve of competition on price and other factors to be selected as an in-network provider.  *See, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) ("[I]f [the health plan] is a competent negotiator, the closed network should lower cost to [the health plan] of supplying drugs to customers (because most suppliers will cut prices in exchange for increased volume).");  *Park Ave. Radiology Assocs. v. Methodist Health Sys., Inc.*, No. 98-5668, 1999 U.S. App. LEXIS 29986, at *12 (6th Cir. Nov. 10, 1999).  The inevitable result of competition for in-network status is that some laboratories will be out-of-network – but that does not itself establish harm to *competition*.  *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (the purpose of antitrust laws is the "protection of *competition*, not *competitors*" (emphasis original)).

Rather, for the challenged agreements to constitute monopolization, Plaintiffs must, at a minimum, provide "context against which the Court may evaluate the extent to which competition has been restricted."  10/18/13 Order (Exh. 3) at 24.  In *RDL*, the Court dismissed Plaintiffs' Section

12

ACTIVE 206095729v.10

2 claims to the extent that they were based on the same agreements because the Plaintiffs "d[id] not describe the dynamics over time of any of the five alleged relevant markets," and "[w]ithin those markets, the plaintiffs d[id] not say how Quest has grown or maintained its market position or how competition generally has fared relative to Quest." *Id.* at 25; *see also* 2/6/14 Order (Exh. 4) at 19 (dismissing claims because Plaintiffs did not allege "the extent of foreclosure, what size each market is, or how the agreement affected each market or its participants' shares").

Plaintiffs' recycled allegations here fail for the same reasons. As in *RDL*, Plaintiffs do not allege how QDI's agreements with BSC and Aetna changed QDI's market position or that of its competitors. *See* 10/18/13 Order (Exh. 3) at 25 (dismissing claims based on Aetna and BSC agreement where plaintiffs failed to plead how "Quest has grown or maintained its market position or how competition generally has fared relative to Quest" as a result of the agreements); 2/6/14 Order (Exh. 4) at 19 ("[W]hile the plaintiffs allege that Quest, LabCorp, and Hunter are participants and the plaintiffs provide their market shares, there is no allegation about how their shares were actually affected by the BSC-Quest Agreement."). Plaintiffs merely allege that, as a result of the challenged agreements, BSC and Aetna each terminated two laboratories from their networks (Westcliff and Hunter, and Hunter and Western Health Sciences, respectively). ¶ 101. But, more detailed versions of the same allegations were insufficient to plead an unreasonable restriction on competition in *RDL*. *See* 10/18/13 Order (Exh. 3) at 18 ("While the FAC alleges that Hunter was Quest's 'largest privately owned competitor operating a full-service laboratory in Northern California' and 'Westcliff was the largest privately owned laboratory in California and Quest's second largest competitor in Southern California,' FAC ¶ 96, this is not enough to show the size of the relevant markets, let alone the magnitude of foreclosure."). "All that can be said [from such allegations] is that three of Quest's alleged competitors were injured, but the antitrust laws are meant to protect competition, not competitors." *Id.* at 19.[11] The Court should reach the same conclusion here.[12]

---

[11] The Court also rejected, as grounds for finding the Aetna and BSC agreements "exclusionary," allegations of a "right-of-first refusal" agreement with Aetna, "coercion" and "harassment" of

*(Footnote continued)*

ACTIVE 206095729v.10

1    As for QDI's acquisitions, Plaintiffs merely allege that, as a result of the Unilab acquisition

2   in 2003 – which Plaintiffs note that, with certain required divestitures, the FTC cleared – QDI's

3   share of the combined plan/out-patient and physician billing markets rose from 17% to 53%, ¶¶ 29,

4   113; the Dignity Health acquisition added another 3% to QDI's share, ¶ 114; and, all told, QDI now

5   "has at least a 70% market share" in an unspecified market, ¶¶ 119, 122.  But these allegations do

6   not plead how the acquisitions impacted QDI's or competitors' market share in the *specific* relevant

