UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN EASTMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>    Defendant. | Case No. 15-cv-00415-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 20 |

## INTRODUCTION

Plaintiffs seek to assert antitrust and related state-law claims against defendant Quest Diagnostics Incorporated for its alleged monopoly pricing for routine diagnostic testing services. Plaintiffs' claims fail because they have not sufficiently alleged that they were injured by Quest's anticompetitive practices or that Quest's conduct foreclosed competition in a substantial share of the relevant market. Plaintiffs' complaint is DISMISSED WITH LEAVE TO AMEND.

## BACKGROUND

Plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez are individuals who have paid for out-patient routine diagnostic testing services by Quest. Compl. ¶¶ 33-35 [Dkt. No. 1]. Their payments to Quest were "as a result of" or "to fulfill" their "co-payment and deductible obligations." *Id*. They allege that Quest was able to charge above-competitive prices for its diagnostic testing services as a result of its exclusionary anti-competitive practices, including eliminating competitors and colluding with major health plans to limit competition in the diagnostic testing services market. *Id*. ¶¶ 115-117.

Plaintiffs allege four causes of action against Quest: (i) monopolization in violation of Section 2 of the Sherman Act; (ii) violation of California's Unfair Competition Law, Cal. Bus. &

1  Prof. Code § 17200; (iii) violation of California's Unfair Practices Act, Cal. Bus. & Prof. Code §§
2  17043, 17044; and (iv) monopolization in violation of California's Cartwright Act, Bus. & Prof.
3  Code § 16700.

## LEGAL STANDARD

A motion to dismiss should be granted under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the nonmoving party's favor, *Knievel v. ESPN,* 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement," *id.* (quotation marks and brackets omitted), and the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations," *W. Min. Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981). If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir.1990).

## DISCUSSION

Quest moves to dismiss the complaint, arguing that (i) plaintiffs lack Article III and statutory standing because they do not allege that Quest's conduct had any impact on the amount they paid for Quest's services; (ii) the monopolization claims fail because plaintiffs do not plead facts necessary to show that Quest's conduct injured competition; (iii) plaintiffs do not plead Quest's pricing and costs necessary to sustain the Unfair Practices Act claim; and (iv) the Unfair Competition Law claim is derivative of the other claims. I heard oral argument on May 13, 2015

and now address each argument in turn.

## I. STANDING

### A. Article III and statutory standing

Quest argues that plaintiffs lack Article III and statutory standing because plaintiffs do not allege that their co-payments or deductibles are higher because of Quest's conduct or would be lower if their testing had been referred to a competitor of Quest. Plaintiffs respond that the purchase of products affected by an anti-competitive overcharge is sufficient to establish standing and that they have satisfied this showing because they allege that "they were injured by the monopoly overcharges that they paid for routine diagnostic testing performed by Quest." Dkt. No. 25 at 19.

Plaintiffs cite to paragraphs 1 and 115-117 of their complaint. *Id.* Those paragraphs state, in their entirety:

> 1. This is a class action under the Sherman Act and related state laws on behalf of health plans and out-patients to recover monopoly overcharges that they have paid directly to Quest Diagnostics Incorporated for routine diagnostic testing.
>
> 115. As a result of its long-term and persistent pattern of kickbacks, exclusionary contracting with aligned health insurers, and acquisitions to advance its overall scheme to monopolize, Quest has injured, and continues to injure, competition in the relevant market for plan/out-patient billing. The injury to competition is manifest in at least three ways: above-competitive prices, inferior quality of testing, and reduction in choice among providers of routine diagnostic testing.
>
> 116. There is ample evidence that Quest has controlled prices in the relevant market in Northern California since at least 2011.
>
> 117. Quest is a rational monopolist. It often substantially discounts its prices in the physician billing market to well below cost to get pull-through business in the relevant plan/out-patient billing market; therefore, it must add a monopoly premium for pull-through testing to compensate for its below-cost prices. The fact that it has been able to charge such premiums for over a decade is strong evidence of its control over pricing in the relevant market for plan/out-patient billing.

