United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLLEEN EASTMAN, et al.,

       Plaintiffs,

    v.

QUEST DIAGNOSTICS
INCORPORATED,

       Defendant.

Case No. 15-cv-00415-WHO

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Re: Dkt. No. 46

## INTRODUCTION

This is a putative antitrust class action against Quest Diagnostics Incorporated ("Quest"), a provider of clinical laboratory testing services. Plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez accuse Quest of monopoly overpricing on its testing services in violation of section 2 of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law. They seek to represent a class defined as

> health plans and outpatients residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011 . . . under plan/outpatient billing arrangements where the payment to Quest was not entirely comprised of a fixed, per-visit copayment amount, but depended at least in part on the total amount due Quest.

First Amended Complaint ¶ 31 ("FAC") (Dkt. No. 46). Quest moves to dismiss, arguing that the FAC suffers from essentially the same deficiencies as the original complaint and should be dismissed on essentially the same grounds.

Plaintiffs do not write on a blank slate. The FTC blessed Quest's acquisition of Unilab Corporation ("Unilab") in 2003, which increased Quest's relevant market share from 7.3% to 56.1%, concluding that, after certain divestitures by Quest, competition in the relevant market would remain "virtually unchanged." The three exclusionary practices complained about here

United States District Court
Northern District of California

have been considered and dismissed in several orders issued by the Hon. Jon S. Tigar and me in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847, 2014 WL 2586339 (N.D. Cal. filed July 10, 2012). Plaintiffs urge that their new allegations should change the analysis of the alleged exclusionary practices to allow the case to proceed. But the slender reeds added to the FAC do not bear the weight necessary to make their claims plausible. Quest's motion is GRANTED, and plaintiffs' claims are DISMISSED WITH LEAVE TO AMEND.

<strong>BACKGROUND</strong>

**I.     THE ORIGINAL COMPLAINT**

Plaintiffs filed this action on January 29, 2015. Dkt. No. 1 ("Compl."). Their original complaint brought claims under section 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Law ("UCL"), and the below-cost and loss-leader sales provisions of California's Unfair Practices Act. *Id.*

Quest moved to dismiss, and, following briefing and oral argument, I issued an order on June 9, 2015 dismissing the original complaint with leave to amend. Dkt. No. 42 ("Prior Order"). I found that plaintiffs had not established standing because they had not alleged facts demonstrating that they had been harmed by Quest's anticompetitive conduct – for example, by having to either satisfy higher deductible obligations or make higher copayments. Prior Order at 3-5. I also found that plaintiffs could not bring claims on behalf of health plans because they had not alleged facts plausibly establishing that they and health plans had suffered identical harms. *Id.* at 5-6.

In addition, I found that plaintiffs' claims failed on the merits. The original complaint alleged that Quest competes in two markets for routine diagnostic testing in Northern California: (1) the plan/outpatient market and (2) the physician billing market. Compl. ¶¶ 3-4; Prior Order at 6. Plaintiffs alleged that Quest has monopolized the plan/outpatient market and has thus "been able to charge above-competitive prices to [class members] while providing inferior quality service." Compl. ¶ 20. They contended that Quest has done this through the use of three exclusionary practices:

(1) "pa[ying] kickbacks to medical providers . . . in the relevant

2

market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/outpatient billing to Quest exclusively regardless of Quest's pricing or its testing quality."

(2) "collud[ing]with two major private health insurers [ – i.e., Aetna, Inc. and Blue Shield of California – ]  to suppress its competition in the relevant market for plan/outpatient billing."

(3) "acquir[ing] its competitors for plan/outpatient billing in order to eliminate their competition."

*Id.*; Prior Order at 6.

I held that none of these theories, as alleged in the original complaint, could support plaintiffs' monopolization claims.  The kickback/leveraging theory failed because plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers resulted in Quest charging above-competitive prices in the plan/outpatient market.  Prior Order at 8-10.  The collusion theory failed because plaintiffs had not shown that the three competitors that were allegedly eliminated as a result of Quest's agreements with Aetna and Blue Shield – i.e., Hunter Laboratories, Inc. ("Hunter"), Western Health Sciences Medical Laboratory ("Western Health"), and Westcliff Medical Laboratories ("Westcliff") – constituted a substantial share of the relevant market.  *Id.* at 10-11.  The acquisition theory failed because plaintiffs' allegations did not provide any reason to doubt the FTC's conclusion that, following the divestitures, Quest's acquisition of Unilab in 2003 would leave competition in Northern California "virtually unchanged."  *Id.* at 11-12.  Further, Quest's subsequent acquisition of Dignity Health in 2013 allegedly increased its market share by a mere three percent – a "relatively insubstantial" amount that was not enough to raise concern under the antitrust laws.  *Id.*

The allegations in support of the below-cost and loss-leader pricing claims under the Unfair Practices Act were insufficient because plaintiffs had not pleaded Quest's prices and costs for the relevant testing services, and the UCL claims failed as derivative of the monopolization and Unfair Practices Act claims.  *Id.* at 12-14.

## II.     THE FAC

Plaintiffs filed the FAC on July 6, 2015.  Dkt. No. 46.  Like the original complaint, the FAC brings monopolization claims under section 2 of the Sherman Act and the Cartwright Act,

3

plus derivative claims under the UCL.  *See* FAC ¶¶ 166-84.  It drops the below-cost and loss-leader pricing claims.  *Id.*

The FAC identifies the same two markets as the original complaint (i.e., the plan/outpatient market and the physician billing market) and the same three exclusionary practices in the plan/outpatient market (i.e, the kickback/leveraging theory, the collusion theory, and the acquisition theory).  *See, e.g.,* FAC ¶¶ 3-4, 20.  Its most significant additions are to its monopoly overpricing and standing allegations.

