UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN EASTMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>　　　　Defendant. | Case No. 15-cv-00415-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 69 |

## INTRODUCTION

This is the third time I have addressed plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez's claims against Quest Diagnostics Incorporated ("Quest"), a provider of clinical laboratory testing services. Plaintiffs accuse Quest of monopoly overpricing in violation of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law, and seek to represent a class defined as

> health plans and outpatients residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011 . . . under plan/outpatient billing[1] arrangements where the payment to Quest was not entirely comprised of a fixed, per-visit copayment amount, but depended at least in part on the total amount due Quest.

Second Amended Complaint ¶ 61 ("SAC"). I previously dismissed plaintiffs' original and first amended complaints for failure to state a claim, and the SAC recycles many of their unsuccessful claims. They also assert new "tying" claims, but there are no plausible allegations indicating either that the products are tied or that medical providers are coerced. For the reasons discussed below, and in my prior orders in this case, Quest's motion to dismiss is GRANTED.

---

[1] Plaintiffs define "plain/outpatient billing" as "routine diagnostic testing for which a private health insurance plan, the State of California, or an outpatient has paid a fee directly to Quest." SAC ¶ 61.

# BACKGROUND

## I. ORIGINAL COMPLAINT

Plaintiffs filed this action on January 29, 2015. Dkt. No. 1 ("Compl."). Their original complaint brought claims under section 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Law ("UCL"), and the below-cost and loss-leader sales provisions of California's Unfair Practices Act ("UPA"). *Id.*

Quest moved to dismiss, and, following briefing and oral argument, I issued an order on June 9, 2015 dismissing the original complaint with leave to amend. Dkt. No. 42 ("First Dismissal Order"). I found that plaintiffs had not established either Article III or antitrust standing because they had not alleged facts plausibly demonstrating that they had been harmed by Quest's alleged anticompetitive conduct. First Dismissal Order at 3-5. Further, plaintiffs could not bring claims on behalf of health plans because they had not alleged facts plausibly establishing that they and health plans had suffered identical harms. *Id.* at 5-6.

I also addressed and rejected each of plaintiffs' theories of liability. The original complaint alleged that Quest competes in two markets for routine diagnostic testing in Northern California: (1) the plan/outpatient market and (2) the physician billing market. Compl. ¶¶ 3-4; *see also* First Dismissal Order at 6. Plaintiffs alleged that Quest has monopolized the plan/outpatient market and has thus "been able to charge above-competitive prices to [class members] while providing inferior quality service." Compl. ¶ 20. They asserted that Quest has done this through the use of three exclusionary practices:

> (1) "pa[ying] kickbacks to medical providers . . . in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/outpatient billing to Quest exclusively regardless of Quest's pricing or its testing quality."
>
> (2) "collud[ing] with two major private health insurers [ – i.e., Aetna, Inc. and Blue Shield of California – ] to suppress its competition in the relevant market for plan/outpatient billing."
>
> (3) "acquir[ing] its competitors for plan/outpatient billing in order to eliminate their competition."

*Id.*; *see also* First Dismissal Order at 6.[2]

I held that none of these theories, as alleged in the original complaint, could support plaintiffs' monopolization claims. The kickback/leveraging theory failed because plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers resulted in Quest charging above-competitive prices in the plan/outpatient market. First Dismissal Order at 8-10. The collusion theory failed because plaintiffs had not shown that the three competitors that were allegedly eliminated as a result of Quest's agreements with Aetna and Blue Shield – i.e., Hunter Laboratories, Inc. ("Hunter"), Western Health Sciences Medical Laboratory ("Western Health"), and Westcliff Medical Laboratories ("Westcliff") – constituted a substantial share of the relevant market. *Id.* at 10-11. The acquisition theory failed because plaintiffs' allegations did not provide any reason to doubt the FTC's conclusion that, following the divestitures, Quest's acquisition of Unilab in 2003 would leave competition in Northern California "virtually unchanged." *Id.* at 11-12. Further, Quest's acquisition of Dignity Health in 2013 allegedly increased Quest's market share by a mere three percent – a "relatively insubstantial" amount that was not enough to raise concern under the antitrust laws. *Id.*

The allegations in support of the below-cost and loss-leader pricing claims under the UPA were insufficient because plaintiffs had not pleaded the prices and costs for the relevant testing services, and the UCL claims failed as derivative of the monopolization and UPA claims. *Id.* at 12-14.

---

[2] Each of these alleged exclusionary practices was also previously raised in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847 (N.D. Cal. filed July 10, 2012), a related case brought against Quest by a group of competing laboratories alleging monopolization claims similar to those at issue here. Judge Tigar dismissed the plaintiffs' section 2 claims with leave to amend in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245, *13-15 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). After the matter was transferred to me, I dismissed the section 2 claims with leave to amend a second time in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, *14-16 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"). The plaintiffs did not allege section 2 claims in their second amended complaint, although I discussed certain aspects of their collusion theory in dismissing the second amended complaint's cause of action for violations of section 1 of the Sherman Act. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at *10-14 (N.D. Cal. Feb. 6, 2014) ("*Rheumatology III*").