7   markets alleged in the Complaint (i.e., plan/out-patient billing and physician billing), as opposed to

8   the "combined" market or some other unspecified market.  Nor do these allegations say anything

9   about nearly half of QDI's alleged growth over a ten-year period.  *Cf. United States v. Grinnell*

10  *Corp.*, 384 U.S. 563, 571 (1966) (the Sherman Act does not punish possession of monopoly power

11  that is derived from "growth or development as a consequence of a superior product, business

12  acumen, or historic accident").  And, as in *RDL*, Plaintiffs plead no other facts that would plausibly

13  establish that these two acquisitions were anti-competitive.  *See* 10/18/13 Order (Exh. 3) at 25.

14    Accordingly, the challenged agreements and acquisitions fail to establish exclusionary

15  conduct or harm to competition, and, as in *RDL*, Plaintiffs' Section 2 claims based on this alleged

16  conduct should be dismissed.

17

18

---

19  physicians, and physicians' preference to use a single laboratory for all of their patients, which
20  Plaintiffs nonetheless re-allege here.  10/18/13 Order (Exh. 3) at 21-22.

21  [12] As in *RDL*, Plaintiffs here also allege no plausible economic incentive for Aetna and BSC –
    purchasers of laboratory services – to enable a seller of those services, QDI, to restrain competition.
22  *See, e.g.*, *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir.
    1998) (to survive a motion to dismiss "[a]ntitrust claims must make economic sense.").  Plaintiffs
23  claim that the arrangement is plausible because "health insurers cut their short-term losses" through
    QDI's discounted prices, and they can pass on any above-competitive pricing in the plan/out-patient
24  billing market to its customers.  ¶ 108.  But Aetna and BSC compete with other health insurers for
    employer and consumer business.  *See* ¶ 25 (alleging that BSC and Aetna "are the third and fourth
25  largest private health insurers in Northern California").  Plaintiffs do not adequately explain why
    BSC or Aetna would put themselves at a long-term competitive disadvantage for QDI's benefit.  As
26  this Court recognized in *RDL*, "courts tend to be skeptical of such claims."  10/18/13 Order (Exh. 3)
27  at 21 (quoting *Stop & Shop*, 373 F.3d at 66).

28

---

14

ACTIVE 206095729v.10

2.      ***Plaintiffs' Conclusory Allegations of Higher Prices and a
Reduction in Quality and Consumer Choice Do Not Plausibly
Allege Harm to Competition or Antitrust Injury***

Having failed to establish impact on the competitive market, Plaintiffs attempt to save their

claims by pleading that QDI's alleged conduct nonetheless harms consumers due to:  (1) QDI's

"above-competitive" prices in the plan/out-patient billing market; (2) QDI's ability to charge such

prices in spite of its inferior quality; and (3) reduced choice for purchasers in the plan/out-patient

billing market due to elimination of QDI's competitors.  These conclusory allegations do not

plausibly establish harm to competition or antitrust injury.

*First*, Plaintiffs' bare assertions that QDI charged "above-competitive" prices in the plan/out-

patient billing market are conclusory and therefore implausible.  *See Iqbal*, 556 U.S. at 678 ("[A]

complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement.").

Plaintiffs do not, for example, plead the "competitive" price for routine laboratory tests or how

QDI's prices compare.[13]  Instead, Plaintiffs claim that because QDI allegedly discounts its prices

below-cost in the physician billing market, QDI "must" charge supra-competitive prices in the

plan/out-patient billing market to compensate.  ¶ 117.  But the allegation that QDI engages in below-

cost pricing in one market does not make it more or less probable that QDI engaged in supra-

competitive pricing in a separate market in which it allegedly has monopoly power.  As the Second

Circuit has observed:

> A monopolist presumably always charges the highest available price to maximize
> its profits without attracting competitors to enter the market. Thus, an antitrust
> plaintiff asserting that a monopolist defendant engaged in a predatory scheme
> faces a significant hurdle in showing the defendant raised prices in one market to
> compensate for losses elsewhere.