3

Paragraphs 1 and 115-117 do not allege that plaintiffs made any payments to Quest, what portion of their co-payment or deductible obligations relate to testing performed by Quest, or that any payments were higher as a result of Quest's anticompetitive conduct. Plaintiffs allege elsewhere that they made payments to Quest "as a result of" or "to fulfill" their "co-payment and deductible obligations," Compl. ¶¶ 33-35, but they do not identify their health plans, whether they are covered by an HMO, PPO, or indemnity plan, or the amount they paid to Quest.

At oral argument, counsel for plaintiffs argued that plaintiffs sufficiently alleged antitrust injury because paragraph 115 alleges that "[t]he injury to competition is manifest in . . . above-competitive prices." But merely alleging that Quest charged above-competitive prices, without alleging facts demonstrating that plaintiffs were injured as a result of Quest's anticompetitive conduct, is insufficient. As plaintiffs have pleaded no facts from which I can conclude that they have been injured, they lack both Article III and statutory standing. *See, e.g., Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1254 (9th Cir. 2008) ("the plaintiff lacks standing because he did not show that he ever purchased an item for a higher price than he would have paid had there been no marketing agreement and thus has suffered no injury-in-fact"); *Spindler v. Johnson & Johnson Corp.*, No. 10-cv-01414 JSW, 2011 WL 12557884, at *4 (N.D. Cal. Aug. 1, 2011) (dismissing antitrust claims where plaintiffs identified how much they paid alleged conspirators for medications, but did not allege that their co-payments increased as a result of the alleged anti-competitive conduct).

The cases cited by plaintiffs are inapposite. *Perez v. State Farm Mut. Auto. Ins. Co.*, 319 F. App'x 615 (9th Cir. 2009) is an unpublished memorandum disposition and is not precedential. In any event, it did not involve alleged harm based on co-payments or deductibles. Rather, the plaintiffs in *Perez* alleged that the defendant automobile insurers conspired to "artificially inflate[] premiums." *Id*. at 617. There is no such allegation here. *Giuliano v. SanDisk Corp.* also involved alleged products purchased from defendant at above-competitive prices and is likewise inapposite. 10-cv-02787 SBA, 2014 WL 4685012, at *3 (N.D. Cal. Sept. 19, 2014) ("Ritz has alleged that it purchased tens of millions of dollars of flash memory products from SanDisk, and that, due to SanDisk's monopolization of the relevant market for flash memory products, Ritz paid above-

4

competitive prices for such products").

Because plaintiffs have not sufficiently alleged that they were injured as a result of Quest's conduct, they lack standing and their claims are DISMISSED WITH LEAVE TO AMEND.

### B. Standing on behalf of health plans

Plaintiffs seek to represent a class of "out-patients *or health plans* residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011 under plan/out-patient billing arrangements." Compl. ¶ 40 (emphasis added). Quest argues that the named plaintiffs, who are individuals who allegedly received diagnostic testing from Quest, lack standing to represent health plans.

Plaintiffs contend that they have standing to assert claims on behalf of health plans because "both the out-patients and the plans that are members of the class are harmed in exactly the same way. Both pay Quest directly and both are subject to Quest's overcharging." Dkt. No. 25 at 21. In support, plaintiffs cite my statement in *Ang v. Bimbo Bakeries USA, Inc.*, that:

> The Ninth Circuit, consistent with *Gratz*, has cautioned courts that when addressing standing in the context of a class action, in 'determining what constitutes the same type of relief or the same kind of injury, we must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry.'

No. 13-cv-01196-WHO, 2014 WL 1024182, at *4 (N.D. Cal. March 13, 2014) (citing *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001)).

*Ang* was a food mislabeling case and is inapposite. There I held that class representatives had standing to assert claims on behalf of class members who purchased substantially similar products that were mislabeled in the same way because the alleged injury was identical. *Ang*, 2014 WL 1024182, at *8 ("The injury allegedly suffered by the plaintiffs is identical to the injury suffered by consumers who purchased the other type of bread."). Unlike *Ang*, the complaint here does not allege facts from which I can conclude that the alleged injuries suffered by the named plaintiffs and health-plans are identical. Any injury to health plans would depend on the pricing agreements the health plans have with Quest and how those prices have been affected by the challenged conduct. Given the different nature of the relationship between individual patients and

5

Quest on one hand and between health plans and Quest on the other, plaintiffs' conclusory statement that the injuries are identical is insufficient to confer standing for health plans.