### A.    Monopoly Overpricing Allegations

Plaintiffs allege that approximately 13.6 to 26.6 percent of Quest's revenues from the Northern California plan/out-patient market constitute monopoly overcharges.  FAC ¶ 136.  The 13.6 percent to 26.6 percent figure comes from plaintiffs' experts' analysis of pricing records compiled by the Truven Corporation ("Truven")[1] for routine diagnostic testing performed in Northern California and across the United States.  *Id.* ¶ 137.  Plaintiffs state that their experts used the Truven data to

> contras[t] pricing in the Northern California plan/outpatient relevant market with pricing in five other regional plan/patient-pay United States markets where Quest's market shares are much lower and it is not likely Quest has monopoly power. The comparison markets are similar to the Northern California market in terms of the size of the metropolitan areas, the presence of Kaiser Permanente as an insurer, or the proximity to Northern California, but have a less concentrated market structure so that it would be unlikely for Quest to have monopoly power in these markets.

*Id.*

The FAC includes the following table displaying the 2013 prices in Northern California and the five comparison markets for blood draws (CPT 36415) as well as the 20 tests that "are most commonly observed in Northern California in 2013," with the tests ranked in descending order of quantity.  *Id.* ¶ 140.  Plaintiffs state that these figures reflect "only claims from private health plans that did not include capitation" and thus reflect only the plan/outpatient market on which their monopolization claims are based.  *Id.* ¶ 138.

---

[1] Plaintiffs describe Truven as "the largest third-party vendor of health care claims data" in the United States.  FAC ¶ 137.

United States District Court
Northern District of California

| CPT Code | Nor. Cal. | New York City | Portland | Seattle | Tampa | So. Cal . |
|----------|-----------|---------------|----------|---------|-------|-----------|
| 36415 | $5.96 | $2.27 | $1.15 | $2.63 | $2.56 | $4.77 |
| 80061 | $20.74 | $14.70 | $20.45 | $19.88 | $10.92 | $15.63 |
| 80053 | $17.70 | $11.05 | $16.06 | $13.64 | $8.97 | $12.85 |
| 83036 | $16.33 | $11.47 | $15.12 | $14.72 | $8.91 | $11.61 |
| 85025 | $13.67 | $8.31 | $12.38 | $11.46 | $6.59 | $9.28 |
| 82306 | $43.01 | $35.94 | $38.86 | $41.91 | $28.57 | $35.25 |
| 84443 | $28.79 | $18.55 | $25.85 | $24.30 | $14.75 | $20.10 |
| 81001 | $4.53 | $3.95 | $5.13 | $4.69 | $2.83 | $3.86 |
| 84439 | $14.66 | $11.80 | $13.61 | $12.69 | $8.61 | $11.22 |
| 87086 | $14.22 | $8.94 | $10.80 | $11.61 | $7.30 | $9.51 |
| 84153 | $27.74 | $21.27 | $28.34 | $28.55 | $16.57 | $21.08 |
| 86003 | $28.32 | $33.78 | $20.02 | $22.28 | $23.04 | $28.25 |
| 85027 | $9.68 | $6.86 | $9.91 | $9.49 | $5.67 | $7.60 |
| 82607 | $24.52 | $18.40 | $24.37 | $22.56 | $14.65 | $19.53 |
| 84403 | $38.82 | $31.55 | $39.67 | $37.12 | $24.30 | $30.91 |
| 84550 | $6.90 | $4.84 | $7.51 | $6.51 | $5.11 | $5.50 |
| 86703 | $21.21 | $15.68 | $20.60 | $19.21 | $13.33 | $15.92 |
| 85652 | $3.78 | $3.08 | $3.49 | $4.04 | $2.39 | $3.24 |
| 83540 | $10.50 | $6.66 | $10.80 | $9.55 | $5.90 | $8.10 |
| 80076 | $13.47 | $9.08 | $12.62 | $9.72 | $7.28 | $9.31 |
| 82043 | $10.03 | $7.33 | $9.11 | $8.97 | $4.19 | $6.82 |

*Id.* ¶ 140.  Plaintiffs state that this table demonstrates that prices are "highest" in Northern California "due to monopoly pricing."  *Id.*

Using the Truven Data, plaintiffs' experts also calculated the "overall average prices" for Northern California and the five comparison markets for 2011 through 2013.  *Id.* ¶ 143.  The results of their analysis are as follows:

|  | 2011 | 2012 | 2013 |
|---|---|---|---|
| **Nor. Cal.** | $12.99 | $14.79 | $18.09 |
| **New York City** | $11.14 | $11.73 | $12.97 |
| **Portland, Oregon** | $14.19 | $15.12 | $16.15 |
| **Seattle** | $12.86 | $12.76 | $15.46 |
| **Tampa** | $10.13 | $9.44 | $10.44 |
| **So. Cal.** | $11.14 | $11.32 | $13.80 |
| **Overall Non-Nor. Cal.** | $11.23 | $11.64 | $13.29 |
| **Estimated Percent Overcharge** | 13.56% | 21.29% | 26.55% |

*Id*. Plaintiffs state that this data demonstrates that Quest's "monopoly overcharge has been growing over time, from 13.6 percent in 2011 to 26.6 percent in 2013, as Quest has increasingly monopolized the market." *Id.* ¶ 143. Although plaintiffs do not explain how their experts reached their estimated monopoly overcharge figures, it appears that they did so by attributing the entire difference between Northern California average prices and non-Northern-California average prices to monopoly overpricing.

Plaintiffs acknowledge that the Truven data "does not identify the firm performing each individual test," and that their experts "performed their calculations using all the patients in each geographic area," as opposed to using only Quest's patients. *Id.* ¶ 142. Plaintiffs contend that an analysis based on the pricing of all testing firms in a given geographic area nevertheless provides reliable evidence of monopoly pricing

> because the laboratory test for a given CPT code is mostly a homogeneous product and therefore prices will be similar across testing firms. In Northern California, for instance, where Quest has monopoly power, economic theories imply that the other firms that remain will offer similar prices to Quest to benefit from Quest's monopoly power to the extent possible. In markets without monopoly power, competition forces Quest and its competitors to charge lower prices than in Northern California.