## II. FIRST AMENDED COMPLAINT

Plaintiffs filed their first amended complaint on July 6, 2015. Dkt. No. 46 ("FAC"). Like the original complaint, the FAC brought claims under section 2 of the Sherman Act, the Cartwright Act, plus derivative claims under the UCL. FAC ¶¶ 166-84. It dropped the below-cost and loss-leader pricing claims. *Id.*

The FAC identified the same two Northern California markets as the original complaint (the plan/outpatient market and the physician billing market) and the same three exclusionary practices in the plan/outpatient market (the kickback/leveraging theory, the collusion theory, and the acquisition theory). *See, e.g., id.* ¶¶ 3-4, 20. Its most significant additions were to its allegations regarding monopoly overpricing and the named plaintiffs' individual experiences purchasing testing from Quest. Specifically, the FAC included pricing data compiled by the Truven Corporation ("Truven") for routine diagnostic testing performed in Northern California and in five other regions around the United States (New York City, Portland, Seattle, Tampa, and Southern California). *See, e.g., id.* ¶ 140. It also included allegations regarding the named plaintiffs' respective health insurance providers and their payments to Quest for testing. *See, e.g., id.* ¶¶ 129-31. In addition, with respect to their acquisition theory, plaintiffs identified a third acquisition, this one of Berkeley HeartLab in 2011, which allegedly added another 4.6 percent to Quest's market share in the plan/outpatient market. *Id.* ¶ 67.

On November 25, 2015, I issued an order granting Quest's motion to dismiss the FAC. Dkt. No. 59 ("Second Dismissal Order"). I held that each of plaintiffs' three theories of liability failed for essentially the same reasons as before. *See* Second Dismissal Order at 10-23. Plaintiffs still had not adequately alleged the monopoly overpricing necessary to support their kickback/leveraging theory. *Id.* at 11-16. They still had not alleged sufficient facts showing that Quest's alleged agreements with Aetna and Blue Shield have foreclosed competition in a substantial share of the plan/outpatient market. *Id.* at 16-20. And they still had not alleged facts plausibly indicating that Quest's acquisitions have unreasonably restricted competition. *Id.* at 20-23. I dismissed the FAC with leave to amend. *Id.* at 23.

Plaintiffs appealed the Second Dismissal Order to the Ninth Circuit but voluntarily

4

dismissed the appeal on December 23, 2015, within two weeks of filing it, after the Ninth Circuit noted that its jurisdiction over the appeal was questionable. Dkt. Nos. 60, 63. Plaintiffs then returned to this Court and renewed their request for pre-complaint discovery of Quest's fee-for-service test pricing. Dkt. No. 62. They sought fee-for-service test pricing for the years 2013 and 2015 for six geographic areas (Northern California, Southern California, New York, Portland, Seattle, and Tampa) and for twenty-one different routine diagnostic testing codes. *Id.* at 2.[3] I denied the request. Dkt. No. 65.

### III.    SECOND AMENDED COMPLAINT

Plaintiffs filed the SAC on January 13, 2016. Dkt. No. 66. Their new allegations are largely identical to those in the original complaint and the FAC, but there are some material differences.

Most significantly, plaintiffs now identify four, instead of three, exclusionary practices. *See, e.g.,* SAC ¶ 85. They continue to allege the collusion theory (regarding Quest's alleged exclusive dealing arrangements with Aetna and Blue Shield) and the acquisition theory (regarding Quest's acquisitions of Unilab, Berkeley HeartLab, and Dignity Health). But they have repackaged the alleged misconduct underlying the kickback/leveraging theory into two separate, but very similar, alleged exclusionary practices. *See id.* ¶¶ 105-21. The first accuses Quest of illegal tying, on the theory that Quest "sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition that they also purchase [its] fee-for-service testing sold in the separate plan/outpatient market." *Id.* ¶ 105. The second accuses Quest of "exclud[ing] competition throughout the plan/outpatient market with economic arrangements with medical providers which constitute exclusive dealing practices." *Id.* ¶ 115. Plaintiffs assert that Quest

> enters into express exclusive dealing contracts with medical providers where they receive capitated testing at very low rates often below Quest's costs. In return for these rates it obtains exclusivity commitments from the providers under which they send all or nearly all of their fee-for-service business to Quest. The latter

---

[3] Plaintiffs made a similar request shortly after I issued the First Dismissal Order. Dkt. No. 43. I also denied that request. Dkt. No. 45.