*Virgin Atl. Airways v. British Airways PLC*, 257 F.3d 256, 271 (2d Cir. 2000) (citations omitted); *see
also Advo Inc. v. Philadelphia Newspapers*, 51 F.3d 1191, 1203 (3d Cir. 1995) (similar); *Adaptive
Power Solutions*, 141 F.3d at 952 ("Antitrust claims must make economic sense.").  And, in any

---

[13] *See, e.g.*, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-cv-00740 (AJT/TRJ),
2013 WL 6682981, at *6 (E.D. Va. 2013) (conclusory allegations that defendant "demanded and
received 'supracompetitive prices'" were implausible where complaint did not allege specific fees
demanded or paid or why such fees were unlawfully supracompetitive).

15

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1   event, Plaintiffs' allegations that QDI engages in "below-cost" pricing in the physician billing

2   market are wholly conclusory.  Accordingly, Plaintiffs' supposition that QDI *must* charge supra-

3   competitive prices in the patient billing market to compensate for below-cost pricing in the physician

4   billing market (which they have not plausibly alleged) must be rejected.

5          *Second*, Plaintiffs' claims about QDI's "inferior quality" do not suffice.  Plaintiffs rely on the

6   same supposed evidence of QDI's "inferior quality" that failed to carry the day in *RDL*.  *See* Exh. 1

7   at 9-10 (comparing ¶ 59 with RDL SAC ¶¶ 116-117).  In any event, to allege an anticompetitive

8   effect, Plaintiffs must claim a "*market-wide* decline in quality of services" in the relevant markets.

9   *Zoellner v. St. Luke's Regional Med. Center, Ltd.*, 937 F. Supp. 2d 1261, 1268 (D. Idaho 2013)

10  (emphasis original).  But Plaintiffs do not contend that QDI is the sole provider of laboratory

11  services in Northern California, and they plead no facts regarding the quality of services offered by

12  QDI's competitors.  They simply label QDI's quality as "inferior" and "substandard" – which does

13  not plausibly establish a market-wide decline in quality.  *See Twombly*, 127 S. Ct. at 1964-65 ("[A]

14  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels

15  and conclusions . . . .").

16         *Third*, Plaintiffs' related claim that QDI's alleged conduct has reduced consumer choice must

17  be rejected.  As this Court explained in response to the same allegation in *RDL*, "the Ninth Circuit

18  has explicitly held that 'allegations that an agreement has the effect of reducing consumers' choices

19  . . . does not sufficiently allege an injury to competition."  10/18/13 Order (Exh. 3) at 22 (quoting

20  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)).

21         Accordingly, because Plaintiffs do not plead harm to competition or antitrust injury, their

22  monopolization claims must be dismissed.

23        **B.**    **Plaintiffs Have Not Plausibly Alleged Monopoly Power in a Relevant**

24              **Market**

25         Plaintiffs also must plead "both that a 'relevant market' exists and that the defendant has

26  power within that market."  *Newcal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1044 & n.3 (9th

27  Cir. 2008).  Plaintiffs fail to plausibly allege either of these elements.

28

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1.      *Plaintiffs' Relevant Product Market Is Implausible*

Plaintiffs contend that there are two distinct product markets at issue in this case:  (1) sales of out-patient, routine diagnostic testing billed directly to health plans or out-patients ("plan/out-patient billing"), ¶ 46, and (2) these very same routine diagnostic tests billed directly to physicians ("physician billing"), ¶ 52.  Plaintiffs contend that these markets are separate "because the manner in which [QDI] bills for its services is dictated largely by the out-patient's health plan (i.e., by whether the patient is enrolled in an HMO plan)."  ¶ 56.