## II. MONOPOLIZATION CLAIMS[1]

Plaintiffs allege that Quest competes in two relevant product markets for the sale of routine diagnostic testing in Northern California: (i) the plan/out-patient market and (ii) the physician billing market. Compl. ¶¶ 3-4. In the plan/out-patient market, routine diagnostic testing is billed directly to health plans or out-patients. The plan or the out-patient typically pays Quest directly for testing, on a test-by-test basis ("fee-for-service testing"). In many instances, the bills are paid jointly by the plan and the out-patient (through deductibles or other plan terms). In contrast, in the physician billing market, Quest bills medical providers directly for routine diagnostic testing.

Plaintiffs allege that Quest has monopolized and "substantially foreclosed competition" in the plan/out-patient market through three exclusionary practices:

> (1) it has paid kickbacks to medical providers (in the form of dramatically below-cost billings) in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/out-patient billing to Quest exclusively regardless of Quest's pricing or its testing quality[2];
>
> (2) it has colluded with two major private health insurers [Blue Shield of California and Aetna] to suppress its competition in the relevant market for plan/out-patient billing; and
>
> (3) it has acquired its competitors for plan/out-patient billing in order to eliminate their competition. As a result of these exclusionary practices, since at least 2011, Quest has been able to charge above-competitive prices to members of the Class while providing inferior quality service.

---

[1] I analyze plaintiffs' monopolization claims under the Sherman Act and California's Cartwright Act (first and fourth causes of action) jointly under federal law because the Cartwright Act mirrors the Sherman Act. *See Cnty of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act.").

[2] Plaintiffs do not allege that Quest has monopolized the physician billing market itself. Rather, it alleges that Quest leveraged its position in the physician billing market to foreclose competition in the plan/out-patient market.

Compl. ¶ 20; *see also id*. ¶¶ 30, 70, 130, 148.

The three alleged exclusionary practices by Quest were previously considered in this district in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847, a separate matter brought by various medical diagnostic laboratories against Quest and other defendants which included monopolization claims similar to those at issue here. Judge Tigar granted the defendants' motion to dismiss with leave to amend in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). The matter was subsequently transferred to me. In *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"), I granted the defendants' motion to dismiss the monopolization claims in the first amended complaint with leave to amend, finding that the plaintiffs did not sufficiently allege that the practices foreclosed competition. The plaintiffs did not allege monopolization claims in their second amended complaint. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847, Dkt. No. 122-3 (N.D. Cal. November 18, 2013) (second amended complaint).

Plaintiffs argue that Quest's three alleged exclusionary practices are actionable if their "combined effect is to foreclose a 'substantial share of the relevant market.'" Dkt. No. 25 at 10-11 (citing *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 328 (1961)). That is true, but the three alleged exclusionary practices cannot sustain plaintiffs' monopolization claims here for the same reasons they failed in *Rheumatology Diagnostics*: plaintiffs have not sufficiently pleaded that the alleged practices, whether independently or in combination, caused antitrust injury or foreclosed competition in a substantial share of the relevant market, the plan/out-patient market in Northern California.[3]

### A. Law regarding Sherman Act § 2 claims

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

---

[3] Because I determine that plaintiffs have not sufficiently pleaded foreclosure or antitrust injury in the relevant market and, separately, lack standing as discussed above, I do not address whether plaintiffs have sufficiently alleged monopoly power in a relevant product market.

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) (citation omitted).

To violate the second element, a defendant must use its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id*. at 482-83 (citation omitted). Accordingly, to be actionable under section 2, a monopolist's conduct "must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original) (citations omitted); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws....").