*Id.*

### B.    Standing Allegations

The FAC alleges that plaintiffs are California residents who paid Quest directly for

United States District Court
Northern District of California

outpatient routine diagnostic testing services, and that they made these payments either "as a result of" or "to fulfill" their "deductible obligations."  FAC ¶¶ 24-26.

Eastman "has paid Quest directly for outpatient routine diagnostic testing services for herself and her daughter.  Those payments were made as a result of deductible obligations.  Health plans in which Ms. Eastman and her daughter have been enrolled also have made payments to Quest directly on their behalf." *Id.* ¶ 24.  Eastman was a member of Blue Shield and Anthem Blue Cross "between January 1, 2011 and the present" and "is currently a member" of Blue Shield.  *Id.* ¶ 131.  The FAC states that

> [o]n February 29, 2012, while [Ms. Eastman] was insured by Anthem Blue Cross, Quest performed seven laboratory tests for Ms. Eastman's daughter. The nominal charges for the tests totaled $747.00, but under the agreement between Quest and Anthem Blue Cross, the maximum allowed amount was $87.50, of which Anthem Blue Cross paid $43.66 and Ms. Eastman paid $43.64.
>
> In 2014, while a member of Blue Shield of California, Ms. Eastman also paid Quest for laboratory tests. Some of the tests that Quest administered to Ms. Eastman's daughter, Madison, were not subject to a deductible under Blue Shield's plan. In those cases, the plan paid 100% of the amount allowed for the tests. For example, Blue Shield paid Quest $23.69 for two tests that Quest administered to Madison Eastman on August 18, 2014, $18.14 for a test administered to her on February 11, 2015, and $11.50 for another test administered to Madison on November 5, 2014. In all those cases, the plan paid the full amount allowed for the tests because they were "not subject to deductible." In other cases, the plan paid the full amount of the tests because Ms. Eastman had already met her deductible obligations for the year. For instance, Blue Shield paid Quest $88.94 for four tests administered to Madison on May 7, 2015, which represented the total amount allowed for those tests. Ms. Eastman was not responsible for payment because, according to her Explanation of Benefits, "[t]he deductible has been met for 2015."

*Id.*

Cruz and Mendez both "paid Quest directly for outpatient routine diagnostic testing . . . to fulfill [their] deductible obligations under plan/outpatient billing plans.  These plans also have made payments to Quest on [their] behalf."  *Id.* ¶¶ 24-25.  Both Cruz and Mendez have been members of Blue Shield since at least January 1, 2011.  *Id.* ¶¶ 129-30.  The FAC states that

> [on] June 26, 2012, Quest sent [Ms. Cruz] an invoice for two laboratory tests administered to her on June 4, 2012. Although the nominal charge by Quest for those tests was $204.70, the applicable discount under the agreement between Quest and Blue Shield of

California was $138.80, so that the amount allowed was $65.90. Blue Shield paid Quest $28.35 and Ms. Cruz paid the balance of $37.55. In addition, Ms. Cruz paid Quest $14.30 for two tests administered to her son, Kristopher Zapien, on May 16, 2013, and $75.10 for two other tests administered to him on November 2, 2013.

[ . . . ]

On August 23, 2014, Quest performed six laboratory tests for Ms. Mendez. The nominal charge for the tests was $694.48, but under the agreement between Quest and Blue Shield of California, the maximum allowed amount was $101.95, of which Blue Shield paid $19.85 and Ms. Mendez paid $82.10. Ms. Mendez also paid Quest $19.90 for tests Quest billed on September 17, 2014, and $8.64 (100% of the amount allowed under the plan) for a test administered to her on October 31, 2012.

*Id.*

Plaintiffs allege that Eastman, Cruz, and Mendez have each "suffered antitrust price injury due to Quest's overcharges. Because the amounts they paid were variable and based on the prices of the tests, Quest's above-competitive prices caused plaintiffs to pay a higher amount than they would have paid absent Quest's anticompetitive conduct." *Id.* ¶ 133.

## III.    PRIOR RELATED CASE

Each of the exclusionary practices alleged in the FAC was also previously raised in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847, 2014 WL 2586339 (N.D. Cal. filed July 10, 2012), a related case brought against Quest by a group of competing laboratories alleging monopolization claims similar to those at issue here. Judge Tigar dismissed the section 2 claims with leave to amend in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245, *13-15 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). After the matter was transferred to me, I dismissed the section 2 claims with leave to amend a second time in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, *14-16 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"). The plaintiffs did not allege section 2 claims in their second amended complaint, although I discussed certain aspects of their collusion theory in dismissing the second amended complaint's cause of action for violations of section 1 of the Sherman Act. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-

United States District Court
Northern District of California

8

1   05847-WHO, 2014 WL 524076, at *10-14 (N.D. Cal. Feb. 6, 2014) ("*Rheumatology III*").[2, 3]

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too

[2] In conjunction with its reply brief, Quest seeks judicial notice of two documents: (1) a publication by the United States Bureau of Labor Statistics that includes the costs of medical care in various cities; and (2) a Form 10-K for Bio-Reference Laboratories, Inc. *See* Dkt. No. 53. Because I do not rely on these documents to resolve this motion, the request is DENIED AS MOOT.

[3] Plaintiffs' request to supplement the record, filed approximately three weeks after the hearing date, *see* Dkt. No. 57, is DENIED. *See* Civil L.R. 7-3(d).

United States District Court
Northern District of California

1    speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076

2    (9th Cir. 2013).