>commitments are not necessarily contained in the express exclusive capitated contracts. Nonetheless Quest makes it clear that, to obtain the low capitated rates and increase their profits, the medical providers must exclusively provide all or nearly all their capitated and fee-for service business to Quest.

*Id.* ¶ 116. Plaintiffs also assert, as they have throughout this case, that "medical providers have a strong preference for one-stop test shopping," and that medical providers' capitated testing agreements with Quest thus "encourage[] them further to deal exclusively with Quest for fee-for-service testing as well as capitated testing." *Id.* ¶ 119.[4]

Plaintiffs continue to bring monopolization claims under section 2 of the Sherman Act and the Cartwright Act, as well as derivative claims under the UCL. *Id.* ¶¶ 188-93, 199-211. In addition, they now allege a separate cause of action titled, "Tying," under both section 1 and section 2 of the Sherman Act. *Id.* ¶¶ 194-198.

Quest filed this motion to dismiss on February 10, 2016. Dkt. No. 69. I heard argument from the parties on April 6, 2015. Dkt. No. 75.

---

[4] Plaintiffs explain this "one-stop test shopping" dynamic in more detail elsewhere in the SAC:

>[D]ue to ease of administration and familiarity, a medical provider in Northern California (or elsewhere) overwhelmingly will prefer to direct all or nearly all of its routine testing to a single diagnostic testing company once the medical provider reaches a "tipping point" with a particular testing company. In other words, a medical provider that is sending a substantial percentage of its routine testing to one diagnostic testing company (whether or not the testing is done in the plan/out-patient or physician billing relevant market) will likely send all of its testing to that testing company because "one-stop shopping" is much more convenient for the medical provider. As a result, when Quest, as the dominant provider in the physician billing market, obtains as little as 50 percent of all routine tests ordered by the provider in both relevant markets, it is likely to obtain all or nearly all of the provider's testing in the plan/outpatient market.

>Quest routinely documents that, when it obtains the exclusive capitated business of a medical provider in the physician billing relevant market, it will also receive the provider's fee-for-service business in the plan/outpatient business. Its records show that it expressly sets its capitated pricing to ensure that this tie between capitated and fee-for-service testing is accomplished

SAC ¶¶ 51-52 (internal numbering omitted). Plaintiffs included substantially similar descriptions of the "one-stop test shopping" dynamic in their FAC and original complaint. *See* FAC ¶ 18; Compl. ¶ 18.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). A court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

**DISCUSSION**

**I.    MONOPOLIZATION CLAIMS**

Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A

1   monopolization claim under section 2 has three elements: "(a) the possession of monopoly power
2   in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal
3   antitrust injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991,
4   998 (9th Cir. 2010) (internal quotation marks omitted).

5   With respect to the second element, the willful acquisition or maintenance of monopoly
6   power must be "distinguished from growth or development as a consequence of a superior
7   product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs.,*
8   *Inc.*, 504 U.S. 451, 481 (1992); *accord Name.Space, Inc. v. Internet Corp. for Assigned Names &*
9   *Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015). "The test of willful maintenance or acquisition of
10  monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine*
11  *v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985); *accord Oahu Gas Serv., Inc. v.*
12  *Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988). To establish this element, the plaintiff must
13  show that the defendant used its monopoly power "to foreclose competition, to gain a competitive
14  advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (internal quotation marks
15  omitted). In other words, the defendant's conduct must be "exclusionary." *United States v.*
16  *Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "[T]o be condemned as exclusionary, a
17  monopolist's act must have an anticompetitive effect. That is, it must harm the competitive
18  *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not
19  suffice." *Id.* at 58 (internal quotation marks omitted; emphasis in original).

20  The third element, causal antitrust injury, requires a showing of "injury of the type the
21  antitrust laws were intended to prevent and that flows from that which makes [the defendant's]
22  acts unlawful."[5] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To
23  establish such injury, the plaintiff must show "(1) unlawful conduct, (2) causing an injury to the
24  plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the

---

[5] In contrast with the inquiry into whether the defendant's acts are exclusionary, the inquiry into causal antitrust injury is viewed from the "perspective of the plaintiff's position in the marketplace," not from the "perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). In addition, "the injured party [must] be a participant in the same market as the alleged malefactor[]." *Id.* (internal quotation marks omitted). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (internal quotation marks omitted).[6]

The Ninth Circuit has stated that "[t]he analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *accord Name.Space*, 795 F.3d at 1131 n.5 ("Because the analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim.") (internal citations omitted). Plaintiffs do not dispute that their claims under the Sherman Act and the Cartwright Act rise and fall together.

Quest contends that despite the repackaging of the kickback/leveraging theory, the exclusionary practices alleged by plaintiffs remain insufficient to support their monopolization claims.[7] I agree.

**A.     Exclusive Dealing (or Kickback/Leveraging) Theory**

The repackaging of the kickback/leveraging theory as an exclusive dealing theory does not help plaintiffs.