However, Plaintiffs do not allege any differences in the laboratory services provided in the two alleged markets.  Instead, they purport to identify different markets based on two different *purchasers* of these products:  health plans/patients and physicians.  But "consumers do not define the boundaries of the market; the products or producers do."  *Newcal*, 513 F.3d at 1045 (citing *Brown Shoe*, 370 U.S. at 325).  Thus, "[c]ourts routinely recognize that otherwise identical products are not in separate markets simply because consumers pay for those products in different ways."  *FTC v. Lab. Corp. of Am.*, No. SACV 10-1873, 2011 U.S. Dist. LEXIS 20354, at *47 (C.D. Cal. Feb. 22, 2011).  For example, in *FTC v. Laboratory Corporation of America*, the court rejected an attempt by the FTC to place laboratory services billed on a capitated basis into a relevant product market that excluded laboratory services billed on a fee-for-service basis, as Plaintiffs attempt to do here.  The court explained that "[t]he services provided by clinical labs are identical regardless of payment method," and that "courts . . . have explicitly rejected the notion that various methods of paying for healthcare (HMO, PPO, etc.) are in separate product markets."  2011 U.S. Dist. LEXIS 20354, at *15, *47-48; *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1409-11 (7th Cir. 1995) (HMOs are not in a product market separate from PPOs, because HMOs compete with PPOs for individual and employer business and medical providers can switch between PPOs and HMOs if changes in relative price make one more lucrative than the other).

Plaintiffs here do not claim that consumers lack choice in the type of plan they select.  To the contrary, they allege that there are a variety of health plans available on the market.  These include HMOs where the physician is billed for patients' lab services, as well as PPOs and other plans where the insurer is billed for the services, with the patient bearing the obligation for co-payments and

1  deductibles.  ¶¶ 5-11, 14; *see also In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D.

2  Cal. 2009) (rejecting product market limited to "the provision of Foreign ATM Transactions routed

3  over Star," as distinct from a market for bank deposit accounts, where complaint failed to plausibly

4  allege that customers were "locked-in" to a particular bank's services).  Nor do Plaintiffs allege that

5  health plans conceal how laboratory services are billed, or that consumers do not knowingly choose

6  those plans.  *See, e.g.*, *Newcal*, 513 F.3d at 1045-46 (relevant product markets defined by product's

7  consumers are impermissible where they are the result of contractual agreements that consumers

8  knowingly agreed to); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (similar),

9  *overruled in part on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

10          Accordingly, Plaintiffs' allegations of separate markets for "plan/out-patient billing" and

11  "physician billing" for the same out-patient laboratory tests should be rejected.

12
13                    **2.     *Plaintiffs Do Not Plausibly Allege Monopoly Power in a
                               Relevant Market Identified in the Complaint***

14          Even if Plaintiffs' alleged relevant product markets were proper, they do not plead facts

15  plausibly showing that QDI has monopoly power in either of those markets.

16          ***Direct Evidence.***  Plaintiffs first rely on so-called "direct evidence" of market power –

17  primarily, QDI's allegedly "above-competitive" prices in the plan/out-patient billing market.  ¶ 58.

18  However, as explained above, Plaintiffs' allegations that QDI charged "above-competitive" prices

19  are wholly conclusory and depend entirely on Plaintiffs' unsupported and economically implausible

20  allegation that QDI necessarily engaged in supra-competitive pricing in the plan/out-patient billing

21  market to compensate for below-cost pricing in the physician billing market.  *See* pp. 15-16, *supra*.

22  And even if Plaintiffs adequately pleaded that QDI charged "above-competitive" prices, nowhere do

23  they allege that QDI has restricted its output, as required to plead direct evidence of market power.

24  *Rebel Oil*, 51 F.3d at 1434; *see also Stewart v. Gogo, Inc.*, No. C-12-5164 EMC, 2013 WL 1501484,

25  at *4 n.3 (N.D. Cal. Apr. 10, 2013) (allegations of supra-competitive prices insufficient to allege

26
27
28

ACTIVE 206095729v.10

1    direct evidence of market power where complaint lacked allegations of restricted output).  Thus,

2    Plaintiffs' alleged "direct evidence" does not suffice to state a plausible monopolization claim.[14]

3         ***Circumstantial Evidence.***  Plaintiffs' allegations of "circumstantial evidence" of QDI's