In addition, to be actionable under section 2, a monopolist's conduct must "foreclose competition in a substantial share of the line of commerce affected." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir.) *cert. denied,* 135 S. Ct. 437 (2014) (quoting *Tampa Elec*, 365 U.S. at 328). Establishing that a substantial share of the relevant market is foreclosed is necessary because, for the monopolist's conduct to adversely affect competition, "the opportunities for other traders to enter into or remain in that market must be significantly limited." *Id*. (quoting *Tampa Elec.,* 365 U.S. at 328). The Supreme Court has explained that:

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa Elec.*, 365 U.S. at 329.

### B. Kickbacks to medical providers

Plaintiffs allege that Quest has discounted its pricing on testing that is billed to medical providers to as much as 50% or more below cost in exchange for commitments by the medical

8

providers to refer all additional testing done under plan/out-patient billing to Quest exclusively. Compl. ¶ 21. According to plaintiffs, these discounts effectively function as kickbacks to the medical providers, in exchange for which the providers refer all of their routine diagnostic testing in the plan/out-patient market to Quest, regardless of whether Quest can provide the lowest cost or highest quality testing. *Id*. ¶ 22. Plaintiffs refer to sales realized through this referral process as "pull-through sales." *Id*. They allege that this practice allows Quest to build market share and charge monopoly prices in the plan/out-patient market. *Id*. ¶ 23.

Judge Tigar rejected monopolization claims based on the same allegations in *Rheumatology I* for lack of antitrust injury. He explained that the plaintiffs had not shown how the alleged below-cost pricing to medical providers allowed Quest to raise prices above competitive levels in the plan/out-patient market. *Rheumatology I* at *14 ("there is no allegation that Quest is able to raise prices on its [plan/out-patient market] business, and the effect of the alleged arrangement on "loss-leader" services would be to keep prices low"). I subsequently rejected the same allegations in the first amended complaint. *Rheumatology II* at *15 ("the FAC fails to allege that such business is priced above a competitive level, or that Quest's alleged scheme will lead to its raising the prices of laboratory diagnostic services above supra-competitive levels. Without these allegations, the plaintiffs cannot support their causes of action for monopolization.").

As in *Rheumatology*, Quest's alleged discounts to medical providers do not show antitrust injury. Plaintiffs allege that the discounts allow Quest to charge "monopoly prices" or "above-competitive prices" on its plan/out-patient business, but they have not alleged what Quest's prices are or how they compare to competitive prices. *See, e.g.,* Compl. ¶¶ 23, 31, 58. Rather, they assert that Quest "*must* add a monopoly premium for pull-through testing to compensate for its below-cost prices." Compl. ¶ 117 (emphasis added). This allegation is conclusory and speculative and does not satisfy the requirement to plead plausible claims. *See, e.g., Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013) (dismissing monopolization counterclaim where counter-plaintiff "provide[d] nothing other than conclusory allegations that IV has demanded and received 'supracompetitive prices'"). In the

1 absence of antitrust injury, the alleged discounts provided by Quest are presumably pro-
2 competitive and not actionable under the antitrust laws. *Cf. Matsushita Elec. Indus. Co. v. Zenith*
3 *Radio Corp.*, 475 U.S. 574, 594 (1986) ("cutting prices in order to increase business often is the
4 very essence of competition").

### C. Collusion with Aetna and Blue Shield to suppress competition

Plaintiffs allege that Quest "has paid large sums" to Blue Shield of California and Aetna, Inc., the third and fourth largest private health insurers in Northern California, "to induce them to exclude competitors of Quest from their networks, which has made it impossible or very difficult for these other laboratories to compete with Quest." Compl. ¶¶ 24-25. Specifically, they assert that Quest induced Aetna to kick 400 of Quest's competitors out of the Aetna network nationwide, including two competitors that were located in Northern California: Hunter Laboratories and Western Health Sciences Medical Laboratory. *Id*. ¶¶ 25, 88. Similarly, they contend that Quest gave Blue Shield a 10% discount in exchange for Blue Shield's agreement to kick two of Quest's competitors, Westcliff Medical Laboratories and Hunter Laboratories, out of the Blue Shield network in Northern California. *Id*. ¶¶ 25, 101. They state that Aetna and Blue Shield cooperate with Quest to "crack the whip" over physicians to coerce them not to refer plan/out-patient business to Quest's competitors and that "physicians face retaliation if they refuse to cooperate, including threats to terminate their plan contracts." *Id*. ¶ 27.