3                                          **DISCUSSION**

4           Quest moves to dismiss on the grounds that (1) plaintiffs' allegations regarding the three

5    exclusionary practices in the plan/outpatient market are still insufficient to support plaintiffs'

6    monopolization claims; (2) plaintiffs' constitutional and statutory standing allegations remain

7    flawed; and (3) plaintiffs have not adequately alleged market power in a properly defined market.

8    Because I find that the alleged exclusionary practices are still inadequately pleaded, I do not

9    address the other issues.

10   **I.      MONOPOLIZATION CLAIMS**

11          Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt

12   to monopolize, or combine or conspire with any other person or persons, to monopolize any part

13   of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.  A

14   monopolization claim under section 2 has three elements: "(a) the possession of monopoly power

15   in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal

16   antitrust injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991,

17   998 (9th Cir. 2010) (internal quotation marks omitted).

18          With respect to the second element, the willful acquisition or maintenance of monopoly

19   power must be "distinguished from growth or development as a consequence of a superior

20   product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs.,*

21   *Inc.*, 504 U.S. 451, 481 (1992).  "The test of willful maintenance or acquisition of monopoly

22   power is whether the acts complained of unreasonably restrict competition." *Drinkwine v.*

23   *Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985).  To establish this element, the

24   plaintiff must show that the defendant used its monopoly power "to foreclose competition, to gain

25   a competitive advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (internal

26   quotation marks omitted).  In other words, the defendant's conduct must be "exclusionary."

27   *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).  "[T]o be condemned as

28   exclusionary, a monopolist's act must have an anticompetitive effect.  That is, it must harm the

United States District Court
Northern District of California

competitive *process* and thereby harm consumers.  In contrast, harm to one or more *competitors* will not suffice."  *Id.* at 58 (internal quotation marks omitted; emphasis in original).

The Ninth Circuit has stated that "[t]he analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *accord Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 2015 WL 4591897, at *5 n.5 (9th Cir. July 31, 2015) ("Because analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim.") (internal citations omitted). Plaintiffs do not dispute that their claims under section 2 of the Sherman Act and the Cartwright Act rise and fall together.

Quest contends that the three alleged exclusionary practices remain insufficient to support plaintiffs' monopolization claims.[4]  For the following reasons, I agree.

**A.     Kickback/Leveraging Theory**

Plaintiffs allege that Quest has cost advantages over its competitors based on "the substantial economies of scale it has realized from its multiple acquisitions," and that it has used these cost advantages to "offe[r] medical providers large price discounts . . . as well as other large economic inducements . . . to encourage medical providers to execute exclusive contracts for capitated testing in the physician billing market."  FAC ¶¶ 73-76.  The large price discounts are "often below even the very low costs Quest enjoys by virtue of its unique economies of scale."  *Id.* ¶ 81.  As to the "other large economic inducements" that Quest allegedly offers to medical providers, plaintiffs state that Quest has "paid the salaries of medical providers' phlebotomists, unnecessarily leased space from the providers where testing draws are taken, and provided free valuable software services."  *Id.* ¶ 83.

Quest's exclusive capitated contracts with medical providers "induce them to send all or nearly all their capitated business to Quest."  *Id.* ¶ 76.  Because medical providers "have a strong preference for 'one-stop shopping,' . . . Quest [has been] able to leverage its cost advantages in the

[4] Again, plaintiffs allege exclusionary practices only within the plan/outpatient market, not within the physician billing market.

United States District Court
Northern District of California

United States District Court
Northern District of California

physician billing market to obtain and maintain market power in the plan/outpatient market." *Id.* ¶

77. "Quest uses the term 'pull-through' to describe this phenomenon," and "carefully calculates"

the revenues it obtains in the plan/outpatient market through its "sharply reduced capitated

pricing" in the physician billing market. *Id.* ¶¶ 77, 82. Plaintiffs state that Quest's "smaller

competitors do not enjoy anything like Quest's economies of scale and cost advantages," and thus

"cannot effectively compete in the physician billing market to nullify Quest's leveraging." *Id.* ¶¶

84-85.

This theory failed in the Prior Order because plaintiffs had not plausibly alleged how

Quest's discounted prices and other economic inducements to medical providers resulted in Quest

charging above-competitive prices in the plan/outpatient billing market. *See* Prior Order at 8-10. I

stated:

> Plaintiffs allege that the discounts allow Quest to charge "monopoly
> prices" or "above-competitive prices" on its plan/outpatient
> business, but they have not alleged what Quest's prices are or how
> they compare to competitive prices. Rather, they assert that Quest
> "must add a monopoly premium for pull-through testing to
> compensate for its below-cost prices." This allegation is conclusory
> and speculative and does not satisfy the requirement to plead
> plausible claims.

*Id.* at 9 (internal citations omitted).

Likewise, in *Rheumatology I*, Judge Tigar dismissed section 2 claims based on Quest's

alleged price discounts on the ground that plaintiffs had not plausibly pleaded antitrust injury. He

explained:

> Plaintiffs' section 2 claim[s] against Quest also fail as a matter of
> law because plaintiffs have not adequately alleged antitrust injury.
> The complaint alleges that Quest engaged in predatory "loss-leader"
> pricing by charging capitated rates for physicians below-cost in
> exchange for more lucrative fee-for-service business.
>
> [ . . . ]
>
> [P]laintiffs have not shown how [this arrangement] produces
> antitrust injury of the kind that the Sherman Act was designed to
> avoid: the eventual raising of prices above competitive levels. To
> the contrary, there is no allegation that Quest is able to raise prices
> on its [fee-for-service] business, and the effect of the alleged
> arrangement on "loss-leader" services would be to keep prices low.

*Rheumatology I*, 2013 WL 3242245, at *14-15.  I subsequently rejected the same allegations after the case was transferred to me:

> [T]he [first amended complaint] fails to allege that [Quest's pull-through] business is priced above a competitive level, or that Quest's alleged scheme will lead to its raising the prices of laboratory diagnostic services above [c]ompetitive levels.  Without these allegations, the plaintiffs cannot support their causes of action for monopolization.