In the First and Second Dismissal Orders, I rejected the kickback/leveraging theory on the ground that plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers in the physician billing market resulted in Quest charging above-competitive prices in

---

[6] A showing of antitrust injury is "necessary, but not always sufficient," to establish antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). Factors relevant to whether a plaintiff that has established antitrust injury also has antitrust standing include "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *accord Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).

[7] Again, plaintiffs' claims are based on exclusionary practices within the plan/outpatient market, not within the physician billing market.

9

the plan/outpatient billing market. *See* First Dismissal Order at 8-10; Second Dismissal Order at 11-16.

Plaintiffs have changed the label for this theory. They have also slightly modified their description of the alleged misconduct underlying the theory. Previously, they accused Quest of giving economic inducements to medical providers in the physician billing market that organically result in those medical providers referring their patients to Quest in the plan/outpatient market, due to their natural preference for "one-stop test shopping." *See, e.g.,* FAC ¶ 81 ("Quest offers medical providers sharply reduced capitated rates in the physician billing market . . . to achieve the one-stop shop tipping points it needs to obtain all or the vast majority of [medical providers'] plan/outpatient business."). Plaintiffs continue to describe this "one-stop test shopping" dynamic, but they now also allege, for the first time in this case, that Quest "conditions" its discounted prices in the physician billing market on "exclusivity commitments from [medical providers] under which they send all or nearly all of their fee-for-service business to Quest." SAC ¶ 116. Plaintiffs admit that these exclusivity commitments are "not necessarily contained" in the capitated contracts Quest enters with medical providers but assert that "Quest makes it clear that, to obtain the low capitated rates and increase their profits, medical providers must exclusively provide all or nearly all their capitated *and* fee-for-service business to Quest." *Id.* (emphasis in original).

Crucially, however, plaintiffs have not changed those aspects of this theory that were found lacking in the First and Second Dismissal Orders. They have not changed their allegations regarding Quest's monopolistic overcharging in the plan/outpatient market – those allegations remain essentially identical to those in the FAC. *Compare* SAC ¶¶ 168-76 *with* FAC ¶¶ 136-43. Nor have they materially changed their allegations regarding Quest's "substantial economies of scale" and "large cost advantages," or explained why these factors, rather than support a plausible inference that Quest overprices in the plan/outpatient market, "indicate that Quest underprices its competitors in that market, much as plaintiffs explicitly allege that it does in the patient billing market." Second Dismissal Order at 14; *see also* SAC ¶ 80 (alleging, with respect to the plan/outpatient market, that Quest "benefits from very substantial economies of scale," "has

10

significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests," "is able to reduce its unit costs by negotiating volume discounts on supplies," and "minimize[s] the costly outsourcing of low-volume tests"). Accordingly, for the reasons stated in the First and Second Dismissal Orders, this theory continues to fail to support a monopolization claim against Quest.[8]

Further, plaintiffs' recharacterization of Quest's economic inducements in the physician billing market as exclusive dealing arrangements highlights an additional flaw in these allegations.[9] As I explained in the First and Second Dismissal Orders in discussing plaintiffs' collusion theory, and as both Judge Tigar and I explained in *Rheumatology*, "an exclusive dealing arrangement does not violate the antitrust laws unless its probable effect is to foreclose competition in a 'substantial share' of the relevant market."[10] Second Dismissal Order at 18; *see also* First Dismissal Order at 10-11; *Rheumatology II*, 2013 WL 5694452, at *11-14, *15; *Rheumatology I*, 2013 WL 3242245, at *10-13. To determine whether the foreclosure amounts to

---

[8] Although Quest does not frame its argument in this way, I note that plaintiffs' failure to adequately plead causal antitrust injury is fatal not only to their exclusive dealing theory, but to all of their claims, because it means that they lack antitrust standing. *See Cargill*, 479 U.S. at 110-11, 110 n.5, 110 n.6 (showing of antitrust injury is necessary to establish antitrust standing under both section 4 and section 16 of the Clayton Act); *see also Somers v. Apple, Inc.*, 729 F.3d 953, 962-65 (9th Cir. 2013) (affirming dismissal of section 2 claims for failure to adequately plead antitrust injury). Further weighing against plaintiffs' antitrust standing in this case is the highly speculative measure of their alleged harm, in that (1) it is unclear how plaintiffs have been cognizably harmed by Quest's alleged overcharging unless that overcharging has caused plaintiffs to pay higher portions of their deductibles than they otherwise would have paid (and plaintiffs do not allege that this was the case); and (2) Cruz and Mendez allege that their only relevant purchases were made while they were insured by Blue Shield, and plaintiffs specifically allege that Blue Shield members receive *discounted* prices from Quest. *See* SAC ¶ 140.