4    market power fare no better.  To rely on circumstantial evidence, Plaintiffs must:  "(1) define the

5    relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that

6    there are significant barriers to entry and show that existing competitors lack the capacity to increase

7    their output in the short run."  *Rebel Oil*, 51 F.3d at 1434.  However, even if Plaintiffs had plausibly

8    defined a relevant market (which they have not), they do not adequately plead that QDI owns a

9    "dominant" share of the market, meaning, in this monopolization case, at least 65 percent.  *Image*

10   *Tech. Serv. v. Eastman Kodak*, 125 F.3d 1195, 1206 (9th Cir. 1997) (quoting *Rebel Oil*, 51 F.3d at

11   1434).

12        Here, Plaintiffs claim that QDI has a market share of "at least 70% by revenue" in the

13   *combined* market for physician billing and patient billing.  ¶ 61.  However, this allegation is utterly

14   conclusory, alleges no facts in support, and appears to have been plucked directly from the Original

15   RDL Complaint.  *See* RDL Compl. ¶ 74.

16        Moreover, Plaintiffs' market power allegations do not match the markets actually alleged in

17   the Complaint.  In *RDL*, the FAC alleged that QDI had "an estimated 73% market share of the

18   Northern California physician outpatient market."  Because the "Northern California physician

19   outpatient market" was not one of the markets pleaded in the complaint, the Court rejected plaintiffs'

20   market power allegations, explaining that "[t]o state a claim, the plaintiffs must allege 'monopoly

21   power *in the relevant market*,' and not just any market."  10/18/13 Order (Exh. 3) at 24 (quoting

22   *Eastman Kodak*, 504 U.S. at 480) (emphasis in Order)).  Plaintiffs make the same mistake here.

23   They do not allege a "combined" relevant market, but rather *separate* plan/out-patient and physician

24

---

25   [14] Plaintiffs also claim that QDI's ability to maintain high market share in spite of its "inferior"
     quality is direct evidence of QDI's market power.  ¶ 59.  But this allegation assumes that Plaintiffs

26   have adequately pleaded QDI's market share, which, as explained below, they have not.  In any
     event, as described in Section II.A.2, *supra*, Plaintiffs' allegations of reduced quality do not

27   plausibly establish harm to competition.

28

billing markets.  And while they make perfunctory attempts to allege that, because QDI's share of the "combined" market is 70%, QDI's market share must be "at least" 70% in *each* of the physician billing and plan/out-patient billing markets, ¶¶ 61, 62, 69, these assertions do not "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.[15]  Accordingly, as in *RDL*, Plaintiffs' market power allegations should be rejected.

## III.   PLAINTIFFS DO NOT PLEAD AN UNFAIR PRACTICE ACT CLAIM

Plaintiffs also tack on a claim under the UPA, which prohibits selling a product below-cost or as a loss leader for the purpose of injuring a competitor or destroying competition.  Cal. Bus. Prof. Code §§ 17043-44; *Cel-Tech Comm., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 174-75 (1999). As this Court explained in *RDL*, "[i]n order to adequately plead a claim under the UPA, 'a plaintiff must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business," as well as the requisite "'desire' to injure competitors or destroy competition."  10/18/13 Order (Exh. 3) at 28-29 (quoting *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of the City and Cnty. of San Francisco*, 114 Cal. App. 4th 309, 322 (Ct. App. 2003), and *Cel-Tech*, 20 Cal. 4th at 169).

While the *RDL* Plaintiffs were permitted to proceed with their UPA claim based on allegations introduced in their First Amended Complaint, this Complaint is distinguishable in two important respects.  First, the differing identity of the plaintiffs in *RDL* (competitors of QDI) and Plaintiffs here (consumers of QDI's services) is decisive.  Plaintiffs are not competitors of QDI, so they cannot plausibly claim to have been damaged by the conduct the UPA prohibits.  Second, even if consumers could bring a UPA claim, Plaintiffs here do not muster the allegations necessary to plead a viable UPA claim – despite this Court's detailed guidance in *RDL*.