I considered the same allegations in *Rheumatology II*. They were insufficient to sustain plaintiffs' monopolization claims because the plaintiffs "d[id] not say how Quest has grown or maintained its market position or how competition generally has fared relative to Quest" as a result of those alleged agreements.[4] *Rheumatology II* at *15; *see also Rheumatology Diagnostics I*

---

[4] *Rheumatology II* involved the same agreements with Aetna and Blue Shield that plaintiffs allege here. *See Rheumatology II* at *5 (plaintiffs alleged that "Aetna, which insures approximately nine percent of the United States population, conspired with Quest to eliminate or exclude 400 regional laboratories from Aetna's provider network in exchange for discounts. Hunter and PBP have been denied in-network status with Aetna . . . ."), and *6 (plaintiffs alleged that "Quest threatened not to renew its contract with BSC [Blue Shield of California] unless BSC agreed not to renew its contracts with Westcliff and Hunter; to further induce BSC, Quest offered a 10 percent discount that 'forced' BSC to accept.").

at *11 (rejecting same allegations because plaintiffs did not allege that Quest obtained its market share because of the alleged agreements or specify how the agreements affected competition generally).

The same is true here. Plaintiffs have not alleged sufficient facts from which I can conclude that Quest's alleged agreements with Aetna and Blue Shield foreclosed competition in a substantial share of the plan/out-patient market in Northern California. The two agreements, in combination, allegedly resulted in the elimination of three of Quest's competitors in Northern California: Hunter Laboratories, Western Health Sciences Medical Laboratory, and Westcliff Medical Laboratories. But without allegations regarding those competitors' prior market shares or the number or lack of other competitors, plaintiffs have at most alleged harm to those competitors, not to competition. *See Rheumatology II* at *12 ("It may very well be that Hunter, Westcliff, and SPA constitute a 'substantial share' of the relevant market or markets, but with only what the plaintiffs present, the Court cannot tell. All that can be said is that three of Quest's alleged competitors were injured, but the antitrust laws are meant to protect competition, not competitors.").

Although plaintiffs allege that Blue Shield and Aetna are "the third and fourth largest private health insurers in Northern California," Compl. ¶ 25, they do not address the circumstances of other health insurers in the relevant market, including two which are apparently larger than Blue Shield and Aetna. Plaintiffs cannot rely on Quest's arrangements with Blue Shield and Aetna to establish foreclosure of a substantial share of the plan/out-patient market in Northern California without accounting for other players which significantly impact competition in the market. *See, e.g.*, *Tampa Elec.*, 365 U.S. at 329 (discussing various factors necessary to determine substantiality of foreclosure); *cf. Microsoft*, 253 F.3d at 69 ("Because an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function.").

### D. Quest's acquisition of competitors in the plan/out-patient market

Plaintiffs allege that Quest was the second largest provider of diagnostic testing in Northern California in 2003 when it acquired its largest competitor, Unilab Corporation. Compl. ¶

11

28. According to plaintiffs, "the acquisition of Unilab allowed Quest to increase its market share from 17% to 53% [in the plan/out-patient and physician billing markets combined], making it by far the largest competitor in the market." *Id*. ¶ 29. They allege that Quest increased its share of the combined by approximately another 3% in 2013 by acquiring the out-patient testing laboratories of Dignity Health. *Id*. ¶ 114.

As plaintiffs acknowledge, Quest's acquisition of Unilab Corporation was cleared by the FTC after certain divestitures by Quest. *Id*. ¶ 112. The FTC noted in its analysis of the consent decree approving the acquisition that "after the divestiture, competition in the market for providing Laboratory Services to physician groups in Northern California will remain virtually unchanged by the proposed acquisition." *See* Compl. ¶ 112 n.1 (citing *FTC Analysis of Quest Consent Decree*, File No. 021 0140, Docket No. C-4074)[5]. Plaintiffs' allegations do not raise any doubt about that conclusion.