*Rheumatology II*, 2013 WL 5694452, at *15.

The principal difference between the allegations in the FAC regarding the kickback/leveraging theory and those in plaintiffs' original complaint (and in the pleadings in *Rheumatology*) is that they include the expert analysis of test pricing in Northern California versus the five comparison regions.  *See, e.g.,* FAC ¶¶ 140, 143.

I agree with Quest that this analysis is not enough to establish the causal antitrust injury that has been missing from their kickback/leveraging theory.  The analysis says little, if anything, about Quest's pricing as an individual entity.  Both of the charts in the FAC are derived from data concerning *all* routine diagnostic testing in the plan/outpatient market in Northern California, not *Quest's* routine diagnostic testing.  *See, e.g., id.* ¶ 142 ("the Truven data does not identify the firm performing each individual test").  According to the FAC, Quest's market share in the plan/outpatient market in Northern California "increased from 56.1 percent after the Unilab acquisition in 2003 to 67.0 percent in 2015."  *Id.* ¶ 47.  Based on these percentages, it appears likely that Quest's market share in the plan/outpatient market between 2011 and 2013 – the years covered by the Truven data and the accompanying expert analysis – was somewhere between approximately one-half and two-thirds of the market.[5]  But this means that somewhere between approximately one-third and one-half of the Northern California data on which the expert analysis is based is likely attributable to entities other than Quest.  Simply put, the expert analysis does not show "what Quest's prices are or how they compare to competitive prices."  Prior Order at 9.

---

[5] Plaintiffs do not allege Quest's approximate market share in the plan/outpatient market for 2011 to 2013.

United States District Court
Northern District of California

United States District Court
Northern District of California

Moreover, plaintiffs' attempt to plead Quest's alleged overcharging in the plan/outpatient market is at odds with their repeated emphasis on how Quest benefits from its "substantial economies of scale" and "large cost advantages" over its competitors. *See, e.g.,* FAC ¶¶ 20, 50, 64-65, 73-76. For example, in describing Quest's market power in the plan/outpatient market, plaintiffs state that Quest

> [h]as significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests through its existing infrastructure. It is also able to reduce its unit costs by negotiating volume discounts on supplies. Quest processes far more routine tests in-house than smaller laboratories do. As a result, it is able to minimize the costly outsourcing of low-volume tests.

*Id.* ¶ 50. Plaintiffs allege that as a result of these and other cost advantages, "price competition with Quest is difficult." *Id.* ¶ 163. These allegations, and the many others in the FAC regarding Quest's ability to offer low prices as a result of its "substantial economies of scale" and "cost advantages," do not indicate that Quest uses its alleged monopoly power to overcharge in the plan/outpatient market. To the contrary, they indicate that Quest underprices its competitors in that market, much as plaintiffs explicitly allege that it does in the patient billing market.

Plaintiffs do not identify anything in the FAC plausibly indicating that the truth is otherwise. The charts at FAC ¶ 140 and FAC ¶ 143 and the accompanying expert analysis are unpersuasive. Plaintiffs also allege that Quest "has . . . the capacity to cause antitrust price injury to [health plans] and outpatients in the proposed class," and that "both precedent and decades of economic analysis demonstrate that, when a firm labors successfully to obtain market power (by expending very substantial and valuable resources), it invariably uses that power for the 'payback,' that is, the levy of above-competitive pricing." FAC ¶ 124. But these statements are conclusory and speculative and, moreover, are focused on what monopolists in general "invariably" do, not what Quest itself actually does. In sharp contrast with plaintiffs' detailed

1   allegations regarding Quest's *underpricing*, their allegations of monopoly *overcharging* are

2   devoid of factual support.[6]

3          Further, the contrast between average prices in Northern California and those in the five

4   comparison regions, even according to plaintiffs' own expert analysis, is not as stark as plaintiffs

5   make it out to be.  According to the chart at FAC ¶ 140, the average prices for CPT Codes 81001,

6   84153, 85027, 84403, 84550, and 83540 are higher in Portland than in Northern California; the

7   average prices for CPT Codes 81001, 84153, and 85652 are higher in Seattle than in Northern

8   California; and the average price for CPT Code 86003 is higher in New York than in Northern

9   California.  *See* FAC ¶ 140.  As Quest puts it, "[o]f the 21 tests hand-picked by plaintiffs in the

10  six regions hand-picked by plaintiffs," only 13 have the highest average price in Northern

11  California.  Mot. at 6.

12         The chart at FAC ¶ 143 is also less than compelling.  Of the three years the chart displays,

13  2011 to 2013, Northern California has the highest overall average price for only one year, 2013.

14  Portland has the highest overall average price for both 2011 and 2012.  Moreover, it appears that

15  plaintiffs' experts reached their estimated monopoly overcharge figures by simply attributing the

16  entire difference between the Northern California overall average price and the non-Northern-

17  California average price to Quest's alleged monopoly overpricing.  There are obviously many

18  other factors that could result in higher prices on routine diagnostic testing in this region than in

19  others.  Plaintiffs do not explain why it is appropriate to assume that any level of above average

20  pricing in this region is attributable to Quest's alleged antitrust violations.

21         The expert analysis in the FAC does show that, in 2013, the prices on certain tests were

22  higher in Northern California than in the five comparison regions, and that in the same year

23  Northern California had the highest overall average price on routine diagnostic testing.  But

24  plaintiffs cite no authority indicating that an entity doing business in a regional market with

25  _____

26  [6] It is also worth noting that, following the dismissal of the monopolization claims in
    *Rheumatology*, the plaintiffs' theory of the case became that Quest systematically prices its tests

27  below-cost both in its capitated contracts and in its fee-for-service business.  *See Rheumatology
    Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2015 WL 1744330, at *1-4 (N.D.