[9] Plaintiffs previously characterized Quest's economic inducements in the physician billing market as simply anticompetitive below-cost price discounts, *see* FAC ¶¶ 71-88; Compl. ¶¶ 71-81, but explicitly disclaimed any reliance on a predatory pricing theory, *see* Dkt. No. 25 at 10, and did not allege that the economic inducements amounted to illegal bundled discounts. As before, plaintiffs do not raise a predatory pricing or bundled discounts theory in the SAC or their opposition brief.

[10] This use of "probable effect" is probably too generous to plaintiffs. The Ninth Circuit has held that "although a Clayton Act violation may be found where an [exclusive dealing arrangement] has the probable effect of foreclosing competition, . . . in a case under section 1 of the Sherman Act, the plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition." *Allied Orthopedic*, 592 F.3d at 996 n.1; *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n.9 (9th Cir. 1982) ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act violation than a . . . Clayton Act violation in exclusive dealing cases.").

11

a substantial share,

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved. . . , and the probable immediate and future effects which preemption of that share of the market might have on effective competition.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). The degree of foreclosure "is important because, for the contract to adversely affect competition, the opportunities for other traders to enter into or remain in that market must be significantly limited." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal quotation marks omitted); *accord Microsoft*, 253 F.3d at 69.

Plaintiffs have not alleged facts from which it can be plausibly inferred that Quest's alleged exclusive dealing arrangements with medical providers have foreclosed a substantial share of the plan/outpatient market. Plaintiffs have not identified, for example, the approximate number of medical providers that have entered into such arrangements with Quest, the approximate number and/or characteristics of the other laboratories operating in the physician billing and plan/outpatient markets, or what competing laboratories have been adversely affected by the arrangements or the extent to which they have been affected.[11] This is the same basic deficiency in pleading substantial foreclosure that has repeatedly resulted in the dismissal of plaintiffs' collusion theory, both in this case and in *Rheumatology*. *See* Second Dismissal Order at 20 ("[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition."); First Dismissal Order at 11 ("Plaintiffs cannot . . . establish foreclosure of a substantial share of the plan/outpatient market in Northern California without accounting for other players which significantly impact competition in the market."); *Rheumatology II*, 2013 WL 5694452, at *15 ("[P]laintiffs do not provide any context against which the Court may evaluate the extent to which competition has been

---

[11] Plaintiffs' allegations regarding Hunter, Western Health, and Westcliff are focused on Quest's agreements with Aetna and Blue Shield, not on Quest's capitated contracts with medical providers.

12

restricted."); *Rheumatology I*, 2013 WL 3242245, at *13 ("Plaintiffs fail to quantify the actual market effect of this alleged activity – i.e., the percentage of physicians who drop other laboratories, or the percentage of laboratories who are foreclosed from the market – even in gross terms."). As before, plaintiffs have not provided sufficient details about the dynamics of the relevant market to gauge whether Quest's alleged exclusive dealing arrangements have resulted in substantial foreclosure.[12]

### B. Collusion Theory

The factual allegations in the SAC in support of this theory are not materially different from those in the FAC. *Compare* SAC ¶¶ 122-151 *with* FAC ¶¶ 89-120. The theory remains based on Quest's exclusive dealing arrangements with Aetna and Blue Shield. Plaintiffs still identify just three particular competing laboratories in the relevant market that have been harmed as a result of the arrangements – Hunter, Western Health, and Westcliff[13] – and still specifically allege that "approximately 1.54 million persons are enrolled in Aetna and Blue Shield plans in Northern California – 10 percent of the available enrollees in the relevant market." SAC ¶ 145. Plaintiffs also still "fail to describe the prior market shares of Hunter, Western Health, and

---

[12] Also weighing against the plausibility of substantial foreclosure here is the absence of facts about the agreements Quest enters with medical providers. Plaintiffs do not provide any information regarding, for example, the approximate length of the agreements or the process by which they can be terminated. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (finding that "the short duration and easy terminability of these [alleged exclusive dealing] agreements negate substantially their potential to foreclose competition") (internal footnotes omitted). Nor do plaintiffs make clear the extent to which any medical providers have actually agreed, either explicitly or implicitly, to refer any portion of their fee-for-service testing to Quest. The SAC sends mixed messages on this issue, alleging both (1) that Quest "conditions" its discounted prices on capitated contracts on medical providers' referral of their fee-for-service testing, *see, e.g.,* SAC ¶ 196; and (2) that the "pull-through" business obtained by Quest in the plan/outpatient market is merely the organic result of medical providers' natural preference for "one-stop test shopping," *see, e.g.,* SAC ¶¶ 51-52, 119. Plaintiffs do not clarify in their opposition brief whether they mean to allege one or the other of these dynamics, or some combination of the two. *See, e.g.,* Oppo. at 14 ("[Physicians] have a strong economic incentive to continue buying Quest's fee-for-service testing even though they are not contractually committed to do so.") (internal quotation marks omitted).