---

[15] Plaintiffs cite "the high penetration of managed care in Northern California" and "the pervasiveness of exclusive capitated contracts," combined with the "inducements" QDI offers for pull-through business and physicians' "preference" for "one-stop shopping." ¶ 62.  However, these vague allegations provide no basis for parsing QDI's share of the physician billing and the patient/out-patient billing markets alleged here from the 70% share of a "physician outpatient market" that Plaintiffs simply lifted from the *RDL* Complaint.

1

### A.     <u>Plaintiffs As Consumers Cannot Recover Damages Under the UPA</u>

2    As numerous cases recognize, the UPA protects **competitors**. *See, e.g.*, *Fisherman's Wharf*,

3 114 Cal App. 4th at 322 ("[T]he prohibitions in the UPA on below-cost sales 'are designed to protect

4 . . . [a *competitor*] whose more powerful neighbor is attempting to drive him out of business.")

5 (quoting *ABC Int'l Traders, Inc. v. Matsushita Electric Corp.*, 14 Cal. 4th 1247, 1261 (1997))

6 (emphasis added); *ABC Int'l Traders*, 14 Cal. 4th at 1261 ("[A] primary concern in the enactment of

7 the UPA was the protection of smaller, independent retailers, especially grocers, against unfair

8 competitive practices of the large chain stores."); *Bay Guardian Co. v. New Times Media*, 187 Cal.

9 App. 4th 438, 460 (Ct. App. 2010) ("[S]ection 17043 is designed to reach a one-on-one clash

10 between competitors, not just an effect on competition.").

11    Thus, even if Plaintiffs plausibly pleaded some injury-in-fact – which, as explained in

12 Section I.A, *supra*, they have not – these consumer Plaintiffs cannot contend that they have suffered

13 a "competitive injury" that the UPA compensates with damages.[16] *See, e.g.*, *Fisherman's Wharf*,

14 114 Cal App. 4th at 330 (requiring plaintiffs to link below-cost pricing to a "competitive injury" and

15 to prove "that the below-cost sales were done 'for the purpose of injuring competitors or destroying

16 competition'"). Indeed, as a general matter, discounts *benefit* consumers, and QDI is not aware of

17 any case in which a *customer*, as opposed to a competitor, was able to prove actual damages under

18 the UPA. *See Leonberger v. Wells Fargo*, No. 13-0114 PJH, 2013 U.S. Dist. LEXIS 89836, at *14

19 (N.D. Cal. June 25, 2013) (dismissing section 17043 claim brought by homeowner against lender in

20 part because homeowner was not a competitor of lender). At most, Plaintiffs may seek injunctive

21 relief. *See* Cal. Bus. & Prof. Code § 17082; *see also Siechert & Synn v. Apple Inc.*, No. H036402,

22 2015 WL 513645, at *17 (Cal. Ct. App. Feb. 6, 2015) ("Plaintiffs seek more than injunctive relief

23 here. They also seek actual and punitive damages. They must plead and prove competitive injury.");

24 *Uneedus v. Cal. Shoppers, Inc.*, 86 Cal. App. 3d 932, 943 (Ct. App. 1978) ("In the absence of such

25

26

---

27 [16] Plaintiffs' failure to plead any injury (much less one causally connected to any below-cost pricing) provides another basis for dismissal of the UPA claim.

28

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1    proof [of actual damages], treble damages are not permitted and a plaintiff is limited to an injunctive

2    remedy.").

3    **B.      Plaintiffs Do Not Plead The UPA's Purpose Requirement**

4            Plaintiffs also fail to satisfy the UPA's "stringent" purpose requirement.  *Bay Guardian*,187

5    Cal. App. 4th at 456.  Under the UPA, Plaintiffs must plead that the defendant priced below-cost

6    "for the ***purpose*** of injuring ***competitors*** or destroying competition."  Cal. Bus. & Prof. Code §

7    17043 (emphasis added).  "Purpose" means more than intentional conduct or knowledge of a likely

8    effect, but rather that it was QDI's "conscious object" and "positive desire" to "cause the [adverse]

9    result."  *Cel-Tech*, 20 Cal. 4th at 173.