The acquisition of Dignity Health only increased Quest's market share by a relatively insubstantial 3%. A similar allegation did not save the complaint in *Rheumatology*. *See Rheumatology II* at *5; *see also Tampa Elec.*, 365 U.S. at 333, 335 (summarily dismissing section 2 claim where conduct affected less than 1% of the market). Further, the asserted market share figures relate to the *combined* plan/out-patient and physician billing markets. Plaintiffs' monopolization claims relate to the allegedly *separate* plan/out-patient market. Accordingly, their allegations do not establish foreclosure of substantial share of the relevant market.

For the reasons stated, plaintiffs' monopolization claims under section 2 of the Sherman Act and California's Cartwright Act are DISMISSED WITH LEAVE TO AMEND.

### III. UNFAIR PRACTICES ACT

Plaintiffs allege that Quest violated California's Unfair Practices Act ("UPA"), Cal. Bus. & Prof. Code §§ 17043, 17044 because it sold testing services in the physician billing market below

---

[5] The FTC's analysis is available at
https://www.ftc.gov/sites/default/files/documents/cases/2003/02/ftc.gov-questanalysis.htm

12

cost or as a loss leader[6] in order to injure class member and suppress competition in the plan/out-patient market. Compl. ¶¶ 143-44. Quest contends that this claim fails because the UPA protects competitors, not consumers. Quest also asserts that even if a UPA claim were actionable by consumers, plaintiffs here cannot prove injury resulting from Quest's alleged below-cost pricing (because plaintiffs benefit from Quest's alleged below-cost services).[7] Quest further argues that the UPA claim fails because plaintiffs have not alleged any of Quest's prices, the costs of any of its services, or its costs of doing business. In opposition, plaintiffs argue that the UPA is not limited to competitors and that they have plausibly pleaded injury because Quest's below-cost services destroy competition.

To plead a UPA claim, "the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing business." *Rheumatology I*, at *15; *see also G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 275 (Ct. App. 1983) ("to satisfy the pleading requirements of section 17043, the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing business"). Plaintiffs have not pleaded Quest's prices or costs, nor did plaintiffs provide any authority in their opposition brief indicating that this is not required. Their allegations are insufficient to state a UPA claim. *See, e.g., Rheumatology I* at *16 (dismissing UPA claim where "the Complaint makes no attempt to allege Quest's sales prices, costs, or cost of doing business. Instead, it merely alleges that Quest's capitated rate contracts are provided at 'below cost'").

In addition, plaintiffs have not pleaded actionable injury. Even assuming that injury to consumers (as opposed to injury to competitors) is actionable under the UPA, plaintiffs have not alleged injury here. As noted above, plaintiffs' allegation that Quest's below-cost pricing in the physician billing market led to above-competitive pricing or reduced competition in the plan/out-patient market is purely speculative and cannot sustain plaintiffs' claims. Plaintiffs' UPA cause of

---

[6] Loss leader means "any article or product sold at less than cost: (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or (c) Where the effect is to divert trade from or otherwise injure competitors." Cal. Bus. & Prof. Code § 17030.

[7] Quest argues that plaintiffs may at most seek injunctive relief under the UPA.

action is DISMISSED WITH LEAVE TO AMEND.[8]

## IV. UNFAIR COMPETITION LAW

Plaintiffs allege that Quest has violated the "unfair" and "illegal" prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. These claims are derivative of plaintiffs' monopolization and UPA claims and fail for the same reasons as those claims. *See* Compl. ¶¶ 137-40. The UCL cause of action is DISMISSED WITH LEAVE TO AMEND.

## CONCLUSION

Quest's motion to dismiss is GRANTED. Dkt. No. 20. Plaintiffs' complaint, including all four causes of action, is DISMISSED WITH LEAVE TO AMEND. Any amended complaint shall be filed within 20 days of this order,

**IT IS SO ORDERED**.

Dated: June 9, 2015

WILLIAM H. ORRICK
United States District Judge

---

[8] Given the deficiencies in the UPA claim, as currently pleaded, I do not at this point address whether injury to consumers is actionable under the UPA.