28  Cal. Apr. 15, 2015) ("*Rheumatology IV*").  The plaintiffs produced considerable evidence in
    support of this theory at summary judgment.  *See id.*

certain prices or an overall average price higher than those in five other regional markets is presumptively engaged in monopolistic overcharging.  As pleaded in the FAC, the kickback/leveraging theory does not support a section 2 or Cartwright Act claim against Quest.

**B.      Collusion Theory**

Plaintiffs allege that "Quest has added to its successful campaign to obtain market power in the plan/outpatient market by colluding with large health plans to further exclude competition and competitors."  FAC ¶ 89.  As in their original complaint, plaintiffs identify two particular health plans that Quest has colluded with – Aetna and Blue Shield.  *Id.* ¶ 93.

Plaintiffs claim that Quest has "provided cash and other large financial incentives" to induce Aetna to force competing laboratories out of its network so that the services of these competing laboratories "become substantially more expensive than Quest's."  *Id.* ¶ 95.  As part of one contract between Quest and Aetna, Aetna agreed to terminate approximately 400 competing laboratories across the country, "including laboratories in Northern California such as Hunter Laboratories, Inc., and Western Health Sciences Medical Laboratory."  *Id.* ¶ 96.  Quest has also bargained with Aetna for a right-of-first-refusal, applicable to Northern California and other regions, which requires Aetna to check with Quest before entering a new contract with a competing laboratory.  *Id.* ¶ 97.

Plaintiffs further accuse Quest of "pay[ing] hundreds of millions of dollars to Aetna to 'crack the whip' . . . over its in-network physician groups to coerce them not to use out-of-network laboratories," and that "[p]hysicians that refuse to fall into line face retaliation," such as threatening phone calls and letters.  *Id.* ¶ 100.  In addition, Aetna "often sends payments for out-of-network testing to the patients and does not tell Quest's competitors if and when this has been done.  As a consequence, Quest's competitors often find it difficult to collect payments [and] their administrative and bad debt costs soar, . . . placing them at [a] further competitive disadvantage."  *Id.* ¶ 107.

Plaintiffs contend that Quest has pursued a similar course of conduct with Blue Shield.  *Id.* ¶ 108.  Quest agreed to give Blue Shield a ten percent discount on test pricing in exchange for Blue Shield's agreement to exclude Hunter and Westcliff from its network.  *Id.* ¶ 109.  In addition, like

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Aetna, Blue Shield "often sends payments for out-of-network testing to the patients and does not

2   tell [Quest's] competitors if and when this has been done."  *Id.* ¶ 112.

3        According to the FAC, Quest's collusion with Aetna and Blue Shield "has foreclosed

4   substantial competitive opportunities in the plan/outpatient market," in that "[a]pproximately 1.54

5   million persons are enrolled in Aetna and Blue Shield plans in California – 10 percent of the

6   available enrollees in the relevant market."  *Id.* ¶ 119.  Plaintiffs further contend that Quest's (as

7   yet unidentified) contracts with other health plans apart from Aetna and Blue Shield "are likely to

8   show that Quest is engaging in similar collusive behavior with other [health plans]," thereby

9   foreclosing an even greater share of the plan/outpatient market.  *Id.* ¶ 120.

10        The collusion theory failed in the Prior Order because plaintiffs had not alleged sufficient

11  facts showing that Quest's alleged agreements with Aetna and Blue Shield foreclose competition

12  in a substantial share of the plan/outpatient market in Northern California.  Prior Order at 10-11.

13  Plaintiffs had identified three competitors that allegedly had been eliminated as a result of Quest's

14  agreements with Aetna and Blue Shield (the same three that plaintiffs identify here, i.e., Hunter,

15  Western Health, and Westcliff) but plaintiffs had not alleged what their market shares were or the

16  number of other competitors in the plan/outpatient market.  *Id.*  Nor had plaintiffs addressed the

17  circumstances of health plans other than Aetna and Blue Shield operating in Northern California.

18  *Id.*  I concluded that plaintiffs could not base a section 2 or Cartwright Act claim on Quest's

19  alleged agreements with Aetna and Blue Shield without accounting for other significant players in

20  the plan/outpatient market.  *Id.*  Absent this information, plaintiffs' allegations amounted to a claim

21  of harm to competitors, not to competition.  *Id.*

22        Judge Tigar reached the same conclusion in *Rheumatology I*.[7]  He noted that the plaintiffs

23  had not alleged that Aetna ever controlled greater than nine percent of the relevant market, and that

24  they had not quantified the actual market effects of Quest's agreement with Aetna – for example,

25  the percentage of physicians who had dropped other laboratories as a result of the agreement, or

26

27  _____

28  [7] *Rheumatology* involved the same agreements with Aetna and Blue Shield that are at issue here,
    although the agreements were analyzed principally under section 1 of the Sherman Act, not
    section 2.

the percentage of laboratories that had been foreclosed from the market.  2013 WL 3242245, at *13.  With respect to the Blue Shield agreement, Judge Tigar observed that the plaintiffs had not identified the market share that Hunter and Westcliff enjoyed prior to the commencement of the agreement; nor had they described how the agreement affected competitors other than Hunter and Westcliff.  2013 WL 3242245, at *11.  He concluded that the plaintiffs had not plausibly alleged that either agreement had resulted in the foreclosure of a substantial share of the relevant market. *Id.*

Likewise, in *Rheumatology II*, I found that the plaintiffs had again failed to provide the factual allegations necessary "to judge whether there has been substantial foreclosure or any other indicia of anticompetitive effects" as a result of the Aetna and Blue Shield agreements.  2013 WL 5694452, at *13, *15.  I found the same in *Rheumatology III*.  2014 WL 524076, at *10-14.