[13] In addition to Hunter, Western Health, and Westcliff, plaintiffs also allege that John Muir Health has also "exited the plan/outpatient market, in large part because of Quest's other exclusionary conduct." SAC ¶ 34. But plaintiffs allege nothing more about John Muir Health. There are no allegations regarding, e.g., its previous market share, when or why it exited the market, or whether/how it was impacted by Quest's agreements with Aetna and Blue Shield.

Westcliff, the number of other competitors in the plan/outpatient market, or the circumstances of health plans other than Aetna and Blue Shield operating in Northern California." Second Dismissal Order at 19. As I held in the Second Dismissal Order, these allegations are not sufficient to plausibly establish that Quest's exclusive dealing arrangements with Aetna and Blue Shield have foreclosed a substantial share of the plan/outpatient market. *Id.* at 19-20. "[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition." *Id.* at 20.

### C. Acquisition Theory

Like their collusion theory, plaintiffs' acquisition theory has not changed materially since the FAC. *Compare* SAC ¶¶ 86-104 *with* FAC ¶¶ 55-70. It remains based on three acquisitions in Northern California between 2003 and 2013: (1) Unilab in 2003, adding 48.8 percent to Quest's share of the plan/outpatient market in Northern California; (2) Berkeley HeartLab in 2011, adding another 4.6 percent; and (3) Dignity Health in 2013, adding another 2.0 percent. SAC ¶¶ 59, 67, 69. Plaintiffs allege no new facts regarding how the three acquisitions have unreasonably restricted competition. The most significant change in their allegations concerns the FTC's decision to clear Quest's acquisition of Unilab upon requiring Quest to divest certain Northern California assets to Laboratory Corporation of America, another provider of clinical laboratory testing services that at that time had a minimal presence in Northern California. Plaintiffs now emphasize that the FTC's decision "does not immunize [Quest's] sustained march to market power over the next decade using various additional exclusionary practices." *Id.* ¶ 96.

I agree with plaintiffs that the FTC's decision is far from dispositive (although it does weigh against the conclusion that Quest's acquisition of Unilab can be plausibly characterized as an unreasonable restriction on competition). What is dispositive is that the SAC, like the FAC, "fail[s] to plausibly allege any specific anticompetitive effects of any of the three acquisitions, whether viewed in isolation or in combination." Second Dismissal Order at 22. "In these circumstances, merely pleading the occurrence of one acquisition that was cleared by the FTC upon the divestiture of assets to a significant competitor, and two others that resulted in minimal

14

1   market share increases, is not enough to state a claim." *Id.*

2   In other words, plaintiffs cannot rely on the fact of the acquisitions alone. In and of
3   themselves, the acquisitions may help plaintiffs show the "possession of monopoly power in the
4   relevant market," but they do not plausibly establish "the willful acquisition or maintenance of that
5   power." *Allied*, 592 F.3d at 998. To satisfy that element, plaintiffs must plead facts showing the
6   particular ways in which the acquisitions have unreasonably restricted competition. For the third
7   time, they have not done so.

**D.   Combined Effect**

Plaintiffs dedicate much of their opposition brief to arguing that Quest's alleged exclusionary practices must be considered in combination, not in isolation. *See, e.g.,* Oppo. at 6. I agree. As I stated in the Second Dismissal Order, however, viewing Quest's alleged exclusionary practices in combination does not push plaintiffs' claims over the line:

> Plaintiffs are correct that a court must look to the aggregate or "synergistic" effect of the alleged exclusionary practices to determine whether the allegations plausibly establish a violation of the antitrust laws. *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* Nevertheless, it is "much more difficult" to find wrongdoing where the plaintiff alleges only "a number of perfectly legal acts," and allegations that establish "some slight wrongdoing in certain areas" need not by themselves amount to a violation. *Id.* Here, plaintiffs have alleged price discounts without establishing any overcharging as a result, exclusive dealing arrangements without establishing that they impact more than a minor fraction of the relevant market, and three acquisitions, one of which was cleared by the FTC and resulted in a new significant competitor entering the market, and the other two of which account for a combined 6.6 percent increase in market share. Whether viewed in isolation or in the aggregate, these allegations do not support plaintiffs' monopolization claims against Quest.

Second Dismissal Order at 22-23. The new allegations in the SAC do not materially change this analysis, except to highlight that plaintiffs' "price discounts" theory (i.e., their exclusive dealing or kickback/leveraging theory) also fails on the ground that plaintiffs' have not adequately alleged substantial foreclosure of the plan/outpatient market based on Quest's agreements with medical providers. Quest's motion to dismiss plaintiffs' monopolization claims is GRANTED.