10           Plaintiffs do not allege that QDI's purpose was to injure competitors, but rather that QDI

11   priced below-cost with the purpose of harming ***class members***.  *See* ¶ 144 ("Quest's conduct has the

12   purpose of injuring members of the Class . . . .").  However, a purpose to harm consumers is not

13   actionable under the UPA.  And even if such a purpose were actionable, Plaintiffs must rely on an

14   attenuated theory of harm whereby below-cost pricing (which generally *benefits* consumers) in one

15   market allowed QDI to charge Plaintiffs above-competitive prices (which are not the subject of the

16   UPA) in another market.  As explained above, this theory makes no economic sense.  *See supra*, pp.

17   15-16.  Further, Plaintiffs plead no facts to make plausible the highly improbable notion that QDI's

18   "conscious object" or "positive desire" in pricing below-cost in the physician billing market was to

19   *harm* its customers in the plan/out-patient billing market.  *Cel-Tech*, 20 Cal. 4th at 173.

20           Nor do Plaintiffs otherwise allege that QDI acted "for the purpose of injuring competitors or

21   destroying competition."  Cal. Bus. & Prof. Code § 17043.  While Plaintiffs purport to allege that

22   QDI's below-cost pricing took business from certain competitors, Plaintiffs have not pleaded that

23   this result was QDI's "conscious object" or "positive desire."  *Cel-Tech*, 20 Cal. 4th at 173.  Mere

24   *knowledge* that below-cost pricing will take business from competitors is insufficient to satisfy the

25   UPA's purpose requirement.  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1154 (9th Cir.

26   2008).  In addition, Plaintiffs' bare allegation that QDI acted with the purpose of "suppressing

27   competition," ¶ 144, without any supporting factual allegations to make such intent plausible, is too

28

1    conclusory to save Plaintiffs' claim.  Accordingly, Plaintiffs' UPA claim should be dismissed for

2    failure to plead the requisite purpose.

3        **C.    Plaintiffs Do Not Plead A Below-Cost Sale**

4        Plaintiffs also fail to plausibly plead a below-cost sale.  In spite of this Court's detailed

5    discussion of the below-cost requirement in several opinions in *RDL*, Plaintiffs' allegations of

6    below-cost pricing here are wholly conclusory.  Plaintiffs do not allege any of QDI's prices, the

7    costs of any of its services, nor its costs of doing business.  *Indep. Journal Newspapers*, 15 Cal. App.

8    3d at 586-87 (dismissing 17043 and 17044 claims for lack of specific factual allegations as to

9    defendant's costs); *Ameritox Ltd. V. Millennium Labs., Inc.*, No. 8:11-cv-775-T-24-TMB, 2013 U.S.

10   Dist. LEXIS 4005, at *19 (M.D. Fla. Jan. 10, 2013) (dismissing claim under Sections 17043 and

11   17044, explaining that a party asserting claims under these sections "must allege the sales price, the

12   cost of the product, and the cost of doing business").  Accordingly, Plaintiffs' UPA claim also

13   should be dismissed for failure to plead the "below cost" requirement.  *See* 6/25/13 Order (Exh. 2) at

14   22-23.