The FAC's principal addition to plaintiffs' collusion theory is the allegation that "[a]pproximately 1.54 million persons are enrolled in Aetna and Blue Shield plans in California – 10 percent of the available enrollees in the relevant market."  *Id.* ¶ 119.  This allegation does not materially advance plaintiffs' case.  As has now been explained in four separate orders dismissing claims based on the Aetna and Blue Shield agreements, an exclusive dealing arrangement does not violate the antitrust laws unless its probable effect is to foreclose competition in a "substantial share" of the relevant market.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961).  To determine whether the foreclosure amounts to a substantial share,

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved. . . , and the probable immediate and future effects which preemption of that share of the market might have on effective competition.

*Id.* at 329.  The degree of foreclosure "is important because, for the contract to adversely affect competition, the opportunities for other traders to enter into or remain in that market must be significantly limited."  *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal quotation marks omitted); *accord Microsoft*, 253 F.3d at 69.

Courts generally recognize that, at least under section 1 of the Sherman Act, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 (or 40 to 50) percent of the relevant market. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (30 to 40 percent); *Microsoft*, 253 F.3d at 70 (40 to 50 percent). Some courts have also held that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a section 2 violation even though the contracts foreclose less than the roughly [40 to 50 percent] share usually required in order to establish a section 1 violation." *Microsoft*, 253 F.3d at 70; *accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 451-52 (4th Cir. 2011); *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003). But even under these cases, whether bringing claims under section 1 or section 2, a plaintiff still must plead facts that support a plausible inference that the exclusive dealing arrangement forecloses a substantial share of the relevant market – it is just that the definition of "substantial share" varies. *See, e.g., Microsoft*, 253 F.3d at 69 ("[I]t is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure.").[8]

Plaintiffs have not pleaded such facts here. As in their original complaint, they fail to describe the prior market shares of Hunter, Western Health, and Westcliff, the number of other competitors in the plan/outpatient market, or the circumstances of health plans other than Aetna and Blue Shield operating in Northern California. Instead, plaintiffs emphasize that approximately ten percent of available enrollees "in California" are enrolled in Aetna or Blue Shield. FAC ¶ 119.

---

[8] The Hon. Beth L. Freeman recently observed that it is "not clear" whether there is a difference, with respect to the degree of market foreclosure required, between pleading a section 1 versus a section 2 claim based on an exclusive dealing arrangement. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 n.8 (N.D. Cal. 2015). She assumed for the purposes of the motion to dismiss at issue that "the degree of market foreclosure required to make out an exclusive dealing claim does not differ under § 1 and § 2." *Id.* Neither party here contends that there is a difference with respect to the degree of market foreclosure required between section 1 and section 2, but even assuming that there is, plaintiffs' allegations are not sufficient to raise a plausible inference of foreclosure of a substantial share of the plan/outpatient market even under a more forgiving section 2 standard.

United States District Court
Northern District of California

United States District Court
Northern District of California

First, pleading the percentage of available enrollees "in California" that are enrolled in Aetna or Blue Shield does not tell me the percentage for Northern California.[9] Second, even if it did, alleging that ten percent of available enrollees in Northern California are enrolled in Aetna or Blue Shield, without providing more information regarding the players in and dynamics of the relevant market, is not enough to plausibly establish foreclosure of a substantial share. Ten percent is far less than the 30 to 50 percent that is generally required to plead an exclusive dealing claim, and plaintiffs do not cite any case holding that a claimant that affirmatively pleads foreclosure of only ten percent of the relevant market states a claim for violation of the Sherman Act, whether under section 1 or section 2. As I stated in the Prior Order, absent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition.

### C. Acquisition Theory

Plaintiffs' acquisition theory is based on three acquisitions over the course of the past thirteen years. *See* FAC ¶ 56. The first was of Unilab Corporation ("Unilab") in 2003, which allegedly increased Quest's market share in the plan/outpatient market from 7.3 to 56.1 percent. *Id.* ¶ 59. The second was of Berkeley HeartLab in 2011, which allegedly added another 4.6 percent to Quest's market share in the plan/outpatient market. *Id.* ¶ 67. The third was of Dignity Health in 2013, which allegedly added another 2.0 percent. *Id.* ¶ 69.

The only material difference between the acquisition theory allegations in the original complaint and those in the FAC is the addition of the Berkeley HeartLab acquisition to the already alleged Unilab and Dignity Health acquisitions. In the Prior Order, I dismissed the acquisition theory on the grounds that Quest's acquisition of Unilab had been cleared by the FTC, and that its acquisition of Dignity Health had further increased its market share by only a relatively insubstantial amount. *See* Prior Order at 11-12. I also noted that plaintiffs' market share

---

[9] Although plaintiffs state that Aetna and Blue Shield cover "10 percent of the available enrollees *in the relevant market*," it is unclear what this figure is based on if not on the alleged number of Aetna and Blue Shield enrollees "in California." *Id.* ¶ 119 (emphasis added).

1    allegations in support of the acquisition theory concerned the combined plan/outpatient and

2    physician billing markets, not the separate plan/outpatient market.  *See id.*

3            Plaintiffs now limit their market share allegations to the plan/outpatient market, but their

4    acquisition theory otherwise remains deficient.  Like the original complaint, the FAC contains no

5    facts that raise any doubt as to the FTC's decision to clear Quest's acquisition of Unilab in 2003.