## II. TYING CLAIMS

For the first time in this case, plaintiffs bring a separate cause of action accusing Quest of an illegal tying arrangement. SAC ¶¶ 194-98. The cause of action states in relevant part that

> Quest has tied fee-for-service sales sold to medical providers in the relevant market for plan/outpatient billing to its sales of separately sold capitated testing in the physician billing relevant market.
>
> Quest has market power in the physician billing relevant market and has conditioned its sales of capitated testing upon referral to Quest of the medical providers' fee-for-service testing as well. Such referral is the only viable economic option for the medical providers seeking to avoid substantial increased capitated costs.
>
> As a consequence of its conduct, Quest has caused substantial price injury in the sale of fee-for-service testing and actual damages to members of the Class, as well as denied them competitive choice.

SAC ¶¶ 195-97 (paragraph numbering omitted). Elsewhere in the SAC, plaintiffs allege that Quest has

> committed a per se tying violation to deny its rivals in the plan/outpatient market distribution of their fee-for-service routine testing to medical providers. Quest sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition they also purchase Quest's fee-for-service testing sold in the separate plan/outpatient market.

SAC ¶ 105.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (internal quotation marks omitted). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Eastman Kodak*, 504 U.S. at 464 n.9 (internal quotation marks and alterations omitted). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* (internal quotation marks omitted).

Plaintiffs appear to accuse Quest of a per se tying violation under section 1 of the Sherman

16

Act. *See, e.g.,* Oppo. at 11.[14] "A plaintiff must prove three elements to prevail on an illegal tying claim: (1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted).

Quest identifies four flaws in plaintiffs' tying theory. Mot. at 11-13. First, Quest argues that plaintiffs do not allege that a single buyer purchases the tying and tied products. According to plaintiffs' tying theory, medical providers purchase the tying product (capitated testing in the physician billing market) while health plans and patients purchase the tied product (fee-for-service testing in the plan/outpatient market). Quest quotes *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722 (W.D. Pa. 1987), for the proposition that "an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual." *Id.* at 731. Plaintiffs respond that "[t]here is one buyer here, medical providers buying capitated testing [ – i.e., the tying product – ] from Quest." Oppo. at 11 n.7. Plaintiffs do not dispute that, according to their tying theory, medical providers do not also purchase the tied product – i.e., fee-for-service testing – from Quest.

Second, Quest argues that plaintiffs have not plausibly alleged coercion. Quest contends that because there are different buyers for the tying product versus the tied product, coercion cannot possibly be established here. Mot. at 11. Further, Quest argues, plaintiffs have not alleged that the tying and tied products cannot be purchased separately. That is, plaintiffs have not alleged either (1) that medical providers who enter capitated testing agreements with Quest must refer their fee-for-service business to Quest, or (2) that medical providers who do not enter capitated testing agreements with Quest cannot refer their fee-for-service business to Quest. *Id.* at 12. Plaintiffs do not dispute this characterization of their allegations. They argue instead that they have adequately alleged coercion because Quest's pricing policy "makes purchase of the tying and

---

[14] To the extent that plaintiffs also rely on their tying allegations to support their monopolization claims, those allegations do not meaningfully impact the analysis above, because they are essentially identical to the allegations in support of plaintiffs' exclusive dealing (or kickback/leveraging) theory.

17

tied products together the only viable economic option." Oppo. at 12. In support of this argument, plaintiffs point to paragraph 113 of the SAC, which states that "Quest's conditioning is also effective because, by accepting Quest's very low capitated rates, medical providers measurably increase their profits on their capitated business, and since cost minimization is their goal accepting tying conditionality is their only viable economic option." SAC ¶ 113; *see also id.* ¶ 196 ("Such referral [of fee-for-service testing] is the only viable economic option for medical providers seeking to avoid substantial increased capitated costs.").

Third and fourth, Quest argues that plaintiffs do not plausibly allege either that "the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin*, 328 F.3d at 1159, or that Quest "has market power" in the tying product market, Mot. at 13. With respect to the volume of commerce affected in the tied product market, plaintiffs contend that they have "alleged that an appreciable number of buyers have accepted capitated/fee-for-service terms." Oppo. at 13. They point to paragraph 109 of the SAC, which includes the following quote from a former Quest salesperson:

> In order to secure the fee-for-service business and referral of these medical providers, Quest offers deeply discounted prices, often below cost, for those capitated tests the medical providers pay for directly. The medical providers thereby lower their costs, and can increase profits on capitated business paid for by the providers. In exchange for these discounts, with very rare exceptions the medical providers refer all of their fee-for-service patients to Quest, including Medi-Cal patients. These referrals, obtained in exchange for discounts, are referred to industry insiders as pull-through. Medical providers paying capitated rates were told that they would have to support Quest with their Medi-Cal, Medicare and third-party insurance patients to maintain the deeply discounted capitated prices. The sales force was required to justify the discounts based on the amount of pull-thorough and track the amount of pull-through of the account to ensure that the pull-through of the account resulted in an overall profit from the client.

SAC ¶ 109 (internal emphasis and alterations omitted).[15] With respect to whether Quest's market power in the tying product market, plaintiffs allege that Quest's share of the physician billing

---

[15] At oral argument, Quest pointed out, and plaintiffs did not dispute, that paragraph 109 of the SAC is taken from a declaration attached to a complaint filed by the California Attorney General against Quest, and that the declarant is describing conduct from 2003 to 2004, when the declarant worked for Quest.

1    market is 71.8 percent. *Id.* ¶ 107.

2            I agree with Quest that plaintiffs have not adequately alleged coercion. Plaintiffs' only

3    stated basis for a finding of coercion is that medical providers' "only viable economic option" is to

4    purchase capitated testing at the discounted rates offered to those medical providers who also refer

5    their fee-for-service testing to Quest. *See* Oppo. at 12; SAC ¶¶ 113, 196. But plaintiffs allege no

6    facts indicating how this is the case.[16] For example, they do not allege the difference in pricing

7    between capitated testing agreements with medical providers who do refer their fee-for-service

8    testing to Quest, and capitated testing agreements with medical providers who do not. *See*

9    *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965-MMC, 2015 WL 4719048, at *7 (N.D. Cal.

10   Aug. 7, 2015) (dismissing tying claim where counterclaimant's theory of coercion was that

11   counterdefendant's prices "render[ed] it economically unviable" to purchase the tying and tied

12   products separately, and counterclaimant had not stated facts showing "how the alleged

13   discounting practice was coercive, e.g., the amount of the difference between the price of [the

14   tying product] when purchased separately and its price when purchased together with [the tied

15   product]"). Nor do they allege the approximate number of medical providers who have obtained

16   "deeply discounted prices" on capitated testing in exchange for referring their patients to Quest for

17   fee-for-service testing, or how Quest's prices on fee-for-service testing compare to the prices of its

18   competitors. *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914-15 (9th Cir. 2008)

19   (finding triable issues on coercion where there was evidence that, among other things, only 14

20   percent of relevant purchasers bought the tied products separately, and a competitor's prices for

21   the tied product were lower than defendant's, indicating that "a rational customer would not

22   purchase [defendant's] allegedly overpriced product in the absence of a tie").

23           A bundled discount does not necessarily equal an illegal tying arrangement. *See id.* at 914-

24   15, 915 n.27; *see also Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d

---

[16] Quest does not dispute that this could be a meritorious theory of coercion if properly alleged. *See* Reply at 9 (Dkt. No. 73) ("It is not enough to allege that there is some discount on Product A that is only available with the purchase of Product B . . . A plaintiff . . . must allege that the discount on Product A is so dramatic (or that the non-discounted price is so punitive) that the only economically viable option is for a plaintiff to purchase both Products A and B.").

1403, 1407 (9th Cir. 1984). Accordingly, merely alleging the existence of a discount on capitated testing for those medical providers who also refer their fee-for-service testing to Quest, without also stating facts indicating how this discount "le[aves] [medical providers] with no rational economic choice" but to commit to Quest for both capitated and fee-for-service testing, *Cascade Health*, 515 F.3d at 915 n.27, does not plausibly establish coercion.[17] Quest's motion to dismiss plaintiffs' tying cause of action is GRANTED.

### III. UCL CLAIMS

Plaintiffs allege that Quest has violated the "unlawful" and "unfair" prongs of the UCL. *See* FAC ¶¶ 199-205. These claims are derivative of the Sherman Act and Cartwright Act claims discussed above, and plaintiffs make no arguments specific to them in their opposition brief. They will also be dismissed.

### CONCLUSION

Despite the benefit of a prior related case bringing substantially similar claims against Quest, three opportunities to flesh out their claims, and two dismissal orders pointing out the deficiencies in their complaints, plaintiffs have been unable to state a plausible claim for relief, and have persisted in accusing Quest of the same basic misconduct without meaningfully adding to the facts stated in support. There is no indication that another chance to amend would yield a different result. Accordingly, and for the reasons discussed above and in my prior orders in this case, Quest's motion to dismiss the SAC is GRANTED, and plaintiffs' claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED**.

Dated: April 26, 2016

_____
WILLIAM H. ORRICK
United States District Judge

---

[17] In addition, as noted above with respect to plaintiffs' exclusive dealing theory, plaintiffs do not make clear the extent to which any medical providers have actually entered capitated agreements with Quest under which they also agree, either explicitly or implicitly, to refer to Quest some or all of their fee-for-service testing. To the extent that plaintiffs have not plausibly alleged that such agreements exist, their tying claims are further deficient.