15   **IV.    PLAINTIFFS DO NOT PLEAD AN UNFAIR COMPETITION LAW CLAIM**

16       The UCL prohibits business acts that are unfair, unlawful or fraudulent.  *See* Cal Bus. & Prof.

17   Code § 17200 *et. seq*; *Cel-Tech*, 20 Cal. 4th at 179-181.  Plaintiffs rely on the "unfair" and

18   "unlawful" prongs.  *See* ¶¶ 136-38.  Here, Plaintiffs allege in only the vaguest terms that QDI has

19   engaged in conduct that is "unfair" or "unlawful."  *Id.*  However, it is apparent that they rely on the

20   same conduct that forms the basis for their monopolization and UPA claims.  Because those claims

21   fail, the UCL claim also should be dismissed.  *See* 10/18/13 Order (Exh. 3) at 34; 6/25/13 Order

22   (Exh. 2) at 24.[17]

23

24   [17] Further, Plaintiffs seek restitution under the UCL but have not alleged facts to show they are
     entitled to that remedy.  *See* ¶¶ 139-40.  "[T]he notion of restoring something to a victim of unfair

25   competition," requires that "[t]he offending party must have obtained something to which it was not
     entitled *and* the victim must have given up something which he or she was entitled to keep."  *Day v.*

26   *AT&T Corp.*, 63 Cal. App. 4th 325, 340 (Ct. App. 1998).  The Complaint does not establish a basis
     for restitution because it does not allege what the Plaintiffs are entitled to that QDI possesses.  For

27   this reason, too, the UCL claim must be dismissed.  *See, e.g., In re High-Tech Emp. Antitrust Litig.*,

28                                                                            *(Footnote continued)*

QUEST DIAGNOSTICS INCORPORATED'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS'
COMPLAINT AND [PROPOSED] ORDER | 3-15-CV-00415-WHO

ACTIVE 206095729v.10

1

## <u>CONCLUSION</u>

2      For the foregoing reasons, the Complaint should be dismissed in its entirety.

3

4    Dated:  March 16, 2015                          Respectfully Submitted,

5                                                     SIDLEY AUSTIN LLP

6

7

8                                                     By:   __/s/ Ryan Sandrock_____
                                                          Ryan Sandrock
9                                                         Attorney for Defendant

10                                                    QUEST DIAGNOSTICS INCORPORATED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ─────────────────────────
     856 F. Supp. 2d 1103, 1124 (N.D. Cal. 2012) (dismissing a UCL claim for failure to plead grounds
27   for restitution).

28

ACTIVE 206095729v.10

1  Richard D. Raskin
   rraskin@sidley.com
2  (*pro hac vice application pending*)
   Allison W. Reimann
3  areimann@sidley.com
   (*pro hac vice application pending*)
4  SIDLEY AUSTIN LLP
   One South Dearborn Street
5  Chicago, Illinois 60603
   Telephone: (312) 853-7000
6  Facsimile: (312) 853-7036

7  Ryan M. Sandrock (SBN 251781)
   rsandrock@sidley.com
8  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
9  San Francisco, California 94104
   Telephone: (415) 772-1200
10 Facsimile: (415) 772-7400

11
   Attorneys for Defendant
12 QUEST DIAGNOSTICS INCORPORATED

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

17 COLLEEN EASTMAN, CHRISTI CRUZ,          )   Case No.: 3:15-cv-00415-WHO
   AND CARMEN MENDEZ                       )
18                                         )   **[PROPOSED] ORDER GRANTING QUEST**
                                           )   **DIAGNOSTICS INCORPORATED'S**
19            Plaintiffs,                  )   **MOTION TO DISMISS PLAINTIFFS'**
                                           )   **COMPLAINT**
20 v.                                      )
                                           )   **ORAL ARGUMENT REQUESTED**
21 QUEST DIAGNOSTICS INCORPORATED,         )
                                           )   Hearing Date:  May 13, 2015
22            Defendant.                   )   Time:          2:00 p.m.
                                           )   Courtroom:     2, 17th Floor
23                                         )   Judge:         Hon. William H. Orrick

24

25

26

27

28

1

## **[PROPOSED] ORDER**

2

3        Defendant Quest Diagnostics Incorporated's motion to dismiss is granted, and Plaintiffs'

4  Complaint is dismissed for failure to state a claim upon which relief can be granted and for lack of

5  subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(1), and 12(b)(6).

6  IT IS SO ORDERED.

7

8

9  Dated: _____, 2015

10                                                    _____
                                                      HONORABLE WILLIAM H. ORRICK
11                                                    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28