6    The FTC only approved the acquisition upon requiring Quest to divest to Laboratory Corporation

7    of America ("LabCorp"), another provider of clinical laboratory testing services which at that time

8    had a minimal presence in Northern California, certain assets "used to provide clinical laboratory

9    testing services to physician groups in Northern California."  Analysis of Agreement Containing

10   Consent Orders to Aid Public Comment: Quest Diagnostics Incorporated and Unilab Corporation,

11   File No. 021 0140 ("FTC Analysis").[10]  This divestiture enabled LabCorp to "replicate Quest's

12   operations, thus replacing the competition that would be lost as a result of the proposed

13   acquisition."  *Id.*  "As a result," the FTC found, "after the divestiture, competition in the market

14   for providing [clinical laboratory testing services] to physician groups in Northern California will

15   remain virtually unchanged by the proposed acquisition."  *Id.*  The FTC highlighted that

16           LabCorp is a well-positioned acquirer of the divested assets for
             several reasons. As the second largest provider of [clinical
17           laboratory testing services] in the United States, LabCorp offers an
             extensive range of more than 4,000 routine and esoteric clinical
18           tests, as well as other services that physician groups require, such as
             patient encounter data and test result reporting information
19           technology. LabCorp currently provides [clinical laboratory testing
             services] throughout most areas of the country, but has a limited
20           presence in Northern California, where its business consists
             primarily of providing clinical reference testing to hospitals and
21           esoteric HIV-related testing. Due to its operations in Southern
             California, however, LabCorp has substantial experience satisfying
22           the requirements of physician groups in California's managed care
             environment. Furthermore, LabCorp has the financial resources to
23           purchase the assets and operate the business in a competitive

24   _____

25   [10] The FTC Analysis is available at https://www.ftc.gov/sites/default/files/documents/cases/2003/
     02/ftc.gov-questanalysis.htm.  Plaintiffs repeatedly reference the FTC Analysis in the FAC.  *See,*
26   *e.g.,* FAC ¶¶ 58, 58 n.1, 63; *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)
     (incorporation by reference doctrine extends "to situations in which the plaintiff's claim depends
27   on the contents of a document, the defendant attaches the document to its motion to dismiss, and
     the parties do not dispute the authenticity of the document, even though the plaintiff does not
28   explicitly allege the contents of that document in the complaint").

manner.

*Id.* Nothing in the FAC or plaintiffs' opposition brief indicates that the FTC's analysis was defective, or that LabCorp did not become and does not remain a significant competitor in the Northern California plan/outpatient market. This fatally undermines plaintiffs' claim that the Unilab acquisition is now actionable under section 2.

Further, the alleged size of the Dignity Health acquisition remains relatively insubstantial,[11] and the Berkeley HeartLab acquisition, which allegedly accounts for only another 4.6 percent increase in Quest's market share, is likewise too limited in scope to raise alarm absent specific allegations regarding its anticompetitive effects.

I do not doubt that, at some point, a series of even relatively insubstantial acquisitions creates cause for concern under the antitrust laws. Here, however, plaintiffs fail to plausibly allege any specific anticompetitive effects of any of the three acquisitions, whether viewed in isolation or in combination. In these circumstances, merely pleading the occurrence of one acquisition that was cleared by the FTC upon the divestiture of assets to a significant competitor, and two others that resulted in minimal market share increases, is not enough to state a claim.[12]

Plaintiffs are correct that a court must look to the aggregate or "synergistic" effect of the alleged exclusionary practices to determine whether the allegations plausibly establish a violation of the antitrust laws. *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). "[I]t would not be proper to focus on specific individual acts of an accused monopolist

---

[11] Now that plaintiffs have limited their market share allegations to the plan/outpatient market, the Dignity Health acquisition accounts for only a 2.0 percent increase in market share, instead of the 3.0 percent alleged in the original complaint. *See* FAC ¶ 69.

[12] Acquisitions are not per se illegal under section 2. Accordingly, to prevail on a section 2 claim arising from an acquisition, the plaintiff must establish that the acquisition "unreasonably restrict[s] competition." *Drinkwine*, 780 F.2d at 739. Neither party cites any authority for how to apply this standard in the acquisition context, and there are not many cases that have considered the issue. In *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), the Supreme Court held that a series of three acquisitions by the defendant violated section 2 where, by attaining control of the three entities, the defendant "eliminated any possibility of an outbreak of competition that might have occurred when [its agreements with the three entities] terminated. By those acquisitions [the defendant] perfected the monopoly power to exclude competitors and fix prices." *Id.* at 576. In *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (5th Cir. 1977), the Fifth Circuit appeared to assume that an acquisition that was illegal under section 7 of the Clayton Act was also illegal under section 2 of the Sherman Act. *Id.* at 981. The allegations in the FAC are not sufficient to state a claim under either of these decisions.

United States District Court
Northern District of California

1   while refusing to consider their overall combined effect." *Id.*   Nevertheless, it is "much more

2   difficult" to find wrongdoing where the plaintiff alleges only "a number of perfectly legal acts,"

3   and allegations that establish "some slight wrongdoing in certain areas" need not by themselves

4   amount to a violation. *Id.*   Here, plaintiffs have alleged price discounts without establishing any

5   overcharging as a result, exclusive dealing arrangements without establishing that they impact

6   more than a minor fraction of the relevant market, and three acquisitions, one of which was

7   cleared by the FTC and resulted in a new significant competitor entering the market, and the other

8   two of which account for a combined 6.6 percent increase in market share.   Whether viewed in

9   isolation or in the aggregate, these allegations do not support plaintiffs' monopolization claims

10  against Quest.

**III.    UCL CLAIMS**

12          Plaintiffs allege that Quest has violated the "unfair" and "illegal" prongs of the UCL. *See*

13  FAC ¶¶ 172-78.   These claims are derivative of the section 2 and Cartwright Act claims discussed

14  above, and plaintiffs make no arguments specific to them in their opposition brief.   They will be

15  dismissed.

**CONCLUSION**

17          For the foregoing reasons, Quest's motion to dismiss is GRANTED.   Plaintiffs' claims are

18  DISMISSED WITH LEAVE TO AMEND.   Given the approaching holidays, plaintiffs shall file

19  their second amended complaint, if any, on or before January 8, 2016.

20          **IT IS SO ORDERED**.

21  Dated: November 25, 2015

23  WILLIAM H. ORRICK
    United States District